# Exhibit 1

1                    REPORTER'S RECORD

2                   VOLUME 1 OF 1 VOLUME

3                COURT CAUSE NO. 2011-67305

4   FEDERAL DEPOSIT INSURANCE        )IN THE DISTRICT COURT
    CORPORATION AS RECEIVER          )
5   FOR FRANKLIN BANK, S.S.B.        )
                    Plaintiff,       )
6                                    )
    VS.                              )HARRIS COUNTY, TEXAS
7                                    )
    MORGAN STANLEY & COMPANY, LLC,)
8   f/k/a MORGAN STANLEY & CO.INC.)
                    Defendant.   )151ST JUDICIAL DISTRICT

9

10

11

12

13   *************************************

14            MOTION IN LIMINE

15   *************************************

16

17

18

19            On the 1st day of June, 2015, the

20   following proceedings came on to be heard in the

21   above-entitled and numbered cause before the Honorable

22   Mike Engelhart, Judge Presiding, held in Houston,

23   Harris County, Texas.

24            Proceedings reported by computer-aided

25   transcription/stenograph machine.

```
 1               A P P E A R A N C E S

 2   Mr. David J. Grais
     dgrais@graisellsworth.com
 3   Mr. Mark B. Holton
     GRAIS & ELLSWORTH LLP
 4   (admitted pro hac vice)
     1211 A venue of Americas
 5   New York, New York 10036
     Telephone: (212) 755-0100
 6   Facsimile: (212) 755-0052
     COUNSEL FOR PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION
 7
     Mr. R. Paul Yetter
 8   State Bar No. 22154200
     pyetter@yettercoleman.com
 9   Mr. Bryce 'Bryce' Lee Callahan
     State Bar No. 24055248
10   mtabolsky@yettercoleman.com
     YETTER COLEMAN LLP
11   909 Fannin Street, Suite 3600
     Houston, Texas 77010
12   Telephone: (713) 632-8000
     Facsimile: (713) 632-8002
13   COUNSEL FOR PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION

14            - AND -
     Ms. Dana M. Seshens
15   dana.seshens@davispolk.com
     Mr. Brian M. Burnovski
16   (admitted pro hac vice)
     Ms. Julia Kiechel
17   DAVIS POLK & WARDWELL LLP
     450 Lexington Ave
18   New York, New York 10017
     Telephone:  (212) 450-4855
19   Telecopier: (212) 450-4875
     COUNSEL  FOR  DEFENDANT  MORGAN  STANLEY  &  COMPANY LLC
20
     Ms. Lauren Miller Etlinger          Mr. Rodney Acker
21   Texas Bar No. 24065755              Texas Bar No. 00830700
     letlinger@fulbright.com             Racker@fulbright.com
22   NORTON ROSE FULBRIGHT US LLP        FULBRIGHT&JAWORSKI LLP
     1301 McKinney Street, #5100         2200 Ross Ave, #2800
23   Houston, Texas 77010               Dallas, Texas 75201
     Telephone:  (713) 651-5151          Tel: (214) 855-8000
24   Telecopier: (713) 651-5246          Fax: (214) 855-8200
     COUNSEL FOR DEFENDANT MORGAN STANLEY & COMPANY LLC

25
```

1                    VOLUME  1  OF  1  VOLUME

2                     MOTION  IN  LIMINE

3                   CHRONOLOGICAL  INDEX

4     JUNE  1,  2015                          PAGE

5     Appearances . . . . . . . . . . . . . . . . 2

6     Chronological Index . . . . . . . . . . . . 3

7     Proceedings . . . . . . . . . . . . . . . . 4

8     Court's Ruling . . . . . . . . . . . 30,109

9     Recessed . . . . . . . . . . . . . . . . 112

10    Court Reporter's Certificate . . . . . . . 113

11    Word Index . . . . . . . . . . . . . . . . 114

12               (No exhibits in this volume)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S
 2    06/01/2015    (Open court)
 3              MR. GRAIS:  Your Honor,  with the Court's
 4    permission, I would  like to address two of the motions
 5    together:  The  motion addressed to Franklin's specific
 6    knowledge  and  the  motion  addressed  to  the
 7    admissibility of newspaper articles  and complaints
 8    against third parties.  Because  Morgan Stanley's
 9    position  on these  two motions rests on three
10    fundamental  misconception s  of  law that are  common  to
11    its opposition  of both motions.
12              The  first is Morgan Stanley 's overly
13    broad concept of materiality.  Morgan Stanley   argues
14    that, although supposedly  objective  standard, there is
15    a different  standard of  materiality  for different
16    types of  Plaintiffs -- sophisticated   plaintiffs,
17    unsophisticated  plaintiffs, plaintiffs   in  the  real
18    estate  business  and  others .
19              For  this proposition, Morgan Stanley
20    cites  only  the  report  of its  own  expert  Dr. Richards
21    (sic).  But, in fact, the  standard of materiality is
22    not only objective , it's also unitary.  There is  a
23    single standard of materiality for all Plaintiffs, and
24    it's not  hard  to  imagine  how  chaotic  it  would  be  for
25    Defendants  to  understand  the  scope  of  their  duties,  as
```

1     well as for the courts to administer securities

2     litigation if the standard materiality varied by

3     Plaintiff.

4              So whatever characteristics of Franklin

5     Morgan Stanley thinks are material to the standard

6     materiality can't be because the standard is both

7     objective and unitary.

8              The second fallacy in Morgan Stanley's

9     view of materiality is that it's somehow necessary to

10    know everything about a total mix of information in

11    order to decide whether an untrue or misleading

12    statement changed the mix of information.  Again, from

13    a practical standpoint, if it were the case that

14    courts had to ascertain the total mix of information,

15    securities trials would never end.  And there -- on

16    the contrary, there should be some showing about why

17    the untrue or misleading statements would have changed

18    the mix of information in light of the particular

19    information that Morgan Stanley is offering.  To say

20    that all the information that was known to Franklin or

21    was available immediately about the mortgage market is

22    not necessary to define whether statements about

23    credit metrics of these loans changed that mix of

24    information.

25              And the third problem with Morgan

1    Stanley's view of the materiality -- and I'll come

2    back to this again in the  knowledge defense, Your

3    Honor -- is that  it imports a surreptitious  reliance

4    defense into the  statute, which the  legislature has

5    explicitly excluded.

6              Exception for the defenses of knowledge

7    on the statute of limitations, both  of which I'll come

8    to you, nothing  about the  identity  of the  individual

9    Plaintiff have  anything  to do with  the  claim  under

10   either the Texas Securities Act  or Sections  11 and 12

11   of the 1933 Act.

12             By introducing  this  information  about

13   Franklin  in particular,  or sophisticated  investors  in

14   general,  there is  a great  risk  that Morgan  Stanley

15   will mislead  the  jury  into  thinking  that the

16   sophistication  of the  buyer  has anything  to do with

17   the merits  of the Plaintiff's  claim.  Or even  worse,

18   into thinking  that because  of the  sophistication  of

19   the buyer, it  somehow  had a duty  to investigate  the

20   securities  beyond  reading  Morgan  Stanley 's disclosure

21   about them.  And that is  specifically  not a law under

22   both the Texas  and Federal  statute s.

23                  THE COURT:   Okay.  Continue .

24                  MR. GRAIS:   Secondly , Your Honor, there

25   is a common  error  in  Morgan  Stanley 's position  which

1       rests upon its misinterpretation of the   Merck case.

2                   THE COURT:  Of the?

3                   MR. GRAIS:  Merck, M-e-r-c-k,  in the

4       Supreme Court.  We argued  the Merck case before, Your

5       Honor, in the  initial motions for summary judgment .

6       And it's clear that under the discovery of the

7       elements of the claim standard of Merck , that mere

8       publication of a newspaper article  or the filing of a

9       complaint is irrelevant .  Because unless it's admitted

10      for the truth of the matter stated therein, which of

11      course it can't be, the mere fact of publication has

12      nothing to do with when the Plaintiff was able to

13      discover all of the elements of its claim.

14                  Morgan Stanley  seems tacitly to  admit

15      that because  it says that somehow or another Merck

16      preserved the  role for inquiry notice, the  former

17      standard that it relies on.  And in particular  in Page

18      7 of its brief in opposition to our motion s, makes the

19      statement that the trier of fact must identify the

20      time at which there was  storm warnings, as well as the

21      time at which the Plaintiff  actually discovered the

22      elements of its claim.

23                  But Merck says nothing like that , Your

24      Honor.  What Merck says is that under certain

25      circumstances it may be useful to determine when

1  inquiry notice took place but only under limited
2  circumstances.  And apparently, what the Supreme Court
3  had in mind was when a nondiligent Plaintiff argues
4  that it couldn't have begun to investigate sooner.
5           Publications and other material not
6  accepted -- not offered for the truth of the matter
7  stated therein may be relevant to when it could have
8  begun such an investigation.  But there is no
9  remaining role for storm warnings or inquiry notice
10 after Merck.
11          And the idea that all of the newspaper
12 articles and complaints against third parties are
13 somehow irrelevant irrespective of the truth of the
14 matter stated therein can't survive Merck as properly
15 interpreted.  There simply is no continuing role for
16 inquiry notice.
17          And lastly, Your Honor, the third
18 pervading error, if you will, is Morgan Stanley's
19 misconstruction of the knowledge defense.  The Texas
20 statute specifically provides that the defense is that
21 the buyer was aware of such untruth or omission.  That
22 is, unaware -- or aware of the falsity of the specific
23 untrue or misleading statements.  That view was, of
24 course, adopted also by Judge Cote  in the FHFA case.
25          The purpose of this defense is what

```
1    might be called no harm, no foul.  If the buyer
2    already knew that the statement was false, then the
3    law has no interest in protecting the buyer because it
4    was already aware of the falsity of the statements.
5                But what Morgan Stanley tries to do by
6    offering, particularly, knowledge of Franklin as its
7    sophisticated investor, is began surreptitiously to
8    introduce a due diligence defense or a requirement of
9    due diligence or a requirement to show reasonable
10   reliance.
11               The knowledge requirement, Your Honor,
12   was never intended to do that.  It was intended only
13   to negate the untrue or misleading statements.
14   Specifically not to argue that the Plaintiff or the
15   buyer should have known or could have known or had
16   investigated further would have known, because then
17   the knowledge defense as Morgan Stanley construes it
18   slips immediately into requirements on the Plaintiff
19   that the legislature specifically didn't provide.
20               Thank you, Your Honor.
21               THE COURT:  I'm sorry.  Can you
22   elaborate on the part about it was not -- you said it
23   was not intended -- one moment.
24               (Pause)
25               THE COURT:  You lost me on the part that
```

1   it was intended to negate the untrue or misleading

2   statements.  It wasn't intended to do the other.  I'm

3   missing the nuance there.  Can you restate that?

4                    MR. GRAIS:  Of course, Your Honor.  The

5   knowledge defense is limited to knowledge of a

6   specific -- the untruth or misleading nature of the

7   specific statements that the --

8                    THE COURT:  Okay.  In other words, the

9   actionable statements themselves as opposed to greater

10  knowledge of the market and the -- things like that?

11                   MR. GRAIS:  Exactly, Your Honor.

12                   THE COURT:  Okay.  All right.  So that

13  is the two motions in limine, the knowledge and the

14  newspaper articles, et cetera.

15                   MR. GRAIS:  Just a brief word about

16  Dr. James in hindsight.  Dr. James was designated as a

17  witness on negative causation for which his hindsight

18  studies may be pertinent.  But the law is clear that

19  materiality is determined at the time of the

20  investment.  In this case, well before Dr. James's

21  study and that nothing that happens after the

22  investment is made is pertinent to whether or not the

23  untrue or misleading statements were material when

24  they were made.

25                   What Morgan Stanley says is that in

1    stock-drop cases it's sometimes done to analyze what

2    the market did when the true information was disclosed

3    and therefore the untrue or misleading statement

4    corrected.  But as we express in our brief, Your

5    Honor, that is not this case.

6              First of all, the truth has not been

7    disclosed.  Secondly, there is not the same liquid and

8    efficient market that there is in stocks.  As the

9    Court is aware, the stock exchanges trade tens of

10   millions of shares in most stocks daily.

11   Mortgage-backed securities are traded

12   over-the-counter; episodically  prices are not

13   systematically reported.  And so the sort of  event

14   study that may be customary in stock-drop cases  in

15   efficient markets just has nothing at all to do with

16   the determination of materiality  in this completely

17   different kind of security.

18             Materiality as Morgan Stanley and other

19   Defendants argue in many other contexts is not

20   determined by hindsight.  It has to be determined as

21   of the time when the  investor had to evaluate the

22   statement.

23             THE COURT:  How would it work in a

24   stock-drop case, what  would be an example or

25   circumstance where the subsequent -- when the

1    information -- the  true  information  was  disclosed  and

2    then  the  true  or  misleading  statement  corrected, what

3    kind  of  circumstance  would  that  be?

4              MR. GRAIS:   If  the  misleading  statement

5    were  corrected  two  weeks  later  and  the  stock  went

6    down,  the  materiality  of  the  statement  is  evidenced by

7    the  fact  that  when  the  truth  became  known,  the  price

8    of  the  stock  reacted.

9              On  the  other  hand,  when  the  truth  became

10   known,  investors  didn't  think  it  was  important  enough

11   to  bid  the  price  of  the  stock  down,  then  the  inference

12   is  that  it  wasn't  material.   But  again,  that  makes

13   sense  only  in  a  highly  liquid,  highly  efficient

14   market.   And  it  makes  sense  only  when  the  disclosure

15   comes  a  very  short  time  after  the  allegedly  untrue  or

16   misleading  statement.

17              Here,  years  have  gone  by.  And  to  look

18   back  as  Dr. James  did  is  something  quite  different

19   from  testing  the  reaction  of  the  public  markets  days

20   or  weeks  between  an  untrue  or  misleading  statement  and

21   a  corrected  disclosure.

22              THE  COURT:   But  he  is  looking  in

23   hindsight?  Or  is  he  actually  writing  a  report  that

24   talks  about  what  the  -- putting  himself  back  in  time

25   and  looking  forward?

1          MR. GRAIS:  No, not at all, Your Honor.

2    He's taking the performance of loans and tracing them

3    through the years after these securitization s closed

4    to see how they performed, which is obvious ly nothing

5    that could be envision ed at the time of the purchase

6    and sale of the securities .  It's strict ly by

7    hindsight , Your Honor.

8          It's as if the Plaintiff were to say

9    these loans went into default some months or years

10   after the closing of the securitization and then

11   asking the jury to infer from that that the statements

12   about them were untrue or mislead ing.  The purpose of

13   the statute is to provide sort of a snapshot in time,

14   if you will , Your Honor.  Materiality is determined as

15   of the time that snapshot is taken.  And subsequent

16   events, with the exception of the corrected disclosure

17   in the efficient market, really have no bearing on

18   what an investor knew at the time it had to make its

19   investment decision .

20          THE COURT:  Okay.  Response .

21          MS. SESHENS:  Is this on?

22          THE COURT:  No.

23          MS. SESHENS:  Your Honor, do you have a

24   preference as to which I address first?

25          THE COURT:  Perhaps go in the same

```
 1    order.
 2                 MS. SESHENS:   Sure.  So turning back to
 3    the FDIC's motions concerning evidence of knowledge
 4    and the articles and the complaints, I'll  address that
 5    first.  And then  turn to the motion concerning
 6    Dr. James and his materiality opinion.
 7                 I think contrary to the FDIC's position,
 8    Morgan Stanley is not taking an overly broad view of
 9    materiality.  In fact, we recognize and it is in our
10    papers and I think the parties agree that the standard
11    for materiality is an objective one.
12                 A material or omitted fact -- a
13    misstatement or omitted fact, rather, is material if
14    there is a substantial likelihood that the disclosure
15    of the misstated or omitted information would have
16    been viewed by the reasonable investor as having
17    significantly altered the total mix of information
18    made available.  That is the standard, and I believe
19    the parties all agree.
20                 What comprises that total mix of
21    information is in part where the parties disagree.
22    And we've cited several cases in our brief, including
23    the Kapps case, a Fifth Circuit Section 11 decision
24    that the FDIC does not address in its reply, where the
25    Court looked to publicly available information as part
```

1    of the total mix to render a disclosure immaterial as

2    a matter of law.  And it is that kind of publicly

3    available information that Morgan Stanley contends is

4    relevant to the materiality determination.

5              Similarly we've cited cases that talk

6    about information known to the Plaintiff as being

7    relevant to the total mix.  The standard for

8    materiality does seek to look at materiality from the

9    perspective of the reasonable hypothetical investor,

10   but that reasonable hypothetical investor has to be

11   similar to or standing in the Plaintiff's shoes.

12             So, for example, you can't have a

13   reasonable investor in an RMBS case who is completely

14   unfamiliar with the mortgage markets or who doesn't

15   understand RMBS.  That was not the market for

16   residential mortgage-backed securities.  These were

17   not, general ly speaking, re tail investors .  There's a

18   profile that comprises the reasonable hypothetical

19   RMBS investor, and it is Morgan Stanley 's contention

20   that that investor is just like Franklin Bank.

21             And, in fact, Morgan Stanley 's

22   materiality expert Mr. Richard  has offered his

23   opinions, as has the FDIC's materiality expert, about

24   what was important to residential mortgage-backed

25   securities investors .  And they talk about different

1    characteristics of the securities, different
2    information that is available to them.
3              And Mr. Richard opines that Franklin
4    Bank is just like the reasonable hypothetical
5    mortgage-backed securities investor.  The FDIC has not
6    sought to exclude that opinion.  And evidence about
7    what Franklin Bank knew and the total mix of
8    information is relevant to that.
9              Similarly, the FDIC doesn't cite any
10   decisions to the contrary.  They noted in their brief
11   and Mr. Grais mentioned the FHFA case.  The
12   materiality decisions there were actually quite
13   different.  And there, there were opinions and
14   information about materiality that went to the
15   idiosyncratic nature of the Plaintiff in that case.
16   The Plaintiffs, I should say, which were Fannie Mae
17   and Freddie Mac, referred to as the GSEs generally;
18   and they had an idiosyncratic whole loan business.
19             Whereas here, the opinions and the
20   evidence show that Franklin Bank had a very typical
21   whole loan business.  And, in fact, Franklin Bank
22   originated, sold and purchased the exact same type of
23   loan that backs these securities that are at issue.
24             And so we contend, Your Honor, that
25   under the standard of materiality as the parties agree

1    to it, information that is  publicly  available  that is

2    part of the  total  mix  that is  known  to  Franklin  Bank

3    compromises  the  total  mix  of  information  that's

4    relevant  to  the  materiality  determination  as  seen  from

5    the  perspective  of  a  reasonable  RMBS  investor  standing

6    in  the  shoes  of  Franklin  Bank .  It is  also --

7                    THE  COURT:   So  you're  arguing  their

8    knowledge  --  so  you're  going  --  so  help  me  state  this

9    correctly.   Where  FDIC  is  saying  that  the  materiality

10   is  only  related  to  the  representation s  related  to  the

11   actionable  investment  decision ,  you're  saying  that

12   materiality  goes  beyond  that  to  the,  which  is  what

13   they're  concerned  about  in  a  roundabout  way,  talking

14   about  the  more  broadly  Franklin  Bank 's  knowledge  of

15   the  industry  or  the  market  itself.

16                    MS.  SESHENS:   We  do  think  that's

17   relevant,  Your  Honor,  to  demonstrate  what   a  reasonable

18   investor  in  Franklin  Bank 's  shoes  would  have   known  and

19   understood.   We  do  agree  with  the  FDIC  that

20   materiality  is  an  objective  standard  and  that  it  is

21   assessed  f rom  the  position  of  a  reasonable   RMBS

22   investor .

23                    We  do  think  that  information  in  the

24   public  domain  compromises  the  total  mix  of  information

25   available  to  reasonable  RMBS  investors,  and  that

```
1    certain characteristics of Franklin Bank are
2    reflective of and similar to the characteristics of a
3    reasonable RMBS investor in part as opined upon by our
4    materiality expert.
5                    THE COURT:  That's nice, but what you're
6    really trying to do is use that opening to drive a
7    truck through to show all the things that they're
8    concerned about you showing.
9                    MS. SESHENS:  Well, respectfully, Your
10   Honor, we're not intending to do that.  I take a bit
11   of umbrage with the notion that there's going to be
12   some reliance defense here when there will be a jury
13   charge that has nothing to do with reliance and
14   there's not going to be discussion of reliance and
15   it's not an element of a claim and it's not an element
16   of a defense.  So it's --
17                    THE COURT:  Please slow down.
18                    MS. SESHENS:  I apologize, Your Honor.
19                    THE COURT:  It's okay.
20                    MS. SESHENS:  So it's unclear to us how
21   the jury is somehow going to think that reliance is at
22   issue here.  We do think that the evidence that is at
23   issue in these two motions is relevant to various
24   components of the case, but materiality is clearly one
25   of them.  We do think it is appropriate under the law
```

1    to consider that information; but there are other

2    avenues, obvious ly, that we think it's relevant to as

3    well.

4                    THE COURT:   Like what?

5                    MS. SESHENS:   So as we've put forth,

6    Your Honor, evidence of what Franklin Bank knew and

7    evidence of what Franklin Bank should have known based

8    on, for example, the articles and the complaints that

9    the FDIC challenges are relevant both to Morgan

10   Stanley's knowledge defense, as well as to Morgan

11   Stanley's burden to rebut the FDIC's showing of lack

12   of knowledge under Section 12.

13                   THE COURT:   I'm sorry.   That was a

14   triple negative.   Can you say that --

15                   MS. SESHENS:   Yes, of course.   So under

16   Section 11, Morgan Stanley has a knowledge defense

17   where if it can show that Franklin Bank knew of the

18   alleged misstatements and omissions , there can be no

19   liability.

20                   THE COURT:   Right.

21                   MS. SESHENS:   Under Section 12, it is

22   the Plaintiff's burden to show that the Plaintiff did

23   not know of the alleged misstatements and omission s.

24   And it is then Morgan Stanley 's opportunity to rebut

25   that showing if the Plaintiff is able to make it.

1    That's just a difference in the burdens under the two

2    Federal statutes.

3              So we think that the knowledge evidence

4    and the -- well, the knowledge evidence is obviously

5    directly relevant, we contend, to the knowledge

6    defense.  The knowledge evidence, as well as the

7    newspaper articles and complaints --

8              THE COURT:  What is the nature of that

9    knowledge -- what is the knowledge -- is it a

10   knowledge of the falsity of those specific

11   representations, no, or omissions?

12             MS. SESHENS:  That is what the FDIC

13   contends.  We do not think that it's drawn that

14   tightly.  We do think that the general knowledge is

15   relevant, that the knowledge of the misstatements and

16   omissions can be shown through the evidence that we've

17   put forward.  It is more circumstantial, but we don't

18   think it's drawn as tightly as the FDIC.

19             And we also, Your Honor, believe that

20   that evidence is relevant to our statute of

21   limitations defense.  I can pause for a moment if Your

22   Honor has further questions on knowledge.

23             THE COURT:  Yeah, please pause for just

24   a moment.

25             MS. SESHENS:  Sure.

1        (Pause)

2              THE COURT:  So can you give me -- I'll

3   ask you first, Ms. Seshens, and then  Mr. Grais.  As  a

4   practical matter, what  would your  two -- I'm trying to

5   grasp  the  practical  difference s  between  the  two

6   standards  of  knowledge  that  you're  talking  about  as  it

7   relates  to  this  motion  in  limine  where  you're

8   saying -- where the  Plaintiff  is saying that  the  only

9   knowledge  that's  important -- that's  material  is  their

10  knowledge  about  the  specific  representation s  that  are

11  actionable  here, as  opposed  to  where  you're  saying

12  that  it's  more  broad  than  that  and  a  total  mix  of

13  information  that  touches  on  at  least  in  part  the

14  market .

15              I  know  I'm  not  phrasing  that  accurate ly

16  or  precise ly.   But  when  we  talk  about  Franklin  Bank's

17  knowledge  about  the  representation s, it's  easy  to --

18  that's  easy  to  say.   But  as  a  practical  matter,  what

19  does  that  really  look  like  on  the  ground  in  real  time?

20              In  other  words , if  you're  telling  me  the

21  sky  is  blue -- which  there's  laws  about  that.   If

22  you're  telling  me  that  the  sky  is  blue  and  I  have

23  access  to -- I'm  not  going  to  be  able  to  do  this

24  proper ly.

25              I  can't  imagine  that  it  is  so

1   laser-focused to be able to say that the evidence that

2   relates to their knowledge about these representation s

3   is in this tiny little cylinder and you can look down

4   in it and it's straight as an arrow. There's going to

5   be real-world knowledge that the actual human beings

6   at Franklin Bank had at the time  that these

7   representation s were made.

8               Or are you saying , Mr. Grais , that the

9   only material knowledge is their knowledge of the

10  characteristics of these specific investment vehicles

11  that were being offered to them at that time ?  Or is

12  it more broad than that?  And if it is , how is that

13  practically different than what Morgan Stanley 's

14  arguing?

15              MR. GRAIS:  It's the former , Your Honor.

16  It's specifically it's knowledge of the fact that

17  Morgan Stanley misstated the characteristics of these

18  investment vehicles, these particular investment

19  vehicles .  And the Texas statute makes that clear by

20  saying that the knowledge defense applies if the buyer

21  knew that such untrue or misleading statements, if you

22  already knew this , such statements were untrue or

23  mislead ing.  So the focus of the statute is on the

24  untruth of the specific statements that the Defendant

25  made while selling the securities .

1              A related point, Your Honor, is that
2      there is no concept of should have known in the
3      knowledge defense.  In the statute of limitations
4      defense there is, of course, the  standard of when the
5      Plaintiff discovered or should in the exercise of
6      diligence have discovered, there is no such concept in
7      the knowledge defense.  It is purely a question of
8      actual knowledge.
9              To import a should-have-known
10     requirement is then to import a requirement of due
11     diligence investigation on the part of the investor,
12     which both the legislature and Congress expressly
13     omitted.
14             THE COURT:  And you're saying that's
15     under Texas law but in a Federal claims that are in
16     this case?  (Sic)
17             MR. GRAIS:  The same is true, Your
18     Honor.  The knowledge requirement focuses on the
19     untrue or misleading statements specifically.  In
20     neither case is there a component of should have
21     known.
22             THE COURT:  Okay.  So let me ask my
23     question one more time, then.  I appreciate what
24     you've said and that gives me better understanding of
25     your view of the requirement.  But what is -- again,

1    what does that look like, how does someone in the

2    position of authority at Franklin Bank to make these

3    decisions know about the truth or falsity of these

4    representations?

5              MR. GRAIS:  Well, our view is that it

6    wasn't possible because Morgan Stanley didn't disclose

7    information from which it could be told.  And they

8    didn't know.  I suppose had Morgan Stanley taken a

9    different course and made the loan files available for

10   inspection, for example, and had a hypothetical

11   investor inspected the loan files, that perhaps could

12   have conveyed knowledge that Morgan Stanley  made

13   untrue and misleading statements about the  loans.  But

14   that's not what happened here.

15             THE COURT:  All right.  Could you try to

16   go back and respond to the question that I asked a

17   moment ago?

18             MS. SESHENS:  Yes, absolutely, Your

19   Honor.  If I don't address it, please let me know.  I

20   think what Your Honor is driving at is how will this

21   play out at the trial, what kind of evidence are we

22   talking about.  I think -- I don't want  to speak for

23   the FDIC, but I understand their position.

24             It would have to be evidence that

25   Franklin Bank knew that the specific loans in the

1    specific supporting loan groups were not as they were

2    reported to be.  I think our position has been

3    Franklin Bank had knowledge about originators of these

4    loans, knew about, for example, rampant

5    owner-occupancy fraud and amongst themselves remarked

6    that they couldn't believe that everybody out in the

7    world was now learning what Franklin Bank had known

8    for a while, which is that owner-occupancy fraud was

9    prevalent and there are owner-occupancy allegations in

10   this case.

11             And so we would contend that knowledge

12   of widespread owner-occupancy fraud is knowledge

13   related to the alleged misrepresentations here.  So

14   that's one particular example.

15             There are similar examples with

16   appraisal fraud, as well.  There is evidence of

17   knowledge of appraisal fraud in the industry.  And so

18   that, from our perspective, is probative of Franklin

19   Bank's knowledge of the alleged misstatements here

20   concerning inflated appraisals.  Those are just two

21   examples.  I'm happy to provide some others.

22             THE COURT:  So would you address those

23   examples, then.  So what counsel is saying -- and I'm

24   not telling you anything you don't know, but what

25   counsel is saying is that there is some amount of

1    experience and knowledge of the universe of these RMBS

2    securities -- or that's redundant -- RMB securities

3    that an investor would probably -- let's say they had

4    actual knowledge.

5            Let's just say for argument sake they

6    had actual knowledge of these concerns in the

7    industry. Would that be relevant to this knowledge

8    defense, or not at all? It's only the narrow rightful

9    shot of what was told and what was not told?

10           MR. GRAIS:   Exactly, Your Honor.   It's

11   as though someone were told, as Ms. Seshens posits,

12   there's a lot of occupancy fraud going on out there.

13   And from that, Ms. Seshens would ask the Court and

14   jury to infer that the Plaintiff knew that Morgan

15   Stanley had made misstatements about the specific

16   loans in its transaction on which vehicle one of its

17   fellow underwriters was doing due diligence.

18           It's important to remember, Your Honor,

19   of course, that underwriters vet these loans and make

20   filings with the SEC about them.   What does not

21   suffice is that a diligent investor would have found

22   reason to investigate or anything like that.   The only

23   relevant point is whether or not the investor knew

24   that those specific statements were untrue.

25           THE COURT:   And that's the Merck case?

1    Or is that a different -- what's the best case for

2    that?

3                    MR. GRAIS:   Well, the best case, Your

4    Honor, is -- one is Judge Cote's opinion in the FHFA

5    case, which is cited in our brief.   And the other is

6    just the plain language of the Texas statute, which

7    limits the knowledge defense to knowledge or the

8    falsity of such untrue or misleading statement, the

9    specific one.

10                   THE COURT:   All right.   I'll give you

11   the last word, real briefly.

12                   MS. SESHENS:   Sure, Your Honor, if I

13   may.   Two quick points.   I think one is Mr. Grais  has

14   been injecting this should-have-known standard as

15   we've been talking about the knowledge defense.   That

16   relates to the statute of limitations defense.

17                   THE COURT:   I wasn't confused about

18   that.

19                   MS. SESHENS:   Okay.  So we're talking

20   knowledge, we agree and understand we're talking about

21   actual knowledge.   The statute of limitations defense

22   is different.   I just want to touch upon that briefly.

23                   The FDIC has repeatedly contended that

24   inquiry notice, storm warnings, information about

25   Franklin Bank, quote, unquote, should have  known is

```
 1    entirely irrelevant  under Merck.  And we have trouble

 2    understanding how that position is tenable given that

 3    Merck itself, for example, looked  at pleading s in the

 4    public domain to determine the timeliness of the

 5    claims.  That's in the Supreme Court case itself .

 6    Pension Trust, a  Third Circuit decision we cite in our

 7    papers, in fact, applied  Merck but applied inquiry

 8    notice within its analysis.

 9            And, in fact, Judge Cote, who  Mr. Grais

10    just cited for the Nomura -- the FHFA/Nomura decision  ,

11    also relied upon  the inquiry notice standard in  her

12    Merck analysis.  And so  to contend that inquiry notice

13    or what Franklin Bank  should have known is ir relevant,

14    even if Merck were to apply.  And it is obvious ly our

15    position that it does not.  It finds  no support, from

16    our perspective, in the  law; and we think that it is

17    just wrong.

18            As a result , the motion that is directed

19    to the complaints and the newspaper articles  we think

20    should be  denied both because those are relevant, as

21    we've discussed, but  because they also are not hearsay

22    because they're not being offered for the truth of the

23    matter asserted therein .

24            THE COURT:  They're not being offered

25    for the truth of the matter asserted therein; they
```

1    were being offered  to show when they  should  have been

2    on inquiry  notice?

3                    MS. SESHENS:   To show the fact that they

4    were -- exactly, their  existence  in the  market  and to

5    show when they should  have  been  on inquiry  notice.

6                    THE COURT:   Of course  the fact -- what

7    would have tipped  them off would be  the  truth  of the

8    matter  asserted , no?

9                    MS. SESHENS:   Well, not  necessarily .

10   You could  have an  article  that relayed  lots of

11   information  that caused  you to question  your

12   investment, but  it's not  necessarily  the  case that the

13   information  had to be  accurate .  It could  have  just

14   caused  you to question  it.

15                    Our position  is that  the information

16   that is  in the public  domain  is sufficient  to put  an

17   investor, Franklin Bank  in this case , on notice.  And

18   the cases  are legion  that  say that you  can  rely  on

19   complaints  and articles  in order  to do  that.

20                    THE COURT:   It sounds  like  what you've

21   been  talking about  in this  last  little  bit, maybe  I

22   missed  it, is  just the statute  of limitations  issue.

23                    MS. SESHENS:   That's correct .  The

24   articles  and complaints  we think  relate  both  to

25   materiality  as part  of the  total  mix  of  information  as

1    we talked about and also the statute of limitations

2    defense.

3                    And I'm also happy to address Dr. James,

4    Your Honor, whenever you would like me to do so.

5                         COURT'S RULING

6                    THE COURT:  Before we get to the expert,

7    I'm going to rule that -- I'm going to grant the

8    motion in limine as to materiality and deny it as to

9    statute of limitations.  And so we may need to create

10   some sort of instruction for the jury as to the

11   purpose for which they may consider that information.

12                   MR. GRAIS:  Thank you, Your Honor.

13                   THE COURT:  All right.  And the expert,

14   Ms. Seshens?

15                   MS. SESHENS:  Certainly, Your Honor.

16   The FDIC, as they've stated, challenges Dr. James's

17   opinion as being an improper hindsight analysis of

18   what was important to an investor, a hypothetical

19   reasonable investor at the time of investment.  We

20   don't dispute that materiality is assessed as of the

21   time of investment.  But just because that is the

22   case, it does not proscribe any number of different

23   analyses to demonstrate that.

24                   In many ways the materiality experts

25   here are all looking backward in time, but there's no

```
 1    one way to show materiality.  We've shown through the
 2    cases we've cited that it is commonplace in the
 3    securities cases to look at information after the fact
 4    to assess materiality.  The standard that applies in
 5    those cases is no different than what applies here.
 6    It's the same materiality standard.  And the rationale
 7    for why courts in, for example, Section 10(b) cases
 8    look at materiality by focusing on stock price
 9    movement is because the theory is information that is
10    important to investors moves stock prices.
11               Dr. James has applied the same theory
12    here in an empirical way, which is information that is
13    important to reasonable RMBS investors in past
14    performance.  He's just showing it -- he's an
15    economist -- from an empirical perspective.
16               Mr. Richard and Ms. Rutledge, the two
17    materiality experts in this case, are offering their
18    materiality opinions based upon their experience in
19    the market.
20               Dr. James is simply showing from an
21    empirical perspective how these factors would have
22    been or would not have been important to a reasonable
23    hypothetical investor.
24               Ms. Rutledge, for example, could have
25    conducted the same study.  And had her study shown
```

that these characteristics that are allegedly misstated impacted loan performance, the FDIC could have relied on that analysis to show materiality. I imagine if that study would have borne that out, we wouldn't have had this motion here today.

Now, the cases actually support various ways to prove materiality. Event studies are only one of them. For example, a company can restate its financial information. And that can render -- and restatements generally arise out of material errors in the financial statements, let's say. But you can't determine if a prior misstatement was material based upon a restatement unless and until you have the restatement. And so you have to consider what has happened after the fact.

The Burlington case that the FDIC cites very prominently in its briefing talks about an event study, and it relies upon that to analyze a stock price drop. But then there's a section of the opinion that looks at an alleged omission -- allegedly omitted disclosure about discounts for supplies of coats. It's Burlington Coat Factory, I believe was the Plaintiff. And that the supplier wasn't giving as large a discount to Burlington for two particular months; and therefore, Burlington's costs were higher

```
 1    and its numbers were  not accurately reported.

 2             The Court deemed that immaterial by

 3    looking at the full-year cost of goods and saying

 4    within that context those two months are not material

 5    because the cost of goods didn't rise overall.  So the

 6    Court necessarily considered additional information

 7    after the alleged misstatement to determine the

 8    materiality.  It is just another way of looking at it.

 9    Particularly when the analysis is from the perspective

10    of a reasonable hypothetical investor.  What would

11    have been important to the investor.  You can show it

12    the way Ms. Rutledge tries to do it by talking about

13    her experience.

14             But you also can show it empirically by

15    looking at other factors and doing an economic

16    analysis and that's what Dr. James has done.  We think

17    there's tons of support for it in the case law.  The

18    FDIC has not challenged the underlying analyses; and

19    we therefore think it's appropriate in this case.

20             THE COURT:  And so what does it mean --

21    what does that mean in terms of how the study was

22    performed, to look at something  from hindsight versus,

23    as you say empirically -- in other words, can you --

24    what's the word I'm looking for?  Help me understand

25    the relationship between those two concepts, the idea
```

1    of hindsight and then empirically.  What  are you

2    really saying?

3                    MS. SESHENS:  Sure.  So what Dr. James

4    did was he took a look at the performance of the loans

5    that are in one group versus the performance of the

6    loans in other groups to see how allegedly defective

7    loans performed versus allegedly  nondefective  loans.

8    I'm sort of simplifying  for present purposes, but

9    that's the gist of what he did.  And the FDIC's

10   contention is that that's impermissible because loan

11   performance information wasn't  available to an

12   investor at the time of investment.

13                    THE COURT:  Okay.  That's right, the

14   word is "harmonized" is what I was trying to look for.

15   So therefore?

16                    MS. SESHENS:  So they're contending that

17   you can't do that, and we're saying it's entirely

18   appropriate.  People do it all the time in  securities

19   cases, as reflected in the stock-drop cases, as

20   reflected in the Burlington case, as reflected in

21   cases that look at restatements as evidence of

22   materiality.  That  because it's a reasonable

23   hypothetical investor, what would have been important.

24                    You can demonstrate that multiple ways.

25   You can show it by, as the FDIC is trying to through

1    Ms. Rutledge, who has  opinions about what was

2    important in  the investment process; but  you can  show

3    empirically on  the same theory that applies to the

4    stock-drop cases where the  same standard of

5    materiality applies as  it does across Section 10(b)

6    and across Section 11 and across Section 12 .

7                  So our position is that it is  just one

8    way of showing materiality  and there's nothing in the

9    materiality standard or in any of the case law that

10   precludes an expert from doing so.

11                  THE COURT:  But do you agree that what

12   Ms. Rutledge  is doing is looking at it at the time ,

13   whereas the empirical  analysis is in fact  using

14   hindsight?

15                  MS. SESHENS:  No, no, I don't, Your

16   Honor.  And  this is why.  I think Ms. Rutledge  is

17   necessarily looking back at the time from after the

18   fact with all of the  information she knows now and all

19   of the experience  she's had since then.

20                  She does  render her opinions, as  does

21   Mr. Richard , our materiality rebuttal expert, about

22   what was important to reasonable RMBS investors.  But

23   I don't think  that Dr. James is looking at it with

24   hindsight to be  sure he's using information that is

25   available -- that was  available after the time of

```
 1    investment --
 2                    THE COURT:   Only after the time of
 3    investment.
 4                    MS. SESHENS:   That is correct .  But he
 5    is doing that to demonstrate  what would have been
 6    important to a reasonable  investor  at that time
 7    because what would have been  important  to a reasonable
 8    investor  at that time  was information  that impacted
 9    loan performance .  It's the  same  theory  that under lies
10    looking at stock  price  movements  to demonstrate  the
11    materiality  of previously  disclosed  information .
12                    THE COURT:   Response.
13                    MR. GRAIS:   May I briefly, Your Honor?
14                    THE COURT:   Yeah.
15                    MR. GRAIS:   The gist of what  Dr. James
16    did is to use the fact that the  country  had the
17    greatest  recession  since the Great Depression.   To
18    obliterate  the materiality  of the misstatements   that
19    Morgan Stanley  just made, may I  just give Your Honor
20    an example?
21                    Many  investors  would say that if the
22    LTVs of the mortgage  loans  had an average  of 75
23    percent, that  would be  sufficient  to avoid def ault  on
24    their bond in all circumstances  of recession  that the
25    United States  had seen  in the  last 50 years.
```

```
 1                   If it had been 85 percent, they would
 2       say that would not give us enough protection.  So the
 3       difference between 75 and 85 percent when looked at
 4       without foreknowledge of the future is very important
 5       because in the context of the recessions that the
 6       United States have experienced up till then, that made
 7       a big difference in the safety of the bond.  Well,
 8       what happened is that along came the greatest
 9       recession and it overwhelmed both of those
10       protections.  And so even an LTV of 75, while
11       sufficient to protect the bond under normal
12       circumstances, proved to be insufficient to protect it
13       in these extreme circumstances.
14                   All Dr. James is doing is saying it
15       turned out that this was the greatest housing debacle
16       ever and loans all performed badly because the
17       differences in quality ceased to be important in the
18       face of the economic disaster, but nobody knew that
19       that was coming.
20                   And looking forward, investors analyzed
21       these loans and said, Given the circumstances that I
22       predict, the difference between 75 and 85 is very
23       important.  The fact that even 75 couldn't withstand
24       the great recession is pure hindsight and irrelevant
25       besides because really what Dr. James should have done
```

```
 1    is figured out how those loans would have performed
 2    under a variety of economic scenarios if he wanted to
 3    do a real post-facto analysis.
 4              That's why whatever Ms. Seshens may say
 5    about event studies in stock-drop cases, this
 6    post-facto view that because the recession loans
 7    performed poorly irrespective of where their LTVs were
 8    is just a comment on the severity, the housing prices,
 9    it's not a comment on materiality of that information
10    at the time the investor was looking forward.
11              MS. SESHENS:  If I may, Your Honor?
12    Which is just one last point.  I think what Mr. Grais
13    has just articulated is the FDIC's perhaps
14    cross-examination or response to Dr. James but not a
15    reason to render his opinion inadmissible.
16              THE COURT:  How does looking at the
17    stock -- or how is his analysis relevant to a question
18    that the jury will be answering?
19              MS. SESHENS:  The jury will be asked,
20    Your Honor, to assess the materiality of the alleged
21    misstatements and omissions, and his analysis would be
22    relevant to that determination.
23              THE COURT:  Well, okay.  I understood
24    that part.  But I mean if we're looking at -- if I've
25    already assessed the materiality from the -- if it
```

```
 1   can't be a backwards-looking view -- I'm still
 2   struggling with the relevance.
 3              MS. SESHENS:  So some of this gets into
 4   more of the granularity of mister -- I keep calling
 5   him mister; he would be offended by that --
 6   Dr. James's study, which in fact controlled for
 7   identified groups of loans based on the alleged
 8   defects that the FDIC's experts identified in the
 9   loans about departures from underwriting guidelines,
10   inflated appraisals and the like.  And so those are
11   the very alleged misstatements at issue in this case.
12              So Dr. James separated the loans based
13   upon those characteristics and then controlled for
14   other characteristics that could otherwise impact
15   performance.  And so he tested the very materiality of
16   the specific alleged misstatements at the very loan
17   level in this case according to the FDIC's expert.
18              So it's directly relevant, these loans,
19   these offering documents; and it's exactly in that
20   spot.  So it would be an analysis that the jury could
21   look to as it considers materiality as a complement to
22   Mr. Richard, our materiality expert, and as somebody
23   who is either contrary to or rebuttal to Ms. Rutledge,
24   who will be offering the FDIC's opinions, as we
25   understand it.
```

1            THE COURT:   And if you can, articulate

2   the different conclusions between Ms. Rutledge and

3   Dr. James?

4            MS. SESHENS:   I think Ms. Rutledge, and

5   obviously Mr. Grais can correct me if he thinks I've

6   gotten this wrong, in a nutshell will testify to the

7   various characteristics of residential mortgage-backed

8   securities that she thinks were important to investors

9   as part of their investment decisions and she'll focus

10  on, perhaps not surprisingly, the alleged -- the

11  characteristics that are at issue in this case.   She

12  will focus on some others but, you know, LTV ratios,

13  owner-occupancy, conformity with underwriting

14  guidelines; and she'll opine that those were

15  important.

16           We obviously -- we actually don't think

17  that goes far enough, but that's an issue for a

18  different day.   Whereas Dr. James --

19           And she'll provide no empirical

20  evidence, she has performed no studies, she's

21  undertaken no analysis.   It is just her views based on

22  her experience.

23           Dr. James, however, has undertaken an

24  analysis.   Because he's an economist, it is his view

25  generally -- again, I hope I'm attributing to him

1    okay -- but that you can  test these propositions, you

2    can test empirically whether LTV ratios or the

3    allegedly misstated LTV  ratios were important  to a

4    hypothetical  reasonable  RMBS investor.  And  that's

5    what he set out to do.  He's simply --

6                    THE COURT:   Doesn't that sound more like

7    causation  than materiality?

8                    MS. SESHENS:   I don't think so , Your

9    Honor.  Because  the concept  is what is material , what

10   is important  will impact loan performance .  And loan

11   performance  is what is most important  to an RMBS

12   investor because  it impacts  the investor 's ability to

13   obtain cash flows  that it's otherwise  owed under the

14   security .  So it goes direct ly to what is most

15   important  because  it is what impacts the ability for

16   the investor to get paid.

17                    THE COURT:   But they wouldn't -- but  how

18   do they base an invest ment decision on that if you are

19   -- it would be  impossible  for them to have that

20   information  at the time  they made the investment

21   decision.

22                    MS. SESHENS:   Correct, as it relates  to

23   these specific population s of loans , yes.

24                    THE COURT :  And so is his analysis  of

25   these  loans, as  you say , empirical?  Or  is his

```
 1    analysis more broadly the RMBS market?
 2              MS. SESHENS:  His analysis is of these
 3    loans, an empirical analysis of  these loans.
 4              THE COURT:  So tell me, then, one  more
 5    time.  If it is impossible for them to have had this
 6    information, how  is it material in their investment
 7    decision?
 8              MS. SESHENS:  Well, it shows that it's
 9    not material .  It's a way of demonstrating a lack of
10    materiality .  He's not saying --
11              THE COURT:  But doesn't that stand the
12    concept of materiality on its head?
13              MS. SESHENS:  I don't believe so, Your
14    Honor.  Because, again, while  you have to  look at
15    materiality at the time  of investment, you can  show
16    materiality through  many different  ways.  You can look
17    at it from all  different  perspectives.
18              THE COURT:  If  the stocks -- well,  never
19    mind.  That's a different  statement .  Start again.
20    What does it mean to say that you can  look at
21    materiality in lots of different ways?   Materiality is
22    what you base -- what are  the variables that go into
23    making your investment decision?
24              MS. SESHENS:  Correct .  The question
25    here for materiality, as  Morgan Stanley sees it, is
```

```
1    whether the alleged misstatements and omissions as

2    identified by the FDIC would have been material to a

3    reasonable investor.  It's hypothetical.

4              THE COURT:  And separately, as I had

5    said a moment ago, is a causation.  Or is there not --

6    I know we talked about negative causation, but I don't

7    remember from the 20 or 30 hearings we've had whether

8    causation is an element.  Here it's not.

9              MS. SESHENS:  Causation is not an

10   element of the FDIC's affirmative case.  It is an

11   affirmative defense for Morgan Stanley.

12             THE COURT:  That it didn't cause?

13             MS. SESHENS:  Correct, that the alleged

14   misstatements --

15             THE COURT:  Would this --

16             MS. SESHENS:  -- and omissions did  not

17   cause --

18             THE COURT:  Carolyn, I'm so sorry.

19             MS. SESHENS:  -- the loss.

20             THE COURT:  Would Dr. James's analysis

21   also be -- or would it be relevant or is part of what

22   he's going to testify -- is he a negative  or one of

23   the negative causation experts?

24             MS. SESHENS:  He is, Your Honor.  That

25   is correct.
```

1          THE COURT:  Because it really sounds to

2   me like you're talking about -- I don't mean

3   conflating in a negative way like you did something

4   wrong.  But it seems like you're attemp ting to have

5   the Court conflate the concepts of materiality and

6   negative causation.

7          MS. SESHENS:  I think from our

8   perspective, Your Honor, we think  that the analysis

9   actually can support both.  And it's not conflating

10  them because they're two separate concepts and the

11  empirical analysis, the  underlying studies that

12  Dr. James conducted, can give rise to different  expert

13  conclusion s.

14          THE COURT:  All right.  So one more

15  time , then.  Let's flip this around .

16  Ms. Rutherford (sic)?

17          MS. SESHENS:  Ms. Rutledge.

18          THE COURT:  Ms. Rutledge, excuse me.

19  Rutledge was the  Giants' quarterback .  Rutherford

20  is where the  Giants play.

21          (Laughing)

22          MS. SESHENS:  I'm not going to tell

23  you I'm an Eagles fan.

24          THE COURT:  Boo.  You're the one.

25          MS. SESHENS:  I am the one.

```
1              THE COURT:  The -- now I lost my
2    train of thought .
3              Okay.  So look at Ms. Rutledge , and
4    her analysis is  -- do you agree that her analysis
5    is at the time and not looking backwards  ?
6              MS. SESHENS:  I would actually take
7    issue with the notion that she has an analysis.
8              THE COURT:  All right .  Excuse me .
9    Her --
10             MS. SESHENS:  I think that her
11   perspective is that she is trying to opine on what
12   would have been important, what was important to
13   RMBS investors when they made investment decisions  .
14             THE COURT:  Okay.  So then it's fair
15   to say , then, for better or worse , she's not
16   looking at the performance over time.  So she
17   doesn't fall into that potential trap.
18             Are there other experts of theirs
19   that have any so rt of analysis ?  That is , looking
20   at these loans over time?  Do they have --  they
21   have their own negative causation expert  , I would
22   imagine , to rebut your --
23             MS. SESHENS:  They have a rebuttal
24   causation  expert , yes.
25             MR. GRAIS:  Your Honor , our two most
```

1   important experts on our liability case are t hose
2   who will testify about whether or not the loans
3   complied with underwriting standards and whether or
4   not the appraisals were done properly.  In both
5   cases we have specifically removed from the files
6   they reviewed any document dated after the loan was
7   paid precisely to avoid this problem of hindsight.
8                   MS. SESHENS:  I think  -- Your Honor,
9   to be fair, I think it's hard to say that the
10  FDIC's experts don't  do a hindsight analysis.  They
11  are going back in time and they are rereviewing
12  what was done and reanalyzing it based upon  , in
13  some instan ces we contend , additional information
14  and things that were not known at the time.  And
15  it's exactly what they are doing.
16                  Now, that's  not  something that's
17  before Your Honor today , but I think in fairness
18  that is what is going on both with the appraisal
19  and the  reunderwriting expert .
20                  THE COURT:  A nd the case that stands
21  for the proposition that it should not be a
22  hindsight analysis , your best case is what ?
23                  MR. GRAIS:  Frankly, I'm not sure
24  which are the ones we cited in the brief I would
25  most recommend, Your  Honor, but  there are many,

```
 1    many.
 2                    THE COURT:  All right.  Let me try
 3    the other bite.  What should I look at to support
 4    your argument that this analysis  of looking at the
 5    performance over time is something that could be
 6    considered , the Burlington case?
 7                    MS. SESHENS:   I think the Burlington
 8    case supports that .  The Gebhardt case that the
 9    FDIC actually has cited--
10                    THE COURT:  Did you say Geb?
11                    MS. SESHENS:  G eb.  G-e, B as in boy ,
12    h-a-r-t (sic).  Those are two cases that support ,
13    we think , our position .
14                    And I apologize , Your Honor , there
15    are a number we cited for the notion that you can
16    look at after -the-fact information  to assess
17    materiality in the 10(b)  context .  I don't have
18    those cites immediately,  but I can provide them  to
19    you before the end  of the hearing , if that would
20    work.
21                    THE COURT:  Sure.
22                    MS. SESHENS:  Okay.
23                    THE COURT:  Okay .  I'd like to look
24    at those cases one  more time.
25                    MS. SESHENS:  Sure.
```

```
 1                    THE COURT:   Just to see if I can
 2   discern a bright -line rule .
 3                    MR. GRAIS:   Your Honor ?
 4                    THE COURT:   I mean, I do think that
 5   information would naturally be relevant to negative
 6   causation .   I'm not certain that it's relevant to
 7   materiality.
 8                    MR. GRAIS:   May I just ask one
 9   question to clarify the Court's order on the other
10   two motions ?
11                    Your Honor said you were denying the
12   motions with respect to the statute of limitations.
13   I assume that that's the one on newspapers and
14   complaints against third parties.
15                    THE COURT:   Right .   The other one
16   doesn't seem to lend  itself to that.
17                    MR. GRAIS:   And then you said you
18   were granting the one as to materiality  , which I
19   assume is the knowledge part.
20                    THE COURT:   Yes.
21                    MR. GRAIS:   Thank you, Your Honor.
22                    THE COURT:   Yes.   Okay.   Now I guess
23   -- so let me hold off on the Dr. James part.   And I
24   guess we'll turn to your omnibus motion.   It's
25   exactly 4:01.   That's  pretty good.   So there's just
```

1  a handful that are -- have been agreed to or worked

2  out?

3                  MS. SESHENS:  That is our

4  understanding, Your Honor.  And we've glea  ned that

5  from the FDIC 's opposition papers , so I can't say

6  with certain ty that they won't stand up today and

7  say that that's not the case .  But I'm happy to

8  identify the ones that we think -- there are two  .

9  I apologize.  There are two they have said

10 affirmatively they're not opposing  .  And then

11 there's three others -- three and a half we've

12 identified as ones they don't contest in  their

13 opposition.  And so I'm happy to run through.

14                  I don't know if Your Honor has our

15 Appendix A to our motion , which is this chart that

16 lists out every motion and sub motion  .  We can pass

17 up a copy if it would be -- yeah , it's become my

18 Bible on me , so I thought it might be helpful to

19 Your Honor.

20                  THE COURT:  Da na's Bible?

21                  MS. SESHENS:  Yes .

22                  THE COURT:  Where did he go --

23                  MS. SESHENS:  O r Torah.  Depends on.

24 . .

25                  THE COURT:  Where did  Dana Bible go?

```
 1   You got nothing for me .
 2                MR. YETTER:  No, I'm sorry , I don't.
 3   That doesn't --
 4                (Laughing)
 5                MR. CALLAHAN:  Your Honor, t hat would
 6   be the University of Texas .  Dana --
 7                THE COURT:  Dana X. Bible, right ?
 8   Yes.
 9                MS. SESHENS:  Now you've completely
10   lost me .
11                MR. CALLAHAN:  Football coach.
12                THE COURT:  Sorry .  The University of
13   Texas.
14                Okie doke.  Well, let's just start at
15   the beginning , then , and somebody jump up from the
16   other side and tell me if you don't oppose it.
17                So Motion In Limine Number 1 ,
18   Full-Principal Method of Calculating  Interest and
19   Damages.
20                MS. SESHENS:  Yes.  So I'm happy to
21   start there, Your Honor.  This motion is directed
22   at the FDIC's damages expert Ms. Rutledge and her
23   opinion on what she terms the full  -principal
24   method.
25                Before I get into the substance  , I
```

1    just wanted to identify a few key points.

2    Obviously this motion assumes that Ms. Rutledge

3    testifies at trial and she's not excluded for the

4    reasons that were raised in our prior Daubert

5    motion.

6                    I did want to frame the issue for the

7    Court by noting that based on Ms. Rutledge's

8    opinions, we think that is at least a

9    25-million-dollar issue.  And, in fact, likely

10   more.  That the difference between her amortizing

11   principal and full-principal method is that

12   material in the case.

13                    We have moved on the application of

14   this method to all of the claims asserted by the

15   FDIC, including Section 11.  The FDIC has taken its

16   position -- taken the position in its opposition

17   that this doesn't apply to Section 11.  That is not

18   correct.

19                    They also have not opposed our

20   Section 12 arguments at all.  They 've only argued

21   about the TSA.  And, therefore, we would deem those

22   points conceded as to Section 11 and Section 12 and

23   unopposed.  I have a feeling they may say

24   otherwise, but that is the sort of half motion I

25   was referencing previously.

```
 1              The question of what damages can be
 2    put before the jury is a question of law.  There's
 3    no dispute between the parties on that.  We think
 4    this is an issue that can be decided now  , and
 5    there's no reason to wait until trial.
 6              So with that , I will start .  As Your
 7    Honor likely understand s from the briefing , this
 8    method -- the  full-principal  method impacts the way
 9    in which Ms. Rutledge calculates prejudgment
10    interest as part of her damages calculat  ions.
11              And as it applies to Section 12 and
12    really the TSA , according to the FDIC, her opinion
13    applies interest on the full consideration paid by
14    the FDIC, really Franklin Bank  , for the securities
15    without accounting for princip  al repayments that
16    were received by Franklin Bank and the FDIC over
17    time.
18              So what that means is in an RMBS
19    situation , if you pay a hundred dollars for a
20    security and then  you receive princip al back, that
21    balance , the consideration paid declines  .  You
22    receive back the monies you paid out  .  And
23    Ms. Rutledge is applying interest on  the hundred
24    dollars rather on the declining balance  , which we
25    contend is improper in this context.
```

```
 1                    THE COURT:  Now, prejudgment interest
 2     is something that -- is this the kind of
 3     prejudgment interest that would be something the
 4     Court would determine post verdict , if appropriate,
 5     right, to factor into a judgment as opposed to
 6     something the jury would be deciding , no?
 7                    MS. SESHENS:  I don't -- I think it's
 8     part of what the jury would decide because it's
 9     part of the statutory damages formula , at least for
10     Section 12 and the TSA because it is  -- the damages
11     themselves include the interest component  .  So it
12     is part of , for example , Ms. Rutledge's opinions
13     and it is part of the rebuttal opinions that
14     address these matters.
15                    THE COURT:  Anybody  want to chime in
16     on that point?
17                    MR. YETTER:  That's an interesting
18     point, Your Honor .  I'm going to argue this  point
19     on our behalf .  And we have not given that enough
20     thought , but that's a very interesting point
21     because it's pure  prejudgment  statutory  interest
22     under Texas law 6 percent.  And obviously that
23     could streamline things a lot for trial.
24                    But for the moment if you could hold
25     that thought , we will give it more thought and we
```

1  will get back to you on that .  We're prepared to
2  argue the rest of the points , but that's a very
3  interesting thought.
4              MS. SESHENS:  And obviously , Your
5  Honor , we'd be happy to consider that further.
6  It's always been our understanding it would be part
7  of what is presented to the jury.  But if there's
8  reason to think that that's otherwise, we obviously
9  would give that some consideration as well.
10             THE COURT:  I mean, if it's
11  statutorily part of your damages versus I figure
12  out what you r actual damages are and then calculate
13  prejudgment interest, obviously  -- I guess those
14  would be two different creatures.
15             I don't know how  the -- and I guess
16  you would give  the jury -- I'm trying to think how
17  the jury would actually do le that out if it was
18  part of your damages .  I guess you would just give
19  them the, This is how I arrived at this figure and
20  it's more persuasive  than the other fellow's
21  version, and  so you should award this X amount   of
22  prejudgment interest , period.
23             MS. SESHENS:  I think there's  not
24  much dispute.  The formulas , obviously , are  the
25  formulas .  The dispute is really over how you

1   calculate prejudgment interest.  I will say that

2   this issue has come up in other cases and it has

3   been decided , for example, as a matter of law  in a

4   summary judgment motion .  It was applied by the

5   Court in Nomura at trial , and it was part of the

6   damages formula as it was considered by the  Courts

7   in those cases.

8                It is no t a case where you have a

9   damages finding , and then there's a separate

10  statutory interest component.  It is actually  baked

11  into the statute , at least for Section 12 in the

12  TSA.  There's a different  component of this for

13  Section 11, which I'll get to in a moment .  But for

14  Section 12 on the  TSA, it is part of the statutory

15  formula .  And it's the same for both.

16                THE COURT:  Okay.

17                MS. SESHENS:  So our position , as

18  I've just articulated , is that Ms. Rutledge cannot

19  be permitted to opine to the jury on her

20  full-principal  method because  it basically double

21  rewards the FDIC by paying interest on princip  al

22  that was already received.

23                The FDIC does not cite a single case

24  to support its position.  And by contrast  , the only

25  two courts in RMBS cases of which Morgan Stanley is

1    aware that have  considered the issue have supported

2    Morgan Stanley's position.   That's the   Schwab case

3    that we've cited i n our papers in California and

4    the Nomura case, the FHFA case that Mr. Grais and I

5    both referenced earlier today.

6                    In both of those instan ces, the Court

7    held that the prejudgment interest had to be

8    applied to a declining princip al balance and could

9    not be on full principal .  In Nomura, the Plaintiff

10   didn't e ven advance a full-principal methodology ,

11   and the Court applied the  -- effect ively, the

12   amortizing principal methodology , which is

13   Ms. Rutledge's other set of opinions.

14                    Federal courts that have interpreted

15   Section 12 's damages provisions over time are in

16   accord with those holdings.  The  Loftsgaarden case

17   and the John s Hopkins cases that we 've cited all

18   reflect that you get an offset in effect for

19   consideration repaid when it is a declining balance

20   security such as an RMBS .  Or in those cases they

21   were different types of securities.

22                    But on the theory that Section 12 and

23   the TSA are recessionary statutes, which are

24   intended to put the investor back in the position

25   he or she was in initially, that's the only way

1  that you can do it without providing the investor

2  with a windfall.

3          Now, the FDIC contends that there is

4  no unjustified windfall here.  That it's

5  appropriate to essentially double recover because

6  the statutory purposes of the TSA are furthered by

7  that.  We respectfully disagree.

8          The statutory purposes that they 've

9  identified are not unique .  And there is nothing

10  that the FDIC has pointed out to show why or how

11  those purposes aren't furthered by the  amortizing

12  principal method and by the ability to bring a

13  private cause of action and by the ability to have

14  a strict liability claim.

15          For those reasons , prejudgment

16  interest is not intended to punish a Defendant.  It

17  is not intended to over compensate  a Plaintiff.  It

18  is intended to restore the Plaintiff to the

19  position he or she would have been in had the

20  transaction not happened.  And there's nothing that

21  the FDIC identifies that is to the contrary  insofar

22  as amortizing principal should apply.

23          With Section 11 , the application of

24  the methodology is a bit different.  There is no

25  prejudgment interest there.  The formula  , in

1    essence, is the price paid minus the price received

2    upon a disposition.  And there the price paid is

3    analogous to the consideration paid .

4              And Ms. Rutledge again has offered

5    two opinions.  She herself has recognized that

6    there's a lack of clarity  -- that is what she has

7    said -- in how interest should be calculated .  And

8    she did the  full-principal  method where she applied

9    the damages formula without accounting for

10   principal repayments and she did an am ortizing

11   method where she does account for princip al

12   repayments.

13             And the reason that princip al

14   repayments should be deduct ed from the price paid

15   for Section 11 is exactly the same as the reason it

16   should be deducted from  the consideration  paid for

17   Section 12 .  To hold otherwise would provide the

18   FDIC with Section 11 damages that would include

19   monies already repaid on the securities  .  Again, a

20   double recovery.

21             Section 11 , like Section 12 in the

22   TSA, are compensatory in nature .  They are not

23   punitive.  And there 's nothing that the FDIC has

24   identified that supports application of the

25   full-principal  method to Section 11 damages as

```
 1   well.
 2                  THE COURT:   Response?
 3                  MR. YETTER:  Yes , Your Honor .  Paul
 4   Yetter for the FDIC.  We should have a short  ,
 5   little presentation , Your Honor, that will help us
 6   to go through , if the Court allows me ?
 7                  THE COURT:  Sure.
 8                  MR. YETTER:  And it should be on your
 9   screen.  We can probably just do it on the screen  ,
10   Judge, if that works , because I think all the
11   lawyers will have it on their screens.
12                  THE COURT:  Okay.
13                  MR. YETTER:  All right , Your Honor .
14   So I've only been given permission to talk about
15   one thing today , Judge, in the interest of safety
16   for my client.  So  -- hold on.
17                  Really where we're at on this issue  ,
18   this issue of  the damages , is that Morgan Stanley
19   is essentially calling in  to issue the Texas
20   statute, the Securities Act.
21                  THE COURT:  I'm not -- I don't see --
22   am I supposed to be seeing something  ?
23                  MR. YETTER:  Yeah, you should be
24   seeing something on your screen , Judge.  It doesn't
25   look like you are .  Maybe we can --  there we go.
```

1    See if that works.

2                    (Discussion off the record)

3                    THE COURT:  There we go .

4                    MR. YETTER:  There we go.

5                    THE COURT:  I'm sorry , one more time.

6                    MR. YETTER:  Sure.  Judge, the

7    complaints that Morgan Stanley has basically go to the

8    -- to the actual  language of the legislature  in the

9    Texas Securities Act.  So the language of the statute

10   is very clear.  It adds interest.  It says  -- it's a

11   very simple formula .  It adds interest to the

12   compensation paid for the security.

13                    So you take the security the day you

14   bought it , you figure out how much you paid for it,

15   you add interest at the statutory rate until the day

16   of trial -- or the day of the verdict.  Then from that

17   amount , you subtract certain things.  You subtract all

18   the income you've got on the security, which would be

19   both your interest payments and your princip  al repaid,

20   and you subtract your sale proceeds.

21                    So you start with the  -- how much you

22   paid plus interest, and you subtract income  , which is

23   interest plus -- that you got paid and  principal

24   repaid , and then sale proceeds .  That's what the

25   statute literally says.

1                    They're saying, Nope, for this kind

2      of security -- and that applies to all sorts of

3      securities , Judge.  Life insurance policies , all

4      kinds of securities.  What Morgan Stanley is saying

5      for this kind of security for  RMBs -- or RMBSs,

6      that you have to have a different formula.

7                    And so if you see the first bullet ,

8      it says what their -- what Morgan Stanley  is

9      basically saying is the statutory formula shouldn't

10     be the actual compensation you paid , and then you

11     add interest.  It should be the actual compensation

12     you paid less income you receive later , and then

13     you add interest.

14                    Now, that's not what the statute

15     says; but that's what they're asking for, Your

16     Honor.  That's their  amortizing  principal basis.

17     And they're saying , Oh, but if you don't do that ,

18     it's too ha rsh on people that violate the law with

19     regard to residential mortgage-backed securities.

20     And so what they're really proposing is a net

21     compensation paid, then you add interest.

22                    Now, here --

23                    THE COURT:  Didn't you start off by

24     saying that you calculated -- I thought you started

25     it off by saying that you c alculated at  net of --

```
1              MR. YETTER:  No, you don't.   Okay.
2    So the statute says --
3              THE COURT:  -- you made money on the
4    security.  You subtract -- you subtracted several
5    things.
6              MR. YETTER:  The whole p oint, Your
7    Honor, is when do you add interest?
8                   And what the statute says is you take
9    the purchase price , then you add interest from the
10   day of the purchase to the day of the verdict.
11   Then you subtract.
12              THE COURT:  Oh, okay.  So your
13   subtraction is after you've added the interest.
14              MR. YETTER:  That's what the statute
15   says.  Now , what Morgan Stanley wants to say is  --
16              THE COURT:  G et the net first , and
17   then calculate  the interest.
18              MR. YETTER:   Exactly.  And that's wh y
19   there's a difference.
20              THE COURT:  Yes.
21              MR. YETTER:  Because if you take out
22   the income before you add the  interest, then you're
23   going to have a lesser amount  .
24              THE COURT:  That's like  an attorney
25   taking a fee on a gross recovery as opposed to the
```

1    net recovery.

2              MR. YETTER:  Very much like that.  So

3    here what the statute says , for very good reasons ,

4    it says take the purchase price , then add the

5    interest , and then deduct your income and your

6    sales proceeds.

7              And there's three reasons .  And I

8    can, hopefully, Judge, quickly go through .  So the

9    first reason , number one .  It's a very simple --

10   it's a very simple formula .  And the Texas Supreme

11   Court through the pattern jury charge says to trial

12   judges, Use that formula when you charge the jury .

13   And the formula is total purchase price plus

14   interest, then you take off your income and your

15   sales proceeds.  And that's what it is right here  .

16             The big dispute we have with Morgan

17   Stanley is they want to take the income off twice

18   because they want to take the purchase price, then

19   subtract the income and add interest  .  And then

20   they want to take the result and subtract income

21   again the second time .  And subtracting income

22   twice is not what the statute says.

23             So, Your Honor, what the PJC tells

24   trial courts to do is use the language of the

25   statute.  So when we charge this jury  , unless your

```
 1   idea of having the interest  --
 2              THE COURT:  Be a judgment decision as
 3   opposed to a jury decision .
 4              MR. YETTER:  Yes.  That's an
 5   interesting idea.  I'm not saying -- I can't
 6   comment .  Smarter people than I are going to be
 7   thinking about that overnight,  Your Honor.
 8              Then it's going to be  -- the jury is
 9   going to have to decide  this and you're going to
10   give them the actual language.  And unless we
11   change the language, which is what Morgan Stanley
12   is saying we have to do, the jury's going to decide
13   the way the s tatute says.
14              Okay.  Second point.  So this is --
15   the first point is that's what the statute says and
16   that's what the PJC tells us to do.  And on that
17   point, Your Honor, both sides before  -- actually in
18   February , exchanged jury charges .  And not
19   surprisingly , both sides have the jury charge that
20   says exactly this.  It says  the -- it track s the
21   language of the statute.
22              So you have full purchase price plus
23   interest , and then you subtract income and sales
24   proceeds.  S o that's what both sides did.
25              And, Your Honor, I can give that to
```

1    you if you're interested.  But I'll represent to

2    the Court that  Morgan Stanley's and the FDIC's

3    proposed jury charges exchan ged on February  the

4    20th, 2015, say exactly what I just said.

5              Okay.  Second point.  The second

6    point is that the text of the statute requires us  .

7    And there's lots of good reasons for that.  So what

8    the text says , Both sides agree that princip al that

9    is repaid i s called -- is income.

10             And the reason I'm focusing on the

11   language, Your Honor, is because the Texas

12   Securities Act has compensation and income, two

13   different words in two different parts.  They don't

14   mean the same thing.

15             So compensation paid is essentially

16   the purchase price, what you paid for the security.

17   Then you add interest.  Then second step, you take

18   out the income, which is both the interest you

19   actually earned and the repaid principal and the

20   sales proceeds.  So that's the second step.

21             Both experts' reports , Your Honor,

22   call repaid principal  income.  It can't be the same

23   thing.  It can't be income and compensation paid

24   under the statute because , as the Court knows , you

25   don't -- you  can't do that .  You can't have two

1    words that mean the same thing   or else the

2    legislature --  and, of course , the legislature

3    could never have done something irrational or

4    unreasonable .  Not our legislature .  So we,

5    obviously, have to -- can't do it --  can't

6    interpret it that way.

7                 So the bottom line  is, Your Honor ,

8    the statute says income is subtracted after you add

9    interest in step two, not in step one.  In fact,

10   what we've heard from Morgan Stanley   -- and I think

11   they've done it very effectively -- they talked

12   about, Oh, it's a windfall and they're getting

13   double recovery .

14                 And, in fact , it's not.  It's working

15   just like the legislature said.  First you have the

16   amount you paid plus interest .  And step two is

17   taking out the income.  What they would like to do,

18   Morgan Stanley, is take out income twice on both

19   sides of the  equation.

20                 What they really are saying  --

21                 THE COURT:  I'm sorry , I missed that

22   part.  How is what they're arguing taking out

23   income t wice?

24                 MR. YETTER:  Okay.  Because step one

25   is consideration paid plus interest   under the

1    statute.  And step two is then you take out income.
2    You subtract income, which is interest, repaid
3    principal and sales proceeds.
4              What they want to do is also take out
5    repaid principal from step one before you add
6    interest.  And so they would be taking out twice.
7              THE COURT:  All right.  It sounds to
8    me like what they're saying is he would take it out
9    at the beginning, which then would ultimately
10   reduce the base amount on which the interest is
11   calculated.
12             MR. YETTER:  True.  But they're
13   taking out income on both sides of the equation.
14   They're taking out the prepaid principal on step
15   one.
16             THE COURT:  Right.
17             MR. YETTER:  And then the income and
18   the sales proceeds -- I'm sorry, the interest and
19   the sales proceeds on step two.  So they want to
20   have income on both sides of this equation when the
21   statute says it's only in step two.
22             THE COURT:  Okay.  Keep going.  What
23   else?
24             MR. YETTER:  All right.  So what they
25   really are saying, Your Honor, is they're saying

1     for this type of security  -- and, again, the Texas

2     Securities Act covers  all types  of  securities  --

3     for this type of security  that is called --  that

4     they call an amortizing  security where you get paid

5     your principal along the way , you have to have a

6     different rule.

7                  And the Texas Supreme Court has said

8     no, you don't do that.  They have one securities

9     act.  It may be better su ited for certain

10    securities than others , but it's one rule.  The

11    legislature  has that prerogative.

12                  Here, Morgan Stanley wants to say you

13    have to have a different damage calculation because

14    the nature of the security they're claiming is

15    different.  And they cite to two cases  , Nomura and

16    Schwab.  And with all due respect to very capable

17    counsel, neither case held , as I believe the Court

18    was told, that the amortizing method is the legally

19    required method .  And I'll explain briefly why.

20                  Schwab wasn't e ven a Texas Securities

21    Act case.  It was a California statute.  It has

22    different wording in significan t ways.  It wasn't

23    even -- and they ruled on summary judgment that the

24    different California statute , which apparently has

25    different legislative intents, has a different way

1      of doing things.

2                     That's not what the Texas Securities

3      Act says.   In a very specific way  there's a --  in

4      the Texas  Securities Act, very briefly , Judge, it

5      says compensation paid plus interest thereon.

6      "Thereon " being compensation paid.

7                     The California act doesn't say that.

8      It doesn't have the word  "thereon. "  So that

9      California Judge on summary judgment made a

10     different ruling that we don't believe has anything

11     to do -- that in any way requires the  Court to make

12     a ruling one way or  the other in this case.

13                    Nomura, which is a Federal court

14     case, both parties agreed to apply this  amortizing

15     principal.  The Judge never made a ruling one way

16     or the other.  She simply said , This is what the

17     Plaintiff and the Defendant agree upon in the

18     approach and I'm going  to enforce it.  So there was

19     no ruling either way.

20                    We're not --  we don't believe that

21     there's any case under the Texas Securities Act or

22     specifically under the Section 12 that deals with

23     this issue foursquare.  But we think in this case  ,

24     Your Honor , the statute is what the Court  's going

25     to follow .  The PJC is what the Court is going to

```
 1    charge the jury on .  And the purposes of the
 2    statute is what you're going to be guided by, which
 3    is point three.
 4                   The purposes of this statute  -- I'm
 5    on Slide 5, Judge.
 6                   THE REPORTER:  Going to what?
 7                   THE COURT:  " I'm on Slide 5," he
 8    said.
 9                   MR. YETTER:  I'm sorry , let me slow
10    down.
11                   The purposes of this statute , which
12    are absolutely clear because the Supreme Court
13    eight years ago in 2007 said , Our state 's blue sky
14    laws, which is what this statute is a part of  , have
15    three -- and I'm quoting ; this is a Citizens
16    Insurance case -- quote, "long-standing purposes ."
17    This is our Texas Supreme Court.
18                   THE COURT:  You know what ?  With all
19    due respect , I've read the slide and I get -- the
20    statute is there to encourage people to comply with
21    the blue sky laws.
22                   MR. YETTER:  Exactly.  And so what
23    this -- what Morgan Stanley is saying is  if it
24    slightly -- if it is not precisely compensatory ,
25    then it can't survive.  Well , in fact , the Court
```

1   has said it needs to  incentivize  and it needs  to

2   deter.

3            And I'd make one other  point,  Your

4   Honor , that's not actually reflected on this

5   statute -- on this slide.  Is that the Texas

6   legislature basically decided that when someone

7   misrepresents , causes  -- makes misrepresentations

8   in selling a security , the legislature is going to

9   come in and compensate that victim  ized  investor by

10  awarding them the Texas statutory prejudgment

11  interest amount , which at least in today's world

12  can be far more than the agreed interest that they

13  thought they were going to get on their security.

14            So, for example, here when securities

15  are purchased and the interest rate is , perhaps in

16  many of these , much less than 6 percent , the

17  Supreme Courts  -- I mean, the legislature said

18  you're going to get 6 percent the entire life of

19  that security.

20            Now, Morgan Stanley could just as

21  easily be in this courtroom saying , Well, that's

22  overcompensatory.  And so that's inconsistent  .  And

23  so they could only get the interest that they

24  thought  they were going to get when they bought the

25  security.

```
 1                    The legislature's totally entitled to
 2    do that.  They're totally entitled to encourage
 3    compliance and deter violations, and they're
 4    entitled to create incentives.
 5                    So concluding, Your Honor, actual --
 6    we actually think that the approach we're using is
 7    the actual compensation paid approach plus
 8    interest, and then deduct the income.  That's what
 9    we believe the statute requires.  That's what we
10    believe you're going to -- the Court's going to
11    charge.  And there are lots of good reasons to do
12    that.
13                    THE COURT:  Now, whether I make that
14    decision or the jury makes that decision, I think it's
15    going to be a readily ascertainable number either way.
16    Just math.  That is something that we could fix post
17    verdict fairly easily.
18                    MR. YETTER:  Absolutely.  And  if you
19    don't want to have  to -- if we're right or even if
20    they're right, it will all come out in the trial.  And
21    afterwards you can take a fresh look if you want to
22    take a fresh look at it, Your Honor.  Or maybe even
23    we'll take the approach that you'll apply the
24    interest.  And that can happen all after trial, but we
25    need to have -- after the verdict, but we need to have
```

```
 1    the evidence before the jury.
 2                    THE COURT:  Now, but this is a motion in
 3    limine point.  So they are arguing that there
 4    shouldn't even be testimony at  the trial --
 5                    MR. YETTER:  That's what they're
 6    arguing.
 7                    THE COURT:  -- about the -- your
 8    calculation.
 9                    MR. YETTER:  How do we get a ruling from
10    the jury if we don't have the evidence in the trial
11    record?  Unless we want to do this again .  And I don't
12    think anybody wants to try this case again, Your
13    Honor.  We have to have the evidence in the record  .
14                    Again, as you said , either you can apply
15    this as a matter of law afterwards if that's what we
16    consider -- you consider to be appropriate or you can
17    always fix it in a post -judgment motion.
18                    THE COURT:  Right .  So how is this --  so
19    why would this be appropriately a limine  point?
20    Unless you're -- I mean, you're really asking me to
21    make a legal decision , sort of  a summary judgment --
22    or a Rule 166 motion to decide something as a matter
23    of law.
24                    MS. SESHENS:  What we think , Your Honor ,
25    contrary to Mr. Yetter 's portrayal of this whole
```

1   issue, that you have to decide it and you have to

2   decide it before anything goes before the jury for

3   this reason .  Mr. Yetter has characterized this whole

4   amortizing principal methodology as Morgan Stanley's.

5              To be clear , Morgan Stanley does not

6   think there are damages in this case.  We have not put

7   forth an affirmative damages expert .  We have

8   responded to the  FDIC's Ms. Rutledge, the FDIC 's own

9   expert .  All these criticisms of the  amortizing

10  methodology,  which are incorrect  and I'll get to those

11  in a moment , are Ms. Rutledge 's method.

12             And the reason we need a motion in

13  limine ruling now is that  she otherwise has two

14  opinions .  She has damages opinions that vary in the

15  range of 25 to 30 million dollars.  And the jury can't

16  decide which opinion is legally tenable.  The Court

17  has to make that determination.

18             It can be  -- we think it would be clear

19  legal error for the jury to decide which methodology

20  under the statute is appropriate .  And the jury cannot

21  be left to choose between Ms. Rutledge  's two opinions.

22             So unless they  are pulling one , in which

23  case we challenge it on different grounds  ,

24  Ms. Rutledge has put forth the  amortizing principal

25  methodology.  Ms. Rutledge has back ed out principal

```
1    repayments from the amount on which she has calculated
2    prejudgment interest.  S he has not backed out income
3    twice.  That is not what is going on here.
4              But to be clear , we do not think that
5    this is an issue that can go to the jury.  How would
6    the jury decide whether it's her  amortizing principal
7    method or her  full-principal method?  It's clearly a
8    legal question of how the statutes work  .
9              MR. YETTER:  I'm happy to  respond to
10   that.  I don't want to interrupt her presentation  ,
11   Your Honor , but if you 'd like a response to that , I'll
12   be happy to.
13             THE COURT:  Are you  finished --
14             MS. SESHENS:  I just want to clarify a
15   few points, Your Honor.  That is why this jury charge
16   issue, to our mind , is a total red herring , because we
17   don't think  this opinion can even go to the jury.
18   Nobody is saying the charge shouldn't reflect what the
19   statutes say.  The  point is the jury cannot make this
20   determination.  It is a legal question that has to be
21   decided by the Court.
22             Now, in terms of how Mr. Yetter has
23   described Ms. Rutledge's  methodology, we think that
24   there were some errors in that description  that I just
25   wanted to clarify .  I think Your Honor actually picked
```

 1    up on it .  But it is not the case that income is being

 2    backed out twice.

 3                  To be clear , what Ms. Rutledge has done

 4    is taken in her  amortizing method the princip al, the

 5    consideration paid, minus interest .  The way she

 6    determines the interest is to reduce the consideration

 7    paid by princip al repayment and calculate interest on

 8    that amount .  So it's consideration paid, minus

 9    princip al repayments, interest  calculated  on that

10    declining balance.  Those two are added together.

11                  Then she takes out  -- and this is

12    Ms. Rutledge , this is the FDIC's expert .  She then

13    takes out income, which she defines as income and

14    princip al repayments .  And so that is how she takes

15    those out at the end of the statute.

16                  The Nomura case , for example, which is a

17    Section 12 case where the Court awarded Section 12

18    damages using the  amortizing princip al method, the

19    Court took the income out from the consideration paid  ,

20    and then didn't take it out -- I'm sorry  , took the

21    princip al payments out from consideration paid , and

22    then only took income out at the end.    But

23    mathematically it's the same thing .

24                  But there's no double counting of

25    income .  That is the  point I want to make clear to

1    Your Honor.  I think Your Honor understood that by

2    your questions .  It is only the basis on which

3    prejudgment interest is being calculated that is at

4    issue.

5                   Just two quick points, Your Honor.

6                   THE COURT:  Does anybody have  like a

7    ready -- or do the reports themselves have the

8    ready, the formula  -- an actual display of the

9    formula that they are using so I can  see where --

10   see what that actually look s like mathematically?

11                  MS. SESHENS:  Yes , I believe -- I

12   don't want to speak for the FDIC , but I think both

13   damages experts have put into numbers how these

14   things work.  Our expert , just so Your Honor knows ,

15   simply follow ed Ms. Rutledge's methodology .  He did

16   not opine on whether that was proper or not.  H e

17   just said if  you take her methodology , here's how

18   the numbers change .  But there are actual  numeric

19   calculations  that reflect how the numbers are

20   impacted by this.

21                  THE COURT:  So, I mean, I agree with

22   you that the jury is not going to be the one that

23   decide s which methodology is used, I don't think.

24   I mean, that  doesn't make any sense.  I don't know

25   -- maybe Mr. Yetter can speak to this as well  , but

1    I don't know that we're asking them to make that

2    decision.

3            We're asking them  -- I guess what I'm

4    saying is if we let Ms. Rutledge testify as she

5    proposes , then she would be saying this is what the

6    damages are and whatever that damage number is at

7    the end of the day , if the jury agreed with her ,

8    that would per se include whatever prejudgment

9    interest they were entitled to .  And if I bless

10   that , then that would be the  end of it.

11           Versus her opinion  -- her giving an

12   opinion as to these are what the actual damages

13   are, and then we ultimately conclude the right

14   methodology is to  -- at the end of the trial , then

15   figure out which basis to -- which manner is the

16   correct way to calculate the prejudgment interest.

17           MS. SESHENS:  I think , Your Honor ,

18   given the statutory language , it would seem it has

19   to be the former .  It's part of the statutory

20   formula.  I t's not like you assess , for example,

21   contractual damages or tort damages  , you know, a nd

22   then there's  discretionary statutory  interest where

23   there's mandatory  statutory interest.  A nd the

24   Court can do the simple math .

25           This is actually a statutory

1    interpretation question .   How does this statute

2    work as a legal matter ?

3                    Putting it into numbers is not so

4    hard once you make that determination.  But that's

5    the question we 've put before the Court now .   It's

6    the question we think the Court has to decide

7    before trial because we don't think the jury can

8    make that determination.

9                    (Sotto voce discussion between

10   counsel)

11                   MS.  SESHENS:   Your Honor , my esteem ed

12   colleague just made the excellent   point that when

13   you think about from the charge , you know , they're

14   not -- the jury is not going to be  asked to

15   calculate  the different components of the damages

16   formula .  There's going to be  a damages number

17   that's been put  before them and they're going to

18   pick it or they're  not.

19                   THE COURT:   Or it's going to be a

20   blank .

21                   MS.  SESHENS:   R ight .  And so it's not

22   going to be  the case  that they're going  to go and

23   pick and choose and figure out how the   statute

24   actually works .  They're going to listen to the

25   opinions --

1            THE COURT:  No .  I think we're saying

2    the same thing  in part.   In that  we're never going

3    to ask the jury to decide , Do you do  it this way or

4    do you do it that way ?

5            It's going to be the experts ought to

6    be able to opine this is what the damages are.   But

7    the Court 's going to decide  -- the Court will have

8    to decide whether it's an issue of -- the Court

9    will decide  the  -- I guess what we're saying is if

10   I agree with you  -- or whoever I agree with , the

11   other way is simply not  -- the other analysis is

12   just not relevant because it's a legal

13   determination.

14            MS. SESHENS:  That 's correct, Your

15   Honor.  And that is how we see this issue very

16   clearly.  And I would just note before I sit down

17   and yield the floor to Mr. Yetter that you didn't

18   hear the FDIC say anything at all about Section 11  .

19   Their whole presentation  is about  the TSA.  They

20   have no  argument in  response to Section 11 .

21            They've said nothing about

22   Section 12.  Section 12's language about

23   consideration paid  for the security plus interest

24   thereon is exactly the same as the TSA.  You can't

25   reconcile their position .  If it's amortizing

1   principal under Section 12 , it has to be  amortizing

2   principal under the TSA .  There's nothing in the

3   statute or in its purpose that says otherwise.

4                    Thank you , Your Honor.

5                    THE COURT:  All right.  Very briefly  .

6   Just for the record , it's 4:39 .  So I don't know

7   how much further we're going  to get.

8                    MR. YETTER:  Okay .  Let's just spend

9   five more minutes on this , Judge.  What is your --

10  do you have any  -- what is the question that you

11  need answered?

12                   As a matter of evidence , the evidence

13  needs to come into the trial for the jury to make a

14  determination to answer the question.  The question

15  that the FDIC has said -- I'm sorry , that Morgan

16  Stanley has said , the FDIC is entitled to recover

17  the consideration paid for the certificate plus

18  interest thereon at the legal rate from the date of

19  payment .  That's step one.  Comma, less the greater

20  of .  And then they go into income, the value of the

21  certificate at the time they sold it and the actual

22  consideration received for the certificate  .  Dot,

23  dot, dot.

24                   So the point is they have  -- Morgan

25  Stanley has in their jury charge exactly the same

```
 1   formula that we have.  Now , until the Court
 2   suggested that maybe the Court can decide this
 3   after the verdict , we assumed like in every other
 4   securities case the jury is  just going to apply
 5   that simple formula :  Consideration plus interest ,
 6   minus income .  And that's , we think , very much
 7   within the jury's province.  They just have to have
 8   evidence.
 9               Now, our expert has given two
10   approaches knowing , of course , that Morgan Stanley ,
11   there's lots of these cases .  We know their
12   approach.  She said , Well, if they are convincing
13   and you take their approach, this is how you
14   calculate it.  Our approach , we believe , is the
15   actual compensation approach and this is how you
16   calculate it .  There's nothing inconsistent with
17   the fact that she's given numbers for both.
18   Experts do that a lot.
19               So our point basically , Your Honor , is
20   this is not a motion in limine issue.  At best , maybe
21   this is a charge issue that the  Court deals with on
22   the charge .  But the evidence has got to come into the
23   trial for the jury to be able to decide.
24               THE COURT:  I don't think it can be a
25   charge thing because I think I  have to make a
```

1    decision as to the right methodology legally

2    pretrial, it sounds to me.  Because otherwise the

3    evidence won't be in front of  the jury if I decide

4    that it's --

5                    MR. YETTER:  So --

6                    THE COURT:  -- that it's -- well,

7    either way, I guess.

8                    MR. YETTER:  Our position , Your

9    Honor, our expert's pr epared to give both numbers ,

10   both approaches.

11                   MS. SESHENS:  And as I said , Your

12   Honor, we think that's legally untenable.

13                   MR. YETTER:  It happens in  trials all

14   the time where you have  a more complicated trial

15   where there's some valuation issue and there is an

16   issue that the jury may accept this particular fact

17   over that fact  and a damage expert gives  alternate

18   damage theories .  Frankly, it's happened in every

19   complicated case  --

20                   THE COURT :  Alternate damage theories

21   are if you've got different theories that all fit

22   under the same legal  analysis.  B ut here I think

23   it's a legal question first that will direct the

24   nature of the expert's testimony.

25                   MR. YETTER:  I hear wh ere the Court's

1    coming from.  Obviously you 've heard our arguments

2    why as a legal matter the approach   -- the actual

3    compensation approach is what the statute says is

4    what we think the Court is going to charge the

5    jury.  So the Morgan Stanley position is going to

6    have to require a ch ange in the language of the

7    statut e or a change in the charge to the jury.

8                    But , again, we submit that you could

9    deal with this on  -- at the jury charge or at

10   post-judgment rulings .  But if the Court's inclined

11   to make a decision earlier than that  , we're

12   certainly prepared to  --

13                    THE COURT:  I think that would be

14   tough for the jury because it's a -- what they

15   would hear is , Here's one mathematical formula ,

16   here's another  mathematical formula.  B ut then how

17   do we  instruct them that this is how the Court

18   ruled ultimately  in -- in other words , how does the

19   question change in the jury charge depend  ing on how

20   I make a ruling, say  at the charge conference , that

21   would direct the  jury as to which approach to take  ?

22   That's not clear to me.

23                    MR. YETTER:  So for what it's worth  ,

24   Your Honor , we're comfortable  if the Court wants to

25   make a decision now .  We think the statute is

1    absolutely  clear  for  the  reasons  that  we've  already

2    given  to  the  Court .  We  think  the  full  compensation

3    -- actual  compensation  approach  is  correct.

4              THE  COURT:   Give  you  another  30

5    seconds  if  you  want.

6              MS. SESHENS:    Certainly,  Your  Honor .

7    Thank  you .

8              You've  obviously  heard  us  on  the  fact

9    that  we  think  it 's  a  legal  issue.   I  would  just

10   note  in  closing  that  when  Your  Honor  looks  at  this

11   issue,  it  is  a  legal  issue.   There  is  not  a  single

12   case  that  the  FDIC  has  cited  to  you  that  supports

13   the  full-principal  method .   And  all  of  the  cases

14   that  have  been  decided  in  this  context  and  even     in

15   other  context s  have  supported  the   amortizing

16   principal  method.   We ,  therefore ,  think  there  is  no

17   support  for  the  FDIC's  position.

18              Thank  you,  Your  Honor.

19              THE  COURT:   Tell  me  one  more  time  ,

20   Mr. Yetter ,  where  should  I  read  --  where  should  I

21   look  for  this?  You  just  say  it's  the  plain

22   language  of  the  TSA.

23              MR. YETTER:   So  there  is  no  Texas

24   case  on  this  statute  in  this  context,  Your  Honor.

25   There  is  a  statute  that  has  a  simple  formula.   If

1    the Court would like , we can -- I tried to do -- I

2    tried to kind of distill all this down i nto our

3    presentation .  I'm happy to give you a hard copy of

4    that.  I think we may even have it handy.

5              But the bottom line is , as the

6    statute says , it's a two -step process.  We're

7    handing up to the Court right now a copy  .

8              May I approach, Your Honor?

9              THE COURT:  Sure.

10             MR. YETTER:  I know the Court doesn't

11   like paper , but I thought this might be a little

12   helpful .  But the bottom line is the statute has a

13   clear two-step formula .  To the exten t that Morgan

14   Stanley is correct , they have to change the formula

15   for these types of securities.

16             That's not what the law says.

17   There's one securit ies act.  There's one form ula.

18   It is a two -step formula where income is take  n out

19   in the second step.  Their expert calls repaid

20   principal income, which is what it is ; and it

21   doesn't come out of the first step.

22             And that's our position, Your Honor.

23   I know you can't get  any more certain than the

24   clear words  of our state legislature in every case.

25   This is one where actually  I think it is pretty

 1  clear, Your Honor.

 2              MS. SESHENS:  Your Honor, just one --

 3              MR. YETTER:  Thank you for the time

 4  on this issue.

 5              MS. SESHENS:  -- one point to

 6  conclude.  Well, perhaps really two.

 7              We fundamentally disagree that the

 8  jury charge would have to be changed at all.  The

 9  statute is what the statute is.  The question

10  before the Court is how does one interpret that

11  statute?

12              The jury is not being asked to do

13  that.  The jury will be presented with evidence

14  that is consistent with the interpretation that the

15  Court determines.

16              The second point I would note for

17  Your Honor is the Nomura case that we've talked

18  about had a Section 12 claim, but also had a

19  Virginia blue sky claim, which is the TSA, if you

20  will, of Virginia that also contained the

21  consideration paid plus interest thereon from the

22  date of payment language.  And the Court applied,

23  again, the amortizing principal methodology.

24              So while Texas perhaps hasn't

25  grappled with this issue, other courts have.  The

1    California statute in  Schwab is not different .  It

2    has different language .  It is not substantive ly

3    different .  And the Nomura case  dealt  both with

4    Section 12  and also wi th blue sky  laws.

5                      Thank you,  Your Honor.

6                      THE COURT:  Okay .  I think it's fair

7    for me to look at that case law now  that I have a

8    better grasp of what the argument is about on  this

9    issue.

10                     MS. SESHENS:  Your Honor , on that

11   note, one thing .  Would it be helpful to  Your

12   Honor, and both sides could do this , if we provided

13   you with the cases so that you  have them

14   accessible?  Or do you have them handy?

15                     We realize we should have  thought

16   about this before we came in .  There's a lot of

17   cases we cite , there's a lot of motions .  To the

18   extent it's helpful , I'm sure -- I don't want to

19   speak for the FDIC , but I'm sure we'd all be  happy

20   to send a drive over with everything electronically

21   if that would aid the Court.

22                     THE COURT:  You know what ?  It's just

23   as easy for me to find them on Westlaw as long as

24   they're cited in the  papers.

25                     MS. SESHENS:  Okay .  As long as

```
 1    that's easy enough for you , that's fine.  W e just
 2    wanted to offer it.
 3                    THE COURT:  All right .  Let's see if
 4    we can knock out one more real quick.  Is there a
 5    short one that we could skip to maybe , or two or
 6    three?
 7                    MS. SESHENS:  Hold on one second,
 8    Your Honor.
 9                    THE COURT:  How about use of a smart
10    board at trial , is that --
11                    (Laughing)
12                    MR. YETTER:  So , Your Honor, I'm
13    going to withdraw that because we've tried it and
14    the courtrooms are just not set up effectively.
15    You have to basically kind of  -- you can't really
16    fit it in here  very easily and you have to  kind of
17    do it over the bar.  So we won't use the smart
18    board.  We have good technology in  the courtroom.
19                    THE COURT:  All right.  How about
20    application of  the standing order  of limine ,
21    anybody opposed  to that?
22                    MR. YETTER:  We're good with that
23    one, too, Judge.
24                    THE COURT:  Well --
25                    MR. YETTER:  I s there something  there
```

1    that we have a problem with?

2                    MR. HOLTON:  Well , Your Honor , Mark

3    Holton.

4                    THE COURT:  How are you?  I  haven't

5    talked to you in a  while.  Are you doing okay?

6                    MR. HOLTON:  Fine, sir.  Thank you

7    very much.

8                    In that regard , we do not have an

9    objection to  apply application  of the limine  order.

10   Of course,  we do perhaps have a disagreement with

11   Morgan Stanley about whether that in   limine order

12   precludes the admission of  certain evidence that we

13   think is not  subject to it , but which they have

14   suggested is.

15                   I'm happy  to go into  that.  It's

16   their motion.  I t might be one to knock out

17   quickly .  I don't know .  It's a rather dis crete

18   one, the Bank of America settlement document.  But

19   that's our qualification on the   in limine order.

20                   THE COURT:  Hold on one second .  I'm

21   sorry, so what's the  settlement  document that we're

22   talking about?

23                   MR. HOLTON:  Yes, sir .  Your Honor,

24   this is a motion by Morgan Stanley to preclude the

25   admission into evidence of a settlement agreement

1    between Countrywide and the  Department of  Justice

2    resolving claims relating to RMBS  .

3              And I do need to give a little bit of

4    background here, Your Honor.  You've heard argument

5    today about Dr. James .  And Ms. Seshens noted that

6    one of the things that  Dr. James tries to do  -- and

7    we acknowledge it's related to los  s causation , as I

8    think Your Honor has recognized   -- is to say that

9    he has compared the loans that our underwriter

10   found to be de fective against a controlled set of

11   loans and says, When I do that comparison , the

12   performance is the same in both.  So these

13   underwriting defects didn't cause the loss.

14              THE COURT:  Right.

15              MR. HOLTON:  Well , obviously , Judge,

16   that only works if the controlled set of loans

17   doesn't have the defects associated with it.  And

18   Dr. James fails to make any showing that those

19   loans are free of defects.  And the loans that he

20   chose were loans sold by  Countrywide -- excuse me ,

21   loans sold to the GSE s Fannie Mae and Fredd ie Mac,

22   which we made reference to before.

23              And we -- Dr. James has not made any

24   effort to actually show that that controlled set of

25   loans is free of the defects that our underwriter

1    found in the loans at issue here.

2              But we're trying to go a step beyond

3    that, as we think we're entitled to , Your Honor , as

4    a matter of rebuttal evidence.   As Dr. James

5    admits , his control led set of loans almost

6    certainly contains a lot of loans from   Countrywide

7    because Countrywide was the biggest seller of loans

8    to the GSE s during this  relevant time  period.

9              And that's whe re  the settle ment

10   agreement comes in,  Your Honor.  C ountrywide

11   admitted in its settlement agreement with the

12   Department  of Justice that it sold defective loans

13   to the GSE s during the relevant time period.  So

14   not only has Dr. James f ailed to do anything to

15   demonstrate that his  loans set -- his  control led

16   set is free of defect , we actually have  good

17   evidence that it 's not.

18             And that 's where  the  agreement

19   between the D epartment of  Justice and Bank of

20   America , which of course now owns  Countrywide ,

21   comes in  because it was in that agreement  , an annex

22   to that agreement , where Countrywide , Bank of

23   America  explicitly admitted that we sold defective

24   loans in violation of  -- we made misrepresentations

25   and sold defective loans to the GSEs  .

1        These are the very loans that are in

2   the control set that Dr. James is using to

3   allegedly show no los s causation .  I think it

4   obviously blows up that analysis  entirely.   Now,

5   they said --

6             THE COURT:   And so the limine  point

7   dealing with  settlement agreements  is what you 're

8   addressing ?

9             MR. HOLTON:  Yes, sir .  Because

10  they've --  I don't -- again, don't  want --

11  Ms. Seshens is well able to  speak for herself , but

12  as I understand the argument , they've said, Well,

13  as a matter of sort of policy or what have you,

14  it's a settle ment  agreement , and  so that shouldn't

15  come in .

16             And, of course , our  argument  is,

17  Judge, well,  it's not a  settlement  agreement

18  involving Morgan Stanley .  We're not suggesting

19  that it is.   It's a settlement  agreement involving

20  Bank of America.

21             THE COURT:   So you  say it has some

22  relevance .  So to the extent they're  seeking to

23  exclude  it simply under 408 as a settlement

24  agreement , that shouldn't  happen ?

25             MR. BURNOVSKI:   Your Honor , if I may ?

1      It is our motion .  I'm happy to -- I don't want to

2      interrupt , but I'm happy to explain sort of the

3      bases for the motion , if that would be helpful .

4                      THE COURT :  Sure.  Real quick.

5                      THE REPORTER:   What is your name ?

6                      MR. BURNOVSKI:   Brian Burnovski.

7                      THE REPORTER :  Okay.  Thank you.

8                      THE COURT:   Spell the last name.

9                      MR. BURNOVSKI:  B-u-r-n-o-v-s-k-i .

10                     THE COURT:   Wow, I would have gotten

11     every part of that wrong .

12                     MR. BURNOVSKI:  I t's not an easy one ,

13     Your Honor .

14                     So what the FDIC is seek ing to admit ,

15     Your Honor , is a settle ment agreement by Bank of

16     America with a number of government entities   ,

17     including the U .S. Government and various state

18     attorney general , as well as a statement of facts

19     that was ended to  the agreement.

20                     And just to  -- as a preliminary

21     matter, just to cl ear up a couple of things that

22     Mr. Ho lton said .  Contrary to the FDIC's

23     character ization of the settlement , it is not an

24     admission by Bank of America.  The settlement

25     agreement itself , which is Exhibit 15 to  Morgan

1    Stanley's opening brief, states that Bank of

2    America , quote , unquote , acknowledges the facts set

3    forth in the statement of facts.  It doesn't say

4    anything about an  admission .

5               Second of all , Your Honor, the

6    statement of facts doesn't reflect any conclusive

7    finding of fact by any of the  government  entities

8    or parties to the agreement.  Again, the sett  lement

9    agreement in  Paragraph 21 C states that the

10   settlement was being made , quote , without any

11   adjudication or finding of  any issue of fact or

12   law.

13              So that's just by way of context,

14   Your Honor.  And the bases for our motion for

15   excluding the settlement agreement are twofold.

16   First, it's not relevant.  And second, it's

17   prejudicial.

18              So first on relevance, Your Honor.

19   As you heard, the settlement is being offered by

20   the FDIC in order to support a criticism of

21   Dr. James's analysis, and specifically a criticism

22   that the control group could use to compare to

23   loans at issue in this case is not clean, if you

24   will.

25              The FDIC is incorrect.  As I said ,

```
1   first of all , the way in which they're using  this

2   settlement  is inappropriate because , again, it's

3   not an admission and it's not  any finding of fact.

4   A settlement is just that , a settlement  of disputed

5   claims by two parties .

6                   THE COURT:   Uh-huh.

7                   MR. BURNOVSKI:   And unproven

8   allegations  of misconduct are irrelevant in

9   addition to being hearsay, Your Honor  .  Second, in

10  any event , the settlement doesn't support   Dr.

11  Snow's criticism .  The portion --

12                  THE COURT:   D octor?

13                  MR. BURNOVSKI:   I'm sorry.   Dr. Snow

14  is the FDIC's rebuttal expert to Dr. James.  And

15  the criticism of Dr. James is being offered through

16  Dr. Snow.

17                  And the portion of the statement of

18  facts that the FDIC is relying on is a statement

19  that says -- and it's just one small portion of the

20  statement of facts , which includes a number of

21  other issues  that are  completely irrelevant to this

22  case , and neither the FDIC contends otherwise .

23                  And the portion the y're focusing  on

24  is a supposed admission  -- which , again , we don't

25  believe is an admission  -- that Countrywide or  that
```

1   Bank of America as  the successor to  Countrywide

2   sold loans to the  GSEs Fannie and Freddie, and t hat

3   many of those loans were, quote, defective and/or

4   otherwise ineligible for sale to the GSEs.

5                But what that says, Your Honor, i t's

6   important to sort of focus on what that means.   The

7   fact that loans were in eligible for sale to the

8   GSEs may be a problem for Bank of America , but it

9   doesn't pose any problem  for Dr. James's control

10   group.  And that's because -- simply because the

11   loans didn't meet the underwriting standard  s for

12   the GSEs and were ineligible -- were,  therefore ,

13   ineligible for sale to the  GSEs is completely

14   irrelevant in this case.

15                Because the  offering documents  for

16   the securities at issue in this case specifically

17   disclose that the loans in this case we re

18   underwritten pursuant to standards that were

19   different from the  GSEs underwriting standards  and,

20   in fact , were, quote, less stringent than the GSEs

21   underwriting standards. S o, therefore , Your Honor ,

22   it simply doesn't prove what they're trying to

23   prove with the  settlement.

24                Second of all , even if there was

25   some, quote, unquote, defective loans  in the --

1     that were sold to the  GSEs, again, that doesn't

2     show that there's anything wrong with the

3     benchmark.

4                    For example, Your Honor, if the   GSEs

5     requested that  -- as part of their post purchase

6     diligence efforts that the loans be   a repurchase by

7     Countrywide  and the loans were , in fact ,

8     repurchased, they would n't have been included in

9     Dr. James' benchmark because he simply excluded any

10    loans that would be repurchased.

11                   Second of all , Your Honor  -- so that,

12    Your Honor , is in a nutshell why we believe the

13    settlement agreement and the statement of facts are

14    irrelevant .

15                   But second of all, it's also highly

16    prejudicial .  The FDIC's argument is that it can't

17    be prejudicial because Morgan Stanley was not a

18    party to the settlement agreement  .  But that's not

19    true, Your Honor.

20                   The same concerns regarding juror

21    confusion and unfair prejudice that an  imate legions

22    of decision s that exclude settle ment agreement s are

23    similarly present here.

24                   For example , a juror may hear about  a

25    10-billion-dollar settle ment  with the U.S.

```
 1   Government over conduct relating to  RMBS that
 2   overlaps substantially with the allegation s here
 3   and they simply assume that , Well, Morgan Stanley
 4   must have done the same thing because all   Wall
 5   Street banks are the same .
 6              Second of all , such an improper and
 7   unfounded  inference w ill be particularly
 8   prejudicial here because , as I mentioned, Bank of
 9   America itself didn't admit any wrongdoing under
10   that settle ment agreement.
11              Moreover, the fact that there are no
12   conclusive findings of fact in the statement of
13   facts is important because the jury is likely to
14   find that just because a settlement  is with some
15   government entities , it would take  on undue
16   significance in the minds of jurors.
17              And compound ing that, Your Honor , is
18   the fact that the settlement  agreement itself
19   references a separate  settlement over claims that
20   the FDIC brought against Bank of America on behalf
21   of various failed banks , including Franklin Bank.
22              And I'm sure Your Honor can imagine
23   the confusion and prejudice that would result from
24   knowing that Bank of America  has settled a
25   billion- dollar claim that is very similar to the
```

1    claim at issue here.  Or settled for a billion

2    dollars with similar claims to those  at issue here.

3                    Now, the FDIC offers to redact -- in

4    a footnote, offers to redact references to the FDIC

5    in the agreement.  But, Your Honor, for the reasons

6    I've articulated, Morgan Stanley doesn't believe

7    that that even begins to address the prejudicial

8    effect of admitting the settlement agreement.

9    Particularly given its limited , if any, relevant

10   probative effect.

11                   THE COURT:  Would you elaborate on

12   the -- you think they're offering it for the truth

13   or they're offering  it to show something other than

14   the truth of the matter asserted therein  ?

15                   MR. BURNOVSKI:  I believe they're

16   absolutely offering it  for the truth, Your Honor.

17   It has no relevance unless  you accept as true  the

18   statement in the statement  of facts that

19   Countrywide and/or Bank of America sold , quote,

20   unquote, defective loans to the GSEs.  Only if you

21   accept that as true  is it at all relevant in this

22   case.

23                   THE COURT:  And so setting aside the

24   settlement agreement , this evidence exists

25   elsewhere ?  The evidence that they're trying to

1    show, does that exist outside  of the settlement

2    agreement?

3                      MR. HOLTON:  Affirmative  evidence of

4    defects in the comparative set , Your Honor, I don't

5    believe that we have any other evidence of that.

6                      THE COURT:  So how would you -- okay  .

7    So that if I exclude this document , you're saying ,

8    then you don't have that argument to make?

9                      MR. HOLTON:  Well, our expert , Dr.

10   Snow, points out in his rebuttal that Dr. James,

11   their expert, makes no effort to demonstrate that

12   his control set is , in fact, free of defect.  So

13   that argument is there .  And I don't think they're

14   contesting that  Dr. Snow can make that  point, which

15   he will make and made in his expert report.

16                      But the next step here that we think

17   is critically important to demonstrating just how

18   flawed this analysis is , and you've heard from

19   before how important this issue can be  , this loss

20   causation  issue, how flawed this analysis is,  he

21   said yes.  I don't know .  Acknowledgment ,

22   admission, statement of facts, findings of fact, it

23   all sounds a little bit like,  you know, dancing on

24   the head of a pin, Your Honor.

25                      Countrywide  or Bank of America

1    acknowledged that they did this.  And they

2    acknowledged not just that the loans were not

3    consistent with the guidelines of the  GSEs, but

4    that they were defective .  So it's a little bit of

5    a misread to say  -- to read it as narrowly as

6    Counsel has.

7                  As far as the prejudice goes , Your

8    Honor , really , truly, the important part of  this is

9    Countrywide 's acknowledge ment.  We can present that

10   in a way that would eliminate any reference to a

11   settlement  agreement --

12                  THE COURT:  How  long is that section ?

13   Is it not just a paragraph?

14                  MR. HOLTON:  It's very short .  It's

15   two paragraphs , Your Honor .  It's two paragraphs .

16   And we certainly could distill that and offer that

17   acknowledgment, admission, whatever you want to

18   call it, to the jury without the context  .  We don't

19   think this is necessary without the context of the

20   settlement agreement and the 10 -million-dollar

21   settlement  that Bank of America entered into and

22   all the rest of it.

23                  So if  the prejudice that they're

24   talking about is something that concerns Your

25   Honor , I think it could easily be remedied while

1   still allowing us to put in what's really the crux

2   of the evidence  that we want to put in from the

3   agreement , which is the acknowledge ment, admission

4   by Countrywide  that it sold defective loans  .  The

5   biggest seller of loans to the  GSEs during the

6   relevant time period , that it sold defective loans

7   to the GSEs.

8                    And opposing counsel is , of course,

9   free to make argument s to the  jury about  why that

10  evidence should be not credited or ignored  , but

11  that's really,  I think , all that his  arguments

12  really go to aside from the prejudice   issue.  So we

13  think that  evidence certainly  should be

14  specifically admitted.

15                    (Sotto voce discussion between

16  counsel)

17                    MR.  HOLTON:  So my learned colleague

18  has reminded me that it's really not hearsay  , Your

19  Honor , because what we're doing is demonstrating

20  that there was an investigation that their expert

21  should have done and didn't do to try to

22  demonstrate that he should have seen that these

23  loans  -- that this acknowledge ment by Countrywide

24  had done something to investigate that before

25  putting this before a jury and before   the Court and

```
 1    saying, I've got a clean control group over here of

 2    loans.

 3                      Not only did he fail but  he had

 4    reason to think that there was a problem and he

 5    didn't do anything about it.  So it's not for the

 6    purpose of necessarily for the truth of the matter

 7    being asserted.  I t's that it's  another example of

 8    a faulty process that Dr. James went through to

 9    identify the control led set of loans that he

10    purports to identify as being clean of defect.

11                      If Your Honor has any questions , I'm

12    of course happy to answer them .

13                      MR. BURNOVSKI:  A nd couple of points

14    in response, Your Honor.

15                      THE COURT:  Sure .  Real quick .

16                      MR. BURNOVSKI:  S ure.  Just take them

17    in the reverse  order.  T he last  point that

18    Mr. Ho lton made that it's not being offered for the

19    truth of the matter , I respectfully disagree .  It

20    absolutely is .  And they're fr ee to cross-examine

21    Dr. James without having to  rely on the settlement

22    agreement.

23                      THE COURT:  I'm not going to get hung

24    up on the hearsay part  because experts routinely

25    can and do rely on hearsay .
```

 1                    MR. BURNOVSKI:  Okay.  Then, Your

 2      Honor, still the initial point Mr. Holton made is

 3      that this is necessary in order to show that there

 4      was a process failure by Dr. James.  Again, they

 5      don't each rely on irrelevant and prejudicial

 6      evidence to do so.  They note that it can be

 7      redacted to just those two paragraphs.

 8                    I'm not sure as a practical matter

 9      how that could possibly work, Your Honor, given

10      that the very fact of a settlement with the

11      government is prejudicial.  Whether or not the

12      findings in that are characterize d as an admission

13      or as an acknowledgement of a finding as legal

14      significance --

15                    THE COURT:  Let me interrupt.  Can I

16      see that page, please?  I just want to see what it

17      looks like.

18                    MR. HOLTON:  Of course, Your Honor.

19      I must say that I have -- here --

20                    MS. SESHENS:  We have a clean --

21                    MR. HOLTON:  You have a clean copy.

22      Okay.

23                    MS. SESHENS:  Your Honor, we have a

24      clean copy for you.

25                    MR. HOLTON:  I didn't want to give

1   you one with my notes on it.

2                    THE COURT:  Well , you did want  to

3   give me the one with your notes on it  , but  you

4   thought  it's not fair.

5                    (Laughing)

6                    MR. HOLTON:  I d idn't think it was

7   appropriate to do so , Judge.  It's just a couple of

8   brackets , actually .  So do you  -- here -- okay .

9   Fine.

10                   THE COURT:  Off the record for a

11  second  while  all the cross talk.

12                   (Discussion off the record)

13                   THE COURT:  G o ahead .

14                   MR. BURNOVSKI:   I just wanted to make

15  a point.  Your Honor 's mention ed that you're not

16  going to get  hung  up on hearsay because experts

17  rely on hearsay all the time .  And while true , that

18  doesn't mean that the evidence should be admitted

19  into the record .  I just wanted to quickly draw

20  that distinction.  Thank you.

21                   THE COURT:  That is a fair  point  that

22  in and of itself  it doesn't -- well, let's see , if

23  he relied on it.  W ell, that's a discovery issue.

24  That's a fair  point as to whether it actually comes

25  into evidence , but  whether he can re fer to it or

```
1    talk about it as  the basis of his opinion --
2                    MR. BURNOVSKI:  U nderstood , Your
3    Honor .  I just wanted to draw that distinction.
4                    THE COURT:  That's fair.
5                    (The Court reviewing documents)
6                    THE COURT:  I'm looking  for the
7    beginning here where it says the statement of
8    facts -- hold on one second.
9                    MR. BURNOVSKI:  Your Honor, may I
10   approach?  Well, it might be helpful to have the
11   settlement agreement as well as the annex together   ,
12   if that's what Your Honor  was --
13                   THE COURT:  Sure .  If you've got  it,
14   I'll take a look at it.   Go ahead.   Come on up.
15                   MR. BURNOVSKI:  T his is the
16   settle ment agreement, Your Honor.  And this is the
17   complete annex and  the relevant page it's on,  Page
18   27.
19                   THE COURT:  Let me ask you a
20   question.  It says statement of facts and there's a
21   settlement agreement.  What is the evidence or how
22   does one know that this is , in fact , true as
23   opposed to  -- or an admission by  Countrywide , for
24   example , as opposed to just a finding by  -- by who,
25   by the what , the DOJ or SEC or somebody like that?
```

```
 1              MR. HOLTON:  I think that the

 2   Department of  Justice was the princip al negotiator.

 3   Your Honor , again , I think --  I don't have it i n

 4   front of me , but I think the settlement agreement

 5   explicitly notes Countrywide 's acknowledgement of

 6   the statement of facts.  A nd that  was a semantic

 7   discussion that we had had previously.

 8              I'm not sure where in the agreement

 9   that is.  I would have to take a look at it if I

10   could try to find it .  But Your Honor --

11              MR. BURNOVSKI:   Your Honor , it's --

12   recital I of the settlement agreement is the

13   portion that talks about Bank of America

14   acknowledging and not admitting the statement   --

15   the statements in the statement of fact.  And I

16   would add as well , Paragraph 21 C , contrary to  what

17   Mr. Ho lton just said , indicates explicitly that

18   there is no finding of fact.

19              THE COURT:  Then what does it mean to

20   acknowledge the facts set out in the statement of

21   facts in English ?

22              MR. BURNOVSKI:   I think , Your Honor

23   -- I'm sure that provision was he avily negotiated .

24   And I think the fact that it's not an admission is

25   meaningful  and it's more than just a semantic
```

```
 1    meaning .  And obviously I don't mean to not answer
 2    Your Honor's question .
 3                    THE COURT:  No.  I --
 4                    MR. BURNOVSKI:  W e weren't involved
 5    in that settlement agreement and I'm not sure what
 6    it is.  But the fact that it --  I know what it's
 7    not, and it's not an admission.  And I would add to
 8    that again the fact that there  is expressly no
 9    finding of fact  --
10                    THE COURT:  Yeah .
11                    MR. BURNOVSKI:  --  by the government.
12                    THE COURT:  I mean, it could have
13    said they have read the statement  of f acts.  It
14    also could  have said they admit or adopt the
15    statement  of f acts.  I tend to agree with you that
16    it was not something done lightly.
17                        COURT'S  RULING
18                    THE COURT:  All right .  I'm going to
19    rule that pursuant to 403 , the danger of undue
20    prejudice greatly outweighs the probative value of
21    this document.  And I will exclude the document
22    itself.  If the evidence  -- the information may
23    very well be pertinent to the expert's analysis and
24    opinions , but you'll have to get at it another way.
25                    MR. HOLTON:  Yes, sir.
```

```
 1               THE COURT:  Very good.  We'll leave
 2    it there.   Are we scheduled to resum e this at some
 3    point in the future?
 4               MS. SESHENS:  Not presently, but I
 5    was just going to ask Your Honor if maybe you
 6    wouldn't like to, but I suppose we probably have
 7    to.
 8               THE COURT:  Yeah.  No.  I would be happy
 9    to.  Is 2017 good for you?
10               (Laughing)
11               THE COURT:  Let's see.  We're set for
12    trial at the  very beginning of January , no?  Or right
13    after July --
14               MR. YETTER:  July .  July.
15               MR. CALLAHAN:  July 6th.
16               (Multiple speakers)
17               THE COURT:  Yes, the beginning of  July
18    -- right after the 4th of July.
19               MS. SESHENS:  Correct.
20               THE COURT:  I'm sure we could find some
21    time between now and then  to set aside a day to work
22    on these things .  And then I guess we'll have to  --
23    whatever we can't finish , we'll have to pick up  -- you
24    know, as the trial starts , spend a day or two ,
25    hopefully not more than that , on pretrial matters.
```

1              All right.   I guess let me just let you

2     talk to Veronica.   Veronica and I will visit the next

3     day or so.   And if you then would follow up with her

4     and see what works with your schedules  .   And if we can

5     squeeze in a day  between now and the beginning of

6     trial -- before that week of trial, I could do that.

7              I'm going to be gone the week of   -- from

8     Saturday through the following week  .   So that leaves

9     us with the second half of June.   We ought to be able

10    to find some time in there at some   point.   I know I've

11    got a couple of trials scheduled  , but we'll do the

12    best we can.

13              MR. YETTER:   Thank you, Judge .   That

14    works.

15              THE COURT:   Okay.

16              MS. SESHENS:   Thank you, Your Honor  .

17    Before we adjourn , I had promised Your Honor  some

18    cites on materiality .   I just wanted to respond to

19    Your Honor's prior question .   And we cite two cases on

20    Page 22 of our opposition on the Dr. James   Motion in

21    Limine.   There are In re Merck and In re SLM   Corp.

22    Securities Litigation .   And both are on the same page

23    at the bottom  of 22.

24              THE COURT:   And that's under  your

25    opposition on ?

1              MS. SESHENS:   The Dr. James -- the

2    challenge to Dr. James's materiality opinion as

3    improper hindsight coming in.  Your Honor had asked me

4    previously for case s and I said I didn't have other s

5    at the ready, but we pulled them together.

6              THE COURT:  But you had also cited  --

7    you had told me about Burlington  on that topic  and

8    Gebhardt .

9              MS. SESHENS:   I did.  I just wanted to

10   make sure Your Honor had plenty to read.

11             THE COURT:  Thank you.  Burlington and

12   Gebhardt.  Very good.  We'll leave it there .  Have a

13   nice afternoon.

14             MS. SESHENS:   Thank you very much, Your

15   Honor.

16             THE COURT:  Can I get some order s to

17   conform with the rulings I  have made thus far , please?

18             MR. YETTER:  Yes, Your Honor.

19             MS. SESHENS:   Absolutely.

20             MR. YETTER:   We'll get those over to

21   you.

22             THE COURT:  If you-all can share it and

23   have it all be  one order  thus far , I would appreciate

24   that.

25             MR. YETTER:  We'll do that, Judge.

26

1   THE STATE OF TEXAS )

2   COUNTY OF HARRIS)

3       I, Carolyn Ruiz Coronado, Official Court Reporter
    in and for the 151st Civil District Court of Harris
4   County, State of Texas, do hereby certify that the
    above and foregoing contains a true and correct
5   transcription of all portions of evidence and other
    proceedings requested in writing by counsel for the
6   parties to be included in this volume of the
    Reporter's Record, in the above-styled and numbered
7   cause, all of which occurred in open court or in
    chambers and were reported by me.

8

9       I further certify that this Reporter's Record of
    the proceedings truly and correctly reflects the
    exhibits, if any, admitted, tendered in an offer of
10  proof or offered into evidence.

11      I further certify that the total cost for the
    preparation of this Reporter's Record is $1,243.00 and
12  will be paid by Ms. Lauren Miller Etlinger, NORTON
    ROSE FULBRIGHT US LLP.

13

14      WITNESS MY OFFICIAL HAND this the 5th day of
    June, 2015.

15

16      /s/Carolyn Ruiz Coronado
        Carolyn Ruiz Coronado, Texas CSR#7113
17      Expiration Date:  12/31/2016
        Official Reporter, 151st Civil District Court
18      Harris County, Texas
        201 Caroline, Houston, Tx 77002
19      (713) 398-3548

20

21

22

23

24

25

1                          WORD  INDEX

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**- . -**

**.112** [1]  3:9
**.113** [1]  3:10
**.114** [1]  3:11

**- 0 -**

**00830700**  [1]
2:21

**- 1 -**

**1,243.00**  [1]
113:11
**10-billion-dolla
r** [1]  98:25
**10-million-doll
ar** [1]  102:20
**10017** [1]  2:18
**10036** [1]  2:5
**12's** [2]  56:15;
80:22
**1211** [1]  2:4
**1301** [1]  2:22
**151ST** [1]  1:8
**151st**     [2]
113:3, 17
**1933** [1]  6:11

**- 2 -**

**2007** [1]  70:13
**2011-67305**  [1]
1:3
**2015** [5]  1:19;
3:4;  4:2;  65:4;
113:14
**2016**      [1]
113:17
**2017** [1]  110:9
**20th** [1]  65:4
**2200** [1]  2:22
**22154200**   [1]
2:8
**24055248**   [1]
2:9

**24065755**  [1]
2:21
**25-million-doll
ar** [1]  51:9
**2800** [1]  2:22

**- 3 -**

**30,109** [1]  3:8
**3600** [1]  2:11
**398-3548**   [1]
113:19

**- 4 -**

**450-4855**   [1]
2:18
**450-4875**   [1]
2:19

**- 5 -**

**5100** [1]  2:22

**- 6 -**

**632-8000**   [1]
2:12
**632-8002**   [1]
2:12
**651-5151**   [1]
2:23
**651-5246**   [1]
2:24

**- 7 -**

**7113**      [1]
113:16
**75201** [1]  2:23
**755-0052**   [1]
2:6
**755-0100**   [1]
2:5
**77002**      [1]
113:18
**77010** [2]  2:11,
23

**- 8 -**

**855-8000**   [1]
2:23
**855-8200**   [1]
2:24

**- A -**

**ability**     [4]
41:12,    15;
57:12, 13
**able** [8]  7:12;
19:25;  21:23;
22:1;     80:6;
82:23;  93:11;
111:9
**about**     [74]
5:10,  16,  21,
22;    6:8,  12,
21;       9:22;
10:15;   12:24;
13:12;    15:6,
23, 25;   16:6,
14;  17:13, 14;
18:8;  21:6, 10,
16,  17,  21;
22:2;  24:3, 13,
22;    25:3,  4;
26:15,    20;
27:15,  17,  20,
24;     29:21;
30:1;    32:17,
21;     33:12;
35:1, 21;  38:5;
39:9;     43:6;
44:2;     46:2;
51:21;   59:14;
64:7;    66:12;
73:7;    79:13;
80:18,  19,  21,
22;     87:18;
88:8, 16;  89:9,
19;   90:11, 22;
91:5;     95:4;
98:24;   102:24;
103:9;    104:5;

107:1;   108:13;
112:7
**above**      [1]
113:4
**above-entitled**
[1]  1:21
**above-styled**
[1]  113:6
**Absolutely** [2]
72:18;  112:19
**absolutely** [5]
24:18;   70:12;
85:1;   100:16;
104:20
**accept**     [3]
83:16;  100:17,
21
**accepted**   [1]
8:6
**access**     [1]
21:23
**accessible** [1]
88:14
**accord**     [1]
56:16
**according** [2]
39:17;  52:12
**account**    [1]
58:11
**accounting** [2]
52:15; 58:9
**accurate**   [1]
29:13
**accurately** [2]
21:15; 33:1
**Acker** [1]  2:20
**acknowledge**
[2]       91:7;
108:20
**acknowledged**
[2]  102:1, 2
**acknowledgeme
nt** [5]   102:9;
103:3,    23;
105:13; 108:5
**acknowledges**
[1]  95:2
**acknowledging**
[1]  108:14

**Acknowledgment** [1] 101:21

**acknowledgment** [1] 102:17

**across** [3] 35:5, 6

**action** [1] 57:13

**actionable** [3] 10:9; 17:11; 21:11

**actual** [19] 22:5; 23:8; 26:4, 6; 27:21; 54:12; 60:8; 61:10, 11; 64:10; 72:5, 7; 77:8, 18; 78:12; 81:21; 82:15; 84:2; 85:3

**actually** [23] 7:21; 12:23; 16:12; 32:6; 40:16; 44:9; 45:6; 47:9; 54:17; 55:10; 64:17; 65:19; 71:4; 72:6; 75:25; 77:10; 78:25; 79:24; 86:25; 91:24; 92:16; 106:8, 24

**added** [2] 62:13; 76:10

**addition** [1] 96:9

**additional** [2] 33:6; 46:13

**address** [9] 4:4; 13:24; 14:4, 24; 24:19; 25:22; 30:3; 53:14; 100:7

**addressed** [2] 4:5, 6

**addressing** [1] 93:8

**adds** [2] 60:10, 11

**adjourn** [1] 111:17

**adjudication** [1] 95:11

**administer** [1] 5:1

**admissibility** [1] 4:7

**admission** [14] 90:12, 25; 94:24; 95:4; 96:3, 24, 25; 101:22; 102:17; 103:3; 105:12; 107:23; 108:24; 109:7

**admit** [4] 7:14; 94:14; 99:9; 109:14

**admits** [1] 92:5

**admitted** [8] 2:4, 16; 7:9; 92:11, 23; 103:14; 106:18; 113:9

**admitting** [2] 100:8; 108:14

**adopt** [1] 109:14

**adopted** [1] 8:24

**advance** [1] 56:10

**Affirmative** [1] 101:3

**affirmative** [3] 43:10, 11; 74:7

**affirmatively** [1] 49:10

**after** [19] 8:10; 10:21; 12:15; 13:3; 31:3; 32:15; 33:7; 35:17, 25; 36:2; 46:6; 62:13;

**66**:8; 72:24, 25; 82:3; 110:13, 18

**after-the-fact** [1] 47:16

**afternoon** [1] 112:13

**afterwards** [2] 72:21; 73:15

**Again** [5] 5:12; 58:19; 73:14; 95:8; 105:4

**again** [19] 6:2; 12:12; 23:25; 40:25; 42:14, 19; 58:4; 63:21; 68:1; 73:11, 12; 84:8; 87:23; 93:10; 96:2, 24; 98:1; 108:3; 109:8

**against** [5] 4:8; 8:12; 48:14; 91:10; 99:20

**agree** [13] 14:10, 19; 16:25; 17:19; 27:20; 35:11; 45:4; 65:8; 69:17; 77:21; 80:10; 109:15

**agreed** [4] 49:1; 69:14; 71:12; 78:7

**agreement** [35] 90:25; 92:10, 11, 18, 21, 22; 93:14, 17, 19, 24; 94:15, 19, 25; 95:8, 9, 15; 98:13, 18; 99:10, 18; 100:5, 8, 24; 101:2; 102:11, 20; 103:3; 104:22; 107:11, 16, 21;

**108**:4, 8, 12; 109:5

**agreements** [2] 93:7; 98:22

**ahead** [2] 106:13; 107:14

**allegations** [3] 25:9; 96:8; 99:2

**alleged** [13] 19:18, 23; 25:13, 19; 32:20; 33:7; 38:20; 39:7, 11, 16; 40:10; 43:1, 13

**allegedly** [7] 12:15; 32:1, 20; 34:6, 7; 41:3; 93:3

**allowing** [1] 103:1

**allows** [1] 59:6

**almost** [1] 92:5

**along** [2] 37:8; 68:5

**already** [7] 9:2, 4; 22:22; 38:25; 55:22; 58:19; 85:1

**also** [18] 4:22; 8:24; 17:6; 20:19; 28:11, 21; 30:1, 3; 33:14; 43:21; 51:19; 67:4; 87:18, 20; 88:4; 98:15; 109:14; 112:6

**altered** [1] 14:17

**Alternate** [1] 83:20

**alternate** [1] 83:17

**although** [1] 4:14

**always** [2] 54:6; 73:17

**America** [16]
90:18;   92:20,
23;     93:20;
94:16,   24;
95:2;   97:1, 8;
99:9,  20,  24;
100:19;
101:25;
102:21;  108:13

**Americas** [1]
2:4

**amongst** [1]
25:5

**amortizing** [19]
51:10;   56:12;
57:11,   22;
58:10;   61:16;
68:4,    18;
69:14;  74:4, 9,
24;      75:6;
76:4,    18;
80:25;   81:1;
85:15;  87:23

**amount** [9]
25:25;   54:21;
60:17;   62:23;
66:16;   67:10;
71:11;   75:1;
76:8

**analogous** [1]
58:3

**analyses** [2]
30:23; 33:18

**analysis** [34]
28:8,    12;
30:17;   32:3;
33:9,    16;
35:13;      38:3,
17, 21;  39:20;
40:21,   24;
41:24;  42:1, 2,
3;       43:20;
44:8, 11;  45:4,
7,  19;   46:10,
22;      47:4;
80:11;   83:22;
93:4;    95:21;
101:18,  20;
109:23

**analyze** [2]
11:1; 32:18

**analyzed** [1]
37:20

**animate** [1]
98:21

**annex** [3]
92:21;  107:11,
17

**another** [6]
7:15;     33:8;
84:16;    85:4;
104:7; 109:24

**answer** [3]
81:14;  104:12;
109:1

**answered** [1]
81:11

**answering** [1]
38:18

**Anybody** [1]
53:15

**anybody** [3]
73:12;    77:6;
89:21

**anything** [11]
6:9, 16;  25:24;
26:22;  69:10;
74:2;    80:18;
92:14;    95:4;
98:2; 104:5

**apologize** [3]
18:18;   47:14;
49:9

**apparently** [2]
8:2; 68:24

**Appearances**
[1] 3:5

**Appendix** [1]
49:15

**application** [5]
51:13;   57:23;
58:24;   89:20;
90:9

**applied** [8]
28:7;    31:11;
55:4;   56:8, 11;
58:8; 87:22

**applies** [8]
22:20;  31:4, 5;

35:3, 5;   52:11,
13; 61:2

**apply** [8]
28:14;   51:17;
57:22;   69:14;
72:23;   73:14;
82:4; 90:9

**applying** [1]
52:23

**appraisal** [3]
25:16,   17;
46:18

**appraisals** [3]
25:20;   39:10;
46:4

**appreciate** [2]
23:23; 112:23

**approach** [14]
69:18;  72:6, 7,
23;   82:12, 13,
14, 15;   84:2,
3,  21;   85:3;
86:8; 107:10

**approaches** [2]
82:10; 83:10

**appropriate** [8]
18:25;   33:19;
34:18;    53:4;
57:5;   73:16;
74:20;  106:7

**appropriately**
[1] 73:19

**aren't** [1]
57:11

**argue** [4] 9:14;
11:19;   53:18;
54:2

**argued** [2] 7:4;
51:20

**argues** [2]
4:13; 8:3

**arguing** [5]
17:7;   22:14;
66:22; 73:3, 6

**argument** [10]
26:5;    47:4;
80:20;    88:8;
91:4;    93:12,
16;     98:16;
101:8, 13

**arguments** [4]
51:20;   84:1;
103:9, 11

**arise** [1] 32:10

**around** [1]
44:15

**arrived** [1]
54:19

**arrow** [1] 22:4

**article** [2] 7:8;
29:10

**articles** [9]
4:7;      8:12;
10:14;   14:4;
19:8;    20:7;
28:19;   29:19,
24

**articulate** [1]
40:1

**articulated** [3]
38:13;   55:18;
100:6

**ascertain** [1]
5:14

**ascertainable**
[1] 72:15

**aside** [3]
100:23;
103:12; 110:21

**asked** [5]
24:16;   38:19;
79:14;   87:12;
112:3

**asking** [5]
13:11;   61:15;
73:20; 78:1, 3

**asserted** [6]
28:23,   25;
29:8;    51:14;
100:14; 104:7

**assess** [4]
31:4;    38:20;
47:16; 78:20

**assessed** [3]
17:21;   30:20;
38:25

**associated** [1]
91:17

**assume** [3]
48:13, 19;  99:3

**assumed** [1]
82:3
**assumes** [1]
51:2
**attempting** [1]
44:4
**attorney** [2]
62:24;  94:18
**attributing** [1]
40:25
**authority** [1]
24:2
**available** [11]
5:21;      14:18,
25;      15:3;
16:2;  17:1, 25;
24:9;    34:11;
35:25
**avenues** [1]
19:2
**average** [1]
36:22
**avoid** [2]
36:23;  46:7
**award** [1]
54:21
**awarded** [1]
76:17
**awarding** [1]
71:10
**aware** [5]  8:21,
22;  9:4;  11:9;
56:1

--- - B - ---

**B-u-r-n-o-v-s-k**
**-i** [1]  94:9
**back** [11]   6:2;
12:18,    24;
14:2;    24:16;
35:17;  46:11;
52:20,    22;
54:1;  56:24
**backed** [3]
74:25;     75:2;
76:2
**background** [1]
91:4

**backs** [1]
16:23
**backward** [1]
30:25
**backwards** [1]
45:5
**backwards-look**
**ing** [1]  39:1
**badly** [1]  37:16
**baked** [1]
55:10
**balance** [5]
52:21,    24;
56:8, 19;  76:10
**BANK** [1]  1:5
**Bank** [38]
15:20;  16:4, 7,
20,  21;    17:2,
6;  18:1;  19:6,
7,  17;    22:6;
24:2, 25;  25:3,
7;      27:25;
28:13;  29:17;
52:14,    16;
90:18;  92:19,
22;    93:20;
94:15,    24;
95:1;  97:1, 8,
99:8,  20,  21,
24;    100:19;
101:25;
102:21; 108:13
**Bank's** [4]
17:14,     18;
21:16; 25:19
**banks** [2]  99:5,
21
**base** [3]  41:18;
42:22;  67:10
**based** [8]  19:7;
31:18;    32:12;
39:7,      12;
40:21;  46:12;
51:7
**bases** [2]  94:3;
95:14
**basically** [6]
55:20;    60:7;
61:9;      71:6;
82:19;  89:15

**basis** [4]
61:16;    77:2;
78:15;  107:1
**bearing** [1]
13:17
**became** [2]
12:7, 9
**Because** [11]
4:8;        7:9;
40:24;    41:9;
42:14;    44:1;
62:21;  66:24;
83:2;     93:9;
97:15
**because** [53]
5:6;        6:18;
7:15;  9:3, 16;
24:6;    28:20,
21, 22;  30:21;
31:9;      33:5;
34:10,      22;
36:7;  37:5, 16,
25;        38:6;
41:12,      15;
44:10;    53:8,
10, 21;  55:20;
57:5;    59:10;
63:18;    65:11,
24;    68:13;
70:12;  75:16;
79:7;    80:12;
82:25;  84:14;
89:13;    92:7,
21;      96:2;
97:10;    98:9,
17;  99:4, 8,
13, 14;  103:19;
104:24; 106:16
**become** [1]
49:17
**been** [25]  11:6;
14:16;    25:2;
27:14,      15;
29:1,  5,  21;
31:22;    33:11;
34:23;  36:5, 7;
37:1;    43:2;
45:12;    49:1;
54:6;      55:3;
57:19;    59:14;

79:17;    85:14;
98:8
**Before** [3]
30:6;    50:25;
111:17
**before** [24]
1:21;        7:4;
10:20;  46:17;
47:19;    52:2;
62:22;  64:17;
67:5;      73:1;
74:2;    79:5,  7,
17;    80:16;
87:10;  88:16;
91:22;  101:19;
103:24,    25;
111:6
**began** [1]  9:7
**beginning** [6]
50:15;    67:9;
107:7;  110:12,
17;  111:5
**begins** [1]
100:7
**begun** [2]   8:4,
8
**behalf** [2]
53:19;  99:20
**being** [17]
15:6;    22:11;
28:22,    24;
29:1;    30:17;
69:6;      76:1;
77:3;    87:12;
95:10,      19;
96:9,      15;
104:7, 10, 18
**beings** [1]
22:5
**believe** [17]
14:18;    20:19;
25:6;    32:22;
42:13;  68:17;
69:10,      20;
72:9,        10;
77:11;  82:14;
96:25;  98:12;
100:6,      15;
101:5

**benchmark** [2] 98:3, 9
**besides** [1] 37:25
**best** [5] 27:1, 3; 46:22; 82:20; 111:12
**better** [4] 23:24; 45:15; 68:9; 88:8
**between** [15] 12:20; 21:5; 33:25; 37:3, 22; 40:2; 51:10; 52:3; 74:21; 79:9; 91:1; 92:19; 103:15; 110:21; 111:5
**beyond** [3] 6:20; 17:12; 92:2
**Bible** [4] 49:18, 20, 25; 50:7
**biggest** [2] 92:7; 103:5
**billion** [1] 100:1
**billion-dollar** [1] 99:25
**bite** [1] 47:3
**blank** [1] 79:20
**bless** [1] 78:9
**blows** [1] 93:4
**blue** [6] 21:21, 22; 70:13, 21; 87:19; 88:4
**board** [2] 89:10, 18
**bond** [3] 36:24; 37:7, 11
**borne** [1] 32:4
**Both** [2] 65:8, 21
**both** [32] 4:11; 5:6; 6:7, 22; 19:9; 23:12; 28:20; 29:24; 37:9; 44:9;

46:4, 18; 55:15; 56:5, 6; 60:19; 64:17, 19, 24; 65:18; 66:18; 67:13, 20; 69:14; 77:12; 82:17; 83:9, 10; 88:3, 12; 91:12; 111:22
**bottom** [4] 66:7; 86:5, 12; 111:23
**bought** [2] 60:14; 71:24
**brackets** [1] 106:8
**Brian** [2] 2:15; 94:6
**brief** [8] 7:18; 10:15; 11:4; 14:22; 16:10; 27:5; 46:24; 95:1
**briefing** [2] 32:17; 52:7
**briefly** [6] 27:11, 22; 36:13; 68:19; 69:4; 81:5
**bright-line** [1] 48:2
**bring** [1] 57:12
**broad** [4] 4:13; 14:8; 21:12; 22:12
**broadly** [2] 17:14; 42:1
**brought** [1] 99:20
**Bryce** [2] 2:9
**bullet** [1] 61:7
**burden** [2] 19:11, 22
**burdens** [1] 20:1
**Burlington** [8] 32:16, 22, 24; 34:20; 47:6, 7; 112:7, 11

**Burlington's** [1] 32:25
**BURNOVSKI** [18] 93:25; 94:6, 9, 12; 96:7, 13; 100:15; 104:13, 16; 105:1; 106:14; 107:2, 9, 15; 108:11, 22; 109:4, 11
**Burnovski** [2] 2:15; 94:6
**business** [3] 4:18; 16:18, 21
**buyer** [7] 6:16, 19; 8:21; 9:1, 3, 15; 22:20

- C -

**calculate** [8] 54:12; 55:1; 62:17; 76:7; 78:16; 79:15; 82:14, 16
**calculated** [7] 58:7; 61:24, 25; 67:11; 75:1; 76:9; 77:3
**calculates** [1] 52:9
**Calculating** [1] 50:18
**calculation** [2] 68:13; 73:8
**calculations** [2] 52:10; 77:19
**California** [6] 56:3; 68:21, 24; 69:7, 9; 88:1
**call** [3] 65:22; 68:4; 102:18
**CALLAHAN** [3] 50:5, 11; 110:15

**Callahan** [1] 2:9
**called** [3] 9:1; 65:9; 68:3
**calling** [2] 39:4; 59:19
**calls** [1] 86:19
**came** [3] 1:20; 37:8; 88:16
**can't** [23] 5:6; 7:11; 8:14; 15:12; 21:25; 32:11; 34:17; 39:1; 49:5; 64:5; 65:22, 23, 25; 66:5; 70:25; 74:15; 80:24; 86:23; 89:15; 98:16; 110:23
**cannot** [3] 55:18; 74:20; 75:19
**capable** [1] 68:16
**Caroline** [1] 113:18
**Carolyn** [4] 43:18; 113:3, 16
**case** [75] 5:13; 7:1, 4; 8:24; 10:20; 11:5, 24; 14:23; 15:13; 16:11, 15; 18:24; 23:16, 20; 25:10; 26:25; 27:1, 3, 5; 28:5; 29:12, 17; 30:22; 31:17; 32:16; 33:17, 19; 34:20; 35:9; 39:11, 17; 40:11; 43:10; 46:1, 20, 22; 47:6, 8; 49:7; 51:12; 55:8, 23; 56:2, 4,

16; 68:17, 21;
69:12, 14, 21,
23; 70:16;
73:12; 74:6,
23; 76:1, 16,
17; 79:22;
82:4; 83:19;
85:12, 24;
86:24; 87:17;
88:3, 7; 95:23;
96:22; 97:14,
16, 17; 100:22
**cases** [30]
11:1, 14;
14:22; 15:5;
29:18; 31:2, 3,
5, 7; 32:6;
34:19, 21;
35:4; 38:5;
46:5; 47:12,
24; 55:2, 25;
56:17, 20;
68:15; 82:11;
85:13; 88:13,
17; 111:19;
112:4
**cash** [1] 41:13
**Causation** [1]
43:9
**causation** [13]
10:17; 41:7;
43:5, 6, 8, 23;
44:6; 45:21,
24; 48:6;
91:7; 93:3;
101:20
**CAUSE** [1] 1:3
**cause** [6] 1:21;
43:12, 17;
57:13; 91:13;
113:7
**caused** [2]
29:11, 14
**causes** [1]
71:7
**ceased** [1]
37:17
**certain** [7]
7:24; 18:1;
48:6; 60:17;

68:9; 86:23;
90:12
**Certainly** [2]
30:15; 85:6
**certainly** [4]
84:12; 92:6;
102:16; 103:13
**certainty** [1]
49:6
**Certificate** [1]
3:10
**certificate** [3]
81:17, 21, 22
**certify** [3]
113:4, 8, 11
**cetera** [1]
10:14
**challenge** [2]
74:23; 112:2
**challenged** [1]
33:18
**challenges** [2]
19:9; 30:16
**chambers** [1]
113:7
**change** [6]
64:11; 77:18;
84:6, 7, 19;
86:14
**changed** [4]
5:12, 17, 23;
87:8
**chaotic** [1]
4:24
**characteristics**
[11] 5:4; 16:1;
18:1, 2; 22:10,
17; 32:1;
39:13, 14;
40:7, 11
**characterizatio**
**n** [1] 94:23
**characterized**
[2] 74:3;
105:12
**charge** [20]
18:13; 63:11,
12, 25; 64:19;
70:1; 72:11;
75:15, 18;

79:13; 81:25;
82:21, 22, 25;
84:4, 7, 9, 19,
20; 87:8
**charges** [2]
64:18; 65:3
**chart** [1] 49:15
**chime** [1]
53:15
**choose** [2]
74:21; 79:23
**chose** [1]
91:20
**CHRONOLOGIC**
**AL** [1] 3:3
**Chronological**
[1] 3:6
**Circuit** [2]
14:23; 28:6
**circumstance**
[2] 11:25;
12:3
**circumstances**
[6] 7:25; 8:2;
36:24; 37:12,
13, 21
**circumstantial**
[1] 20:17
**cite** [6] 16:9;
28:6; 55:23;
68:15; 88:17;
111:19
**cited** [13]
14:22; 15:5;
27:5; 28:10;
31:2; 46:24;
47:9; 56:3, 17;
85:12; 88:24;
112:6
**cites** [4] 4:20;
32:16; 47:18;
111:18
**Citizens** [1]
70:15
**Civil** [2] 113:3,
17
**claim** [11] 6:9,
17; 7:7, 13,
22; 18:15;
57:14; 87:18,

19; 99:25;
100:1
**claiming** [1]
68:14
**claims** [7]
23:15; 28:5;
51:14; 91:2;
96:5; 99:19;
100:2
**clarify** [3]
48:9; 75:14, 25
**clarity** [1] 58:6
**clean** [6]
95:23; 104:1,
10; 105:20, 21,
24
**clear** [16] 7:6;
10:18; 22:19;
60:10; 70:12;
74:5, 18; 75:4;
76:3, 25;
84:22; 85:1;
86:13, 24;
87:1; 94:21
**clearly** [3]
18:24; 75:7;
80:16
**client** [1]
59:16
**closed** [1] 13:3
**closing** [2]
13:10; 85:10
**CO.INC.** [1] 1:8
**coach** [1]
50:11
**Coat** [1] 32:22
**coats** [1] 32:21
**COLEMAN** [1]
2:10
**colleague** [2]
79:12; 103:17
**Come** [1]
107:14
**come** [9] 6:1,
7; 55:2; 71:9;
72:20; 81:13;
82:22; 86:21;
93:15

comes      [4]
12:15;     92:10,
21; 106:24
comfortable [1]
84:24
coming      [3]
37:19;   84:1;
112:3
Comma      [1]
81:19
comment      [3]
38:8, 9; 64:6
common      [2]
4:10; 6:25
commonplace
[1] 31:2
COMPANY   [3]
1:7; 2:19, 24
company    [1]
32:8
comparative [1]
101:4
compare    [1]
95:22
compared   [1]
91:9
comparison [1]
91:11
compensate [1]
71:9
compensation
[14]     60:12;
61:10, 11, 21;
65:12, 15, 23;
69:5, 6;  72:7;
82:15;    84:3;
85:2, 3
compensatory
[2]      58:22;
70:24
complaint  [1]
7:9
complaints [10]
4:7;      8:12;
14:4;    19:8;
20:7;   28:19;
29:19,    24;
48:14; 60:7
complement [1]
39:21

complete   [1]
107:17
completely [5]
11:16;   15:13;
50:9;   96:21;
97:13
compliance [1]
72:3
complicated [2]
83:14, 19
complied   [1]
46:3
comply     [1]
70:20
component  [4]
23:20;   53:11;
55:10, 12
components [2]
18:24; 79:15
compounding
[1] 99:17
comprises  [2]
14:20; 15:18
compromises
[2] 17:3, 24
computer-aided
[1] 1:24
conceded   [1]
51:22
concept    [5]
4:13;  23:2, 6;
41:9; 42:12
concepts   [3]
33:25; 44:5, 10
concerned  [2]
17:13; 18:8
concerning [3]
14:3, 5;  25:20
concerns   [3]
26:6;   98:20;
102:24
conclude   [2]
78:13; 87:6
concluding [1]
72:5
conclusions [2]
40:2; 44:13
conclusive [2]
95:6; 99:12

conduct    [1]
99:1
conducted  [2]
31:25; 44:12
conference [1]
84:20
conflate   [1]
44:5
conflating [2]
44:3, 9
conform    [1]
112:17
conformity [1]
40:13
confused   [1]
27:17
confusion  [2]
98:21; 99:23
Congress   [1]
23:12
consider   [6]
19:1;   30:11;
32:14;   54:5;
73:16
Consideration
[1] 82:5
consideration
[16]  52:13, 21;
54:9;   56:19;
58:3,    16;
66:25;  76:5, 6,
8,   19,   21;
80:23;   81:17,
22; 87:21
considered [4]
33:6;    47:6;
55:6; 56:1
considers  [1]
39:21
consistent [2]
87:14; 102:3
construes  [1]
9:17
contained  [1]
87:20
contains   [2]
92:6; 113:4
contend    [6]
16:24;   20:5;

25:11;   28:12;
46:13; 52:25
contended  [1]
27:23
contending [1]
34:16
contends   [4]
15:3;   20:13;
57:3; 96:22
contention [2]
15:19; 34:10
contest    [1]
49:12
contesting [1]
101:14
context    [9]
33:4;    37:5;
47:17;   52:25;
85:14,   24;
95:13;  102:18,
19
contexts   [2]
11:19; 85:15
Continue   [1]
6:23
continuing [1]
8:15
contractual [1]
78:21
Contrary   [1]
94:22
contrary   [7]
5:16;   14:7;
16:10;   39:23;
57:21;  73:25;
108:16
contrast   [1]
55:24
control    [5]
93:2;   95:22;
97:9;  101:12;
104:1
controlled [8]
39:6,    13;
91:10, 16, 24;
92:5, 15; 104:9
conveyed   [1]
24:12
convincing [1]
82:12

copy [5] 49:17; 86:3, 7; 105:21, 24

Coronado [3] 113:3, 16

Corp [1] 111:21

CORPORATION [3] 1:4; 2:6, 13

Correct [4] 41:22; 42:24; 43:13; 110:19

correct [10] 29:23; 36:4; 40:5; 43:25; 51:18; 78:16; 80:14; 85:3; 86:14; 113:4

corrected [5] 11:4; 12:2, 5, 21; 13:16

correctly [2] 17:9; 113:9

cost [3] 33:3, 5; 113:11

costs [1] 32:25

Cote [2] 8:24; 28:9

Cote's [1] 27:4

Could [1] 24:15

could [31] 8:7; 9:15, 13:5; 24:7, 11; 29:10, 13; 31:24; 32:2; 39:14, 20; 47:5; 53:23, 24; 56:8; 66:3; 71:20, 23; 72:16; 84:8; 88:12; 89:5; 95:22; 102:16, 25; 105:9; 108:10; 109:12, 14; 110:20; 111:6

couldn't [3] 8:4; 25:6; 37:23

COUNSEL [4] 2:6, 13, 19, 24

Counsel [1] 102:6

counsel [7] 25:23, 25; 68:17; 79:10; 103:8, 16; 113:5

counting [1] 76:24

country [1] 36:16

Countrywide [15] 91:1, 20; 92:6, 10, 20, 22; 96:25; 97:1; 98:7; 100:19; 101:25; 103:4, 23; 107:23

Countrywide's [2] 102:9; 108:5

COUNTY [2] 1:6; 113:2

County [3] 1:23; 113:4, 18

couple [4] 94:21; 104:13; 106:7; 111:11

course [16] 7:11; 8:24; 10:4; 19:15; 23:4; 24:9; 26:19; 29:6; 66:2; 82:10; 90:10; 92:20; 93:16; 103:8; 104:12; 105:18

COURT [164] 1:3, 4; 6:23; 7:2; 9:21, 25; 10:8, 12; 11:23; 12:22; 13:20, 22, 25; 17:7; 18:5, 17,

19; 19:4, 13, 20; 20:8, 23; 21:2; 23:14, 22; 24:15; 25:22; 26:25; 27:10, 17; 28:24; 29:6, 20; 30:6, 13; 33:20; 34:13; 35:11; 36:2, 12, 14; 38:16, 23; 40:1; 41:6, 17, 24; 42:4, 11, 18; 43:4, 12, 15, 18, 20; 44:1, 14, 18, 24; 45:1, 8, 14; 46:20; 47:2, 10, 21, 23; 48:1, 4, 15, 20, 22; 49:20, 22, 25; 50:7, 12; 53:1, 15; 54:10; 55:16; 59:2, 7, 12, 21; 60:3, 5; 61:23; 62:3, 12, 16, 20, 24; 64:2; 66:21; 67:7, 16, 22; 70:7, 18; 72:13; 73:2, 7, 18; 75:13; 77:6, 21; 79:19; 80:1; 81:5; 82:24; 83:6, 20; 84:13; 85:4, 19; 86:9; 88:6, 22; 89:3, 9, 19, 24; 90:4, 20; 91:14; 93:6, 21; 94:4, 8, 10; 96:6, 12; 100:11, 23; 101:6; 102:12; 104:15, 23; 105:15;

106:2, 10, 13, 21; 107:4, 6, 13, 19; 108:19; 109:3, 10, 12, 18; 110:1, 8, 11, 17, 20; 111:15, 24; 112:6, 11, 16, 22

Court [54] 3:10; 7:4; 8:2; 11:9; 14:25; 26:13; 28:5; 33:2, 6; 44:5; 51:7; 53:4; 55:5; 56:6, 11; 59:6; 63:11; 65:2, 24; 68:7, 17; 69:11, 25; 70:12, 17, 25; 74:16; 75:21; 76:17, 19; 78:24; 79:5, 6; 80:7, 8; 82:1, 2, 21; 84:4, 17, 24; 85:2; 86:1, 7, 10; 87:10, 15, 22; 88:21; 103:25; 107:5; 113:3, 17

court [3] 4:2; 69:13; 113:7

COURT'S [2] 30:5; 109:17

Court's [8] 3:8; 4:3; 48:9; 69:24; 72:10; 80:7; 83:25; 84:10

courtroom [2] 71:21; 89:18

courtrooms [1] 89:14

Courts [2] 55:6; 71:17

courts [7] 5:1, 14; 31:7; 55:25; 56:14; 63:24; 87:25

covers [1] 68:2
create [2]
30:9; 72:4
creatures [1]
54:14
credit [1] 5:23
credited [1]
103:10
critically [1]
101:17
criticism [4]
95:20, 21;
96:11, 15
criticisms [1]
74:9
cross [1]
106:11
cross-examinat
ion [1] 38:14
cross-examine
[1] 104:20
crux [1] 103:1
customary [1]
11:14
cylinder [1]
22:3

- D -

daily [1] 11:10
Dallas [1] 2:23
damage [5]
68:13; 78:6;
83:17, 18, 20
Damages [1]
50:19
damages [27]
50:22; 52:1,
10; 53:9, 10;
54:11, 12, 18;
55:6, 9; 56:15;
58:9, 18, 25;
59:18; 74:6, 7,
14; 76:18;
77:13; 78:6,
12, 21; 79:15,
16; 80:6
Dana [4] 2:14;
49:25; 50:6, 7

Dana's [1]
49:20
dana.seshens
[1] 2:15
dancing [1]
101:23
danger [1]
109:19
Date [1]
113:17
date [2] 81:18;
87:22
dated [1] 46:6
Daubert [1]
51:4
David [1] 2:2
DAVIS [1] 2:17
davispolk.com
[1] 2:15
days [1] 12:19
deal [1] 84:9
dealing [1]
93:7
deals [2]
69:22; 82:21
dealt [1] 88:3
debacle [1]
37:15
decide [18]
5:11; 53:8;
64:9, 12;
73:22; 74:1,
16, 19; 75:6;
79:6; 80:3, 7,
8, 9; 82:2, 23;
83:3
decided [5]
52:4; 55:3;
71:6; 75:21;
85:14
decides [1]
77:23
deciding [1]
53:6
decision [18]
13:19; 14:23;
17:11; 28:6,
10; 41:18, 21;
42:7, 23; 64:2,
3; 72:14;

73:21; 78:2;
83:1; 84:11, 25
decisions [6]
16:10, 12;
24:3; 40:9;
45:13; 98:22
declines [1]
52:21
declining [4]
52:24; 56:8,
19; 76:10
deduct [2]
63:5; 72:8
deducted [2]
58:14, 16
deem [1] 51:21
deemed [1]
33:2
default [2]
13:9; 36:23
defect [3]
92:16; 101:12;
104:10
defective [11]
34:6; 91:10;
92:12, 23, 25;
97:3, 25;
100:20; 102:4;
103:4, 6
defects [6]
39:8; 91:13,
17, 19, 25;
101:4
DEFENDANT [2]
2:19, 24
Defendant [4]
1:8; 22:24;
57:16; 69:17
Defendants [2]
4:25; 11:19
defense [25]
6:2, 4; 8:19,
20, 25; 9:8,
17; 10:5;
18:12, 16;
19:10, 16;
20:6, 21;
22:20; 23:3, 4,
7; 26:8; 27:7,

15, 16, 21;
30:2; 43:11
defenses [1]
6:6
define [1] 5:22
defines [1]
76:13
demonstrate
[8] 17:17;
30:23; 34:24;
36:5, 10;
92:15; 101:11;
103:22
demonstrating
[3] 42:9;
101:17; 103:19
denied [1]
28:20
deny [1] 30:8
denying [1]
48:11
Department [4]
91:1; 92:12,
19; 108:2
departures [1]
39:9
depending [1]
84:19
Depends [1]
49:23
DEPOSIT [3]
1:4; 2:6, 13
Depression [1]
36:17
described [1]
75:23
description [1]
75:24
designated [1]
10:16
deter [2] 71:2;
72:3
determination
[10] 11:16;
15:4; 17:4;
38:22; 74:17;
75:20; 79:4, 8;
80:13; 81:14
determine [5]
7:25; 28:4;

32:12;      33:7;
53:4
**determined** [4]
10:19;   11:20;
13:14
**determines** [2]
76:6; 87:15
**dgrais** [1] 2:2
**Didn't**    [1]
61:23
**didn't**    [17]
9:19;   12:10;
24:6, 8;   33:5;
43:12;   56:10;
76:20;   80:17;
91:13;   97:11;
99:9;   103:21;
104:5;   105:25;
106:6; 112:4
**difference** [6]
20:1;   37:3, 7,
22;      51:10;
62:19
**differences** [2]
21:5; 37:17
**different** [42]
4:15;   11:17;
12:18;   15:25;
16:1,    13;
22:13;   24:9;
27:1,    22;
30:22;   31:5;
40:2,    18;
42:16, 17, 19,
21;      44:12;
54:14;   55:12;
56:21;   57:24;
61:6;   65:13;
68:6, 13, 15,
22,  24,  25;
69:10;   74:23;
79:15;   83:21;
88:1,   2,   3;
97:19
**diligence**  [6]
9:8, 9;      23:6,
11;      26:17;
98:6
**diligent**    [1]
26:21

**direct**    [2]
83:23; 84:21
**directed**    [2]
28:18; 50:21
**directly**    [3]
20:5;   39:18;
41:14
**disagree**    [4]
14:21;   57:7;
87:7; 104:19
**disagreement**
[1] 90:10
**disaster**    [1]
37:18
**discern**    [1]
48:2
**disclose**    [2]
24:6; 97:17
**disclosed**   [4]
11:2, 7;   12:1;
36:11
**disclosure**  [7]
6:20;      12:14,
21;      13:16;
14:14;   15:1;
32:21
**discount**    [1]
32:24
**discounts**    [1]
32:21
**discover**    [1]
7:13
**discovered**  [3]
7:21; 23:5, 6
**discovery**  [2]
7:6; 106:23
**discrete**    [1]
90:17
**discretionary**
[1] 78:22
**discussed**    [1]
28:21
**Discussion**  [2]
60:2; 106:12
**discussion**  [4]
18:14;   79:9;
103:15; 108:7
**display**    [1]
77:8

**disposition** [1]
58:2
**dispute**    [5]
30:20;   52:3;
54:24,   25;
63:16
**disputed**    [1]
96:4
**distill**    [2]
86:2; 102:16
**distinction**  [2]
106:20;   107:3
**DISTRICT**    [2]
1:4, 8
**District**    [2]
113:3, 17
**Doctor**    [1]
96:12
**document**    [6]
46:6;      90:18,
21;      101:7;
109:21
**documents**   [3]
39:19;   97:15;
107:5
**Does** [1] 77:6
**does**    [24]
14:24;   15:8;
21:19;   24:1;
26:20;   28:15;
30:22;   33:20,
21;   35:5, 20;
38:16;   42:20;
55:23;   58:11;
74:5;      79:1;
84:18;   87:10;
101:1; 107:22;
108:19
**Doesn't**    [1]
41:6
**doesn't**    [23]
15:14;   16:9;
42:11;   45:17;
48:16;   50:3;
51:17;   59:24;
69:7, 8;   77:24;
86:10,   21;
91:17;   95:3, 6;
96:10;      97:9,
22;      98:1;

100:6;   106:18,
22
**doing**    [10]
26:17;   33:15;
35:10,   12;
36:5;      37:14;
46:15;      69:1;
90:5; 103:19
**doke** [1] 50:14
**dole** [1] 54:17
**dollars**    [4]
52:19,   24;
74:15; 100:2
**domain**    [3]
17:24;   28:4;
29:16
**done**    [12]
11:1;   33:16;
37:25;      46:4,
12;   66:3, 11;
76:3;      99:4;
103:21,   24;
109:16
**double**    [5]
55:20;      57:5;
58:20;   66:13;
76:24
**down** [7] 12:6,
11;      18:17;
22:3;   70:10;
80:16; 86:2
**draw**    [2]
106:19; 107:3
**drawn**    [2]
20:13, 18
**drive** [2] 18:6;
88:20
**driving**    [1]
24:20
**drop** [1] 32:19
**during**    [3]
92:8, 13; 103:5
**duties** [1] 4:25
**duty** [1] 6:19

— E —

**each** [1] 105:5
**Eagles**    [1]
44:23

earlier    [2]
56:5;  84:11
earned    [1]
65:19
easily    [4]
71:21;    72:17;
89:16;  102:25
easy [5]  21:17,
18;        88:23;
89:1;  94:12
economic    [3]
33:15;    37:18;
38:2
economist  [2]
31:15;  40:24
effect    [3]
56:18;    100:8,
10
effectively  [3]
56:11;  66:11;
89:14
efficient    [4]
11:8,    15;
12:13;  13:17
effort    [2]
91:24;  101:11
efforts    [1]
98:6
eight [1]  70:13
either    [6]
6:10;    39:23;
69:19;  72:15;
73:14;  83:7
elaborate  [2]
9:22;  100:11
electronically
[1]  88:20
element    [4]
18:15;  43:8, 10
elements    [3]
7:7, 13, 22
eliminate    [1]
102:10
ELLSWORTH  [1]
2:3
else [2]  66:1;
67:23
elsewhere  [1]
100:25

empirical    [8]
31:12,  15,  21;
35:13;    40:19;
41:25;    42:3;
44:11
empirically  [5]
33:14,    23;
34:1;      35:3;
41:2
encourage  [2]
70:20;  72:2
ended    [1]
94:19
enforce    [1]
69:18
Engelhart  [1]
1:22
English    [1]
108:21
enough    [5]
12:10;    37:2;
40:17;  53:19;
89:1
entered    [1]
102:21
entire    [1]
71:18
entirely    [3]
28:1;    34:17;
93:4
entities    [3]
94:16;    95:7;
99:15
entitled    [6]
72:1,  2,  4;
78:9;    81:16;
92:3
envisioned  [1]
13:5
episodically  [1]
11:12
equation    [3]
66:19;    67:13,
20
error [3]  6:25;
8:18;  74:19
errors    [2]
32:10;  75:24
essence    [1]
58:1

essentially  [3]
57:5;    59:19;
65:15
estate [1]  4:18
esteemed    [1]
79:11
Etlinger    [2]
2:20;  113:12
evaluate    [1]
11:21
even [15]  6:17;
28:14;    37:10,
23;      56:10;
68:20,    23;
72:19,    22;
73:4;    75:17;
85:14;    86:4;
97:24;  100:7
Event [1]  32:7
event    [4]
11:13;    32:17;
38:5;  96:10
events    [1]
13:16
ever [1]  37:16
every    [5]
49:16;    82:3;
83:18;    86:24;
94:11
everybody  [1]
25:6
everything  [2]
5:10;  88:20
evidence    [44]
14:3;  16:6, 20;
18:22;  19:6, 7;
20:3,  4,  6,  16,
20;        22:1;
24:21,    24;
25:16;    34:21;
40:20;    73:1,
10,  13;  81:12;
82:8, 22;  83:3;
87:13;    90:12,
25;  92:4, 17;
100:24,    25;
101:3,    5;
103:2,  10,  13;
105:6;  106:18,
25;    107:21;

109:22;    113:5,
10
evidenced  [1]
12:6
exact [1]  16:22
Exactly    [4]
10:11;    26:10;
62:18;  70:22
exactly    [9]
29:4;    39:19;
46:15;    48:25;
58:15;    64:20;
65:4;    80:24;
81:25
example    [20]
11:24;    15:12;
19:8;    24:10;
25:4, 14;  28:3;
31:7, 24;  32:8;
36:20;    53:12;
55:3;    71:14;
76:16;    78:20;
98:4,    24;
104:7; 107:24
examples    [3]
25:15, 21, 23
excellent    [1]
79:12
Exception  [1]
6:6
exception  [1]
13:16
exchanged  [2]
64:18;  65:3
exchanges  [1]
11:9
exclude    [5]
16:6;    93:23;
98:22;    101:7;
109:21
excluded    [3]
6:5;      51:3;
98:9
excluding  [1]
95:15
Excuse    [1]
45:8
excuse    [2]
44:18;  91:20

exercise    [1]
23:5
Exhibit    [1]
94:25
exhibits    [2]
3:12;  113:9
exist [1]  101:1
existence    [1]
29:4
exists    [1]
100:24
experience  [5]
26:1;    31:18;
33:13;    35:19;
40:22
experienced [1]
37:6
expert    [27]
4:20;    15:22,
23;    18:4;
30:6,    13;
35:10,    21;
39:17,    22;
44:12;    45:21,
24;    46:19;
50:22;  74:7, 9;
76:12;    77:14;
82:9;    83:17;
86:19;  96:14;
101:9, 11, 15;
103:20
expert's    [3]
83:9,    24;
109:23
Experts    [1]
82:18
experts    [12]
30:24;    31:17;
39:8;    43:23;
45:18;    46:1,
10;    65:21;
77:13;    80:5;
104:24;  106:16
Expiration  [1]
113:17
explain    [2]
68:19;  94:2
explicitly    [4]
6:5;    92:23;
108:5, 17

express    [1]
11:4
expressly    [2]
23:12;  109:8
extent    [3]
86:13;    88:18;
93:22
extreme    [1]
37:13

---

- F -

---

face [1]  37:18
Facsimile   [2]
2:6, 12
fact [48]  4:21;
7:11, 19;  12:7;
14:9,  12,  13;
15:21;  16:21;
22:16;  28:7, 9;
29:3, 6;  31:3;
32:15;    35:13,
18;    36:16;
37:23;    39:6;
51:9;  66:9, 14;
70:25;  82:17;
83:16,    17;
85:8;  95:7, 11;
96:3;  97:7, 20;
98:7;    99:11,
12, 18;  101:12,
22;    105:10;
107:22;
108:15, 18, 24;
109:6, 8, 9
factor [1]  53:5
factors    [2]
31:21;  33:15
Factory    [1]
32:22
facts    [17]
94:18;  95:2, 3,
6;  96:18, 20;
98:13;  99:13;
100:18;
101:22;  107:8,
20;  108:6, 20,
21;  109:13, 15
fail [1]  104:3

failed    [2]
92:14;  99:21
fails [1]  91:18
failure    [1]
105:4
fair [7]  45:14;
46:9;    88:6;
106:4, 21, 24;
107:4
fairly [1]  72:17
fairness    [1]
46:17
fall [1]  45:17
fallacy [1]  5:8
false [1]  9:2
falsity    [5]
8:22;    9:4;
20:10;    24:3;
27:8
Fannie    [3]
16:16;    91:21;
97:2
Fannin    [1]
2:11
faulty    [1]
104:8
FDIC    [44]
14:24;  16:5, 9;
17:9, 19;  19:9;
20:12,    18;
24:23;    27:23;
30:16;    32:2,
16;    33:18;
34:25;    43:2;
47:9;    51:15;
52:12, 14,  16;
55:21,    23;
57:3,  10,  21;
58:18,    23;
59:4;    77:12;
80:18;    81:15,
16;    85:12;
88:19;    94:14;
95:20,    25;
96:18,    22;
99:20;  100:3, 4
FDIC's    [21]
14:3, 7;  15:23;
19:11;    34:9;
38:13;    39:8,

17, 24;    43:10;
46:10;    49:5;
50:22;    65:2;
74:8;    76:12;
85:17;  94:22;
96:14;  98:16
February    [2]
64:18;  65:3
FEDERAL    [3]
1:4;  2:6, 13
Federal    [5]
6:22;    20:2;
23:15;  56:14;
69:13
feeling    [1]
51:23
fellow    [1]
26:17
fellow's    [1]
54:20
FHFA [5]  8:24;
16:11;    27:4;
28:10;  56:4
Fifth [1]  14:23
figure    [5]
54:11,    19;
60:14;  78:15;
79:23
figured    [1]
38:1
files [3]  24:9,
11;  46:5
filing [1]  7:8
filings    [1]
26:20
financial    [2]
32:9, 11
find [5]  88:23;
99:14;  108:10;
110:20;  111:10
finding    [8]
55:9;  95:7, 11;
96:3;  105:13;
107:24;
108:18; 109:9
findings    [3]
99:12;  101:22;
105:12
finds [1]  28:15

Fine [2] 90:6; 106:9

fine [1] 89:1

finish [1] 110:23

finished [1] 75:13

First [3] 11:6; 66:15; 95:16

first [12] 4:12; 13:24; 14:5; 21:3; 61:7; 62:16; 63:9; 64:15; 83:23; 86:21; 95:18; 96:1

five [1] 81:9

flawed [2] 101:18, 20

flip [1] 44:15

floor [1] 80:17

flows [1] 41:13

focus [4] 22:23; 40:9, 12; 97:6

focuses [1] 23:18

focusing [3] 31:8; 65:10; 96:23

follow [2] 69:25; 111:3

followed [1] 77:15

following [2] 1:20; 111:8

Football [1] 50:11

footnote [1] 100:4

foregoing [1] 113:4

foreknowledge [1] 37:4

former [3] 7:16; 22:15; 78:19

formula [24] 53:9; 55:6, 15; 57:25; 58:9;

60:11; 61:6, 9; 63:10, 12, 13; 77:8, 9; 78:20; 79:16; 82:1, 5; 84:15, 16; 85:25; 86:13, 14, 17, 18

formulas [2] 54:24, 25

forth [4] 19:5; 74:7, 24; 95:3

forward [4] 12:25; 20:17; 37:20; 38:10

foul [1] 9:1

found [3] 26:21; 91:10; 92:1

foursquare [1] 69:23

frame [1] 51:6

FRANKLIN [1] 1:5

Franklin [30] 5:4, 20; 6:13; 9:6; 15:20; 16:3, 7, 20, 21; 17:2, 6, 14, 18; 18:1; 19:6, 7, 17; 21:16; 22:6; 24:2, 25; 25:3, 7, 18; 27:25; 28:13; 29:17; 52:14, 16; 99:21

Franklin's [1] 4:5

Frankly [2] 46:23; 83:18

fraud [6] 25:5, 8, 12, 16, 17; 26:12

Freddie [3] 16:17; 91:21; 97:2

free [6] 91:19, 25; 92:16; 101:12; 103:9; 104:20

fresh [2] 72:21, 22

from [46] 5:12; 12:19; 13:11; 15:8; 17:4, 21; 24:7; 25:18; 26:13; 28:15; 31:15, 20; 33:9, 22; 35:10, 17; 38:25; 39:9; 42:17; 43:7; 44:7; 46:5; 49:5; 50:15; 52:7; 58:14, 16; 60:16; 62:9; 66:10; 67:5; 73:9; 75:1; 76:19, 21; 79:13; 81:18; 84:1; 87:21; 92:6; 97:19; 99:23; 101:18; 103:2, 12; 111:7

front [2] 83:3; 108:4

FULBRIGHT [3] 2:22; 113:12

fulbright.com [2] 2:21

full [4] 52:13; 56:9; 64:22; 85:2

Full-Principal [1] 50:18

full-principal [9] 50:23; 51:11; 52:8; 55:20; 56:10; 58:8, 25; 75:7; 85:13

full-year [1] 33:3

fundamental [1] 4:10

fundamentally [1] 87:7

further [6] 9:16; 20:22;

54:5; 81:7; 113:8, 11

furthered [2] 57:6, 11

future [2] 37:4; 110:3

___

- G -

Gebhardt [3] 47:8; 112:8, 12

general [3] 6:14; 20:14; 94:18

generally [4] 15:17; 16:17; 32:10; 40:25

gets [1] 39:3

getting [1] 66:12

Giants [2] 44:19, 20

gist [2] 34:9; 36:15

Give [1] 85:4

give [16] 21:2; 27:10; 36:19; 37:2; 44:12; 53:25; 54:9, 16, 18; 64:10, 25; 83:9; 86:3; 91:3; 105:25; 106:3

Given [1] 37:21

given [9] 28:2; 53:19; 59:14; 78:18; 82:9, 17; 85:2; 100:9; 105:9

gives [2] 23:24; 83:17

giving [2] 32:23; 78:11

gleaned [1] 49:4

goes [5] 17:12; 40:17; 41:14; 74:2; 102:7

Going [1] 70:6

**going** [54]
17:8; 18:11,
14, 21; 21:23;
22:4; 26:12;
30:7; 43:22;
44:22; 46:11,
18; 53:18;
62:23; 64:6, 8,
9, 12; 67:22;
69:18, 24, 25;
70:2; 71:8, 13,
18, 24; 72:10,
15; 75:3;
77:22; 79:14,
16, 17, 19, 22,
24; 80:2, 5, 7;
81:7; 82:4;
84:4, 5; 89:13;
104:23;
106:16;
109:18; 110:5;
111:7
**gone** [2]
12:17; 111:7
**good** [10]
48:25; 63:3;
65:7; 72:11;
89:18, 22;
92:16; 110:1,
9; 112:12
**goods** [2]
33:3, 5
**gotten** [2]
40:6; 94:10
**Government** [2]
94:17; 99:1
**government** [5]
94:16; 95:7;
99:15; 105:11;
109:11
**GRAIS** [23]
2:3; 4:3; 6:24;
7:3; 10:4, 11,
15; 12:4;
13:1; 22:15;
23:17; 24:5;
26:10; 27:3;
30:12; 36:13,
15; 45:25;

46:23; 48:3, 8,
17, 21
**Grais** [9] 2:2;
16:11; 21:3;
22:8; 27:13;
28:9; 38:12;
40:5; 56:4
**graisellsworth.
com** [1] 2:2
**grant** [1] 30:7
**granting** [1]
48:18
**granularity** [1]
39:4
**grappled** [1]
87:25
**grasp** [2] 21:5;
88:8
**Great** [1] 36:17
**great** [2] 6:14;
37:24
**greater** [2]
10:9; 81:19
**greatest** [3]
36:17; 37:8, 15
**greatly** [1]
109:20
**gross** [1]
62:25
**ground** [1]
21:19
**grounds** [1]
74:23
**group** [4] 34:5;
95:22; 97:10;
104:1
**groups** [3]
25:1; 34:6;
39:7
**GSEs** [18]
16:17; 91:21;
92:8, 13, 25;
97:2, 4, 8, 12,
13, 19, 20;
98:1, 4;
100:20; 102:3;
103:5, 7
**guess** [10]
48:22, 24;
54:13, 15, 18;

78:3; 80:9;
83:7; 110:22;
111:1
**guided** [1]
70:2
**guidelines** [3]
39:9; 40:14;
102:3

- H -

**h-a-r-t** [1]
47:12
**half** [3] 49:11;
51:24; 111:9
**HAND** [1]
113:13
**hand** [1] 12:9
**handful** [1]
49:1
**handing** [1]
86:7
**handy** [2] 86:4;
88:14
**happen** [2]
72:24; 93:24
**happened** [5]
24:14; 32:15;
37:8; 57:20;
83:18
**happens** [2]
10:21; 83:13
**happy** [15]
25:21; 30:3;
49:7, 13;
50:20; 54:5;
75:9, 12; 86:3;
88:19; 90:15;
94:1, 2;
104:12; 110:8
**hard** [4] 4:24;
46:9; 79:4;
86:3
**harm** [1] 9:1
**harmonized** [1]
34:14
**HARRIS** [2]
1:6; 113:2
**Harris** [3]
1:23; 113:3, 18

**harsh** [1]
61:18
**hasn't** [1]
87:24
**haven't** [1]
90:4
**having** [3]
14:16; 64:1;
104:21
**He's** [4] 13:2;
31:14; 41:5;
42:10
**he's** [4] 31:14;
35:24; 40:24;
43:22
**head** [2] 42:12;
101:24
**hear** [4] 80:18;
83:25; 84:15;
98:24
**heard** [7] 1:20;
66:10; 84:1;
85:8; 91:4;
95:19; 101:18
**hearing** [1]
47:19
**hearings** [1]
43:7
**hearsay** [7]
28:21; 96:9;
103:18;
104:24, 25;
106:16, 17
**heavily** [1]
108:23
**held** [3] 1:22;
56:7; 68:17
**Help** [1] 33:24
**help** [2] 17:8;
59:5
**helpful** [6]
49:18; 86:12;
88:11, 18;
94:3; 107:10
**Here** [3] 12:17;
43:8; 68:12
**here** [32]
16:19; 18:12,
22; 21:11;
24:14; 25:13,

19;     30:25;
31:5, 12;  32:5;
42:25;     57:4;
61:22;     63:3,
15;     71:14;
75:3;  83:22;
89:16;     91:4;
92:1;  98:23;
99:2, 8;  100:1,
2;     101:16;
104:1;  105:19;
106:8; 107:7
**Here's**     [1]
84:15
**here's**     [2]
77:17;  84:16
**hereby**     [1]
113:4
**herring**     [1]
75:16
**herself**     [2]
58:5;  93:11
**higher**     [1]
32:25
**highly**     [3]
12:13;  98:15
**himself**     [1]
12:24
**hindsight**   [15]
10:16;     17;
11:20;  12:23;
13:7;  30:17;
33:22;  34:1;
35:14,     24;
37:24;     46:7,
10, 22;  112:3
**Hold** [2]  89:7;
90:20
**hold** [5]  48:23;
53:24;  58:17;
59:16; 107:8
**holdings**   [1]
56:16
**HOLTON**   [15]
90:2,  6,  23;
91:15;  93:9;
101:3,     9;
102:14;
103:17;
105:18, 21, 25;

106:6;   108:1;
109:25
**Holton**  [6]  2:3;
90:3;     94:22;
104:18;  105:2;
108:17
**Honor**   [157]
4:3;   6:3, 24;
7:5, 24;   8:17;
9:11, 20;  10:4,
11;     11:5;
13:1, 7, 14, 23;
16:24;  17:17;
18:10,     18;
19:6;   20:19,
22;   22:15;
23:1,     18;
24:19,     20;
26:10,     18;
27:4, 12;  30:4,
12, 15;  35:16;
36:13,     19;
38:11,     20;
41:9;   42:14;
43:24;  44:8;
45:25;  46:8,
17, 25;  47:14;
48:3,  11,  21;
49:4, 14,  19;
50:5, 21;  52:7;
53:18;  54:5;
59:3,  5,  13;
61:16;  62:7;
63:23;  64:7,
17, 25;  65:11,
21;     66:7;
67:25;  69:24;
71:4; 72:5, 22;
73:13,     24;
75:11, 15, 25;
77:1,  5,  14;
78:17;  79:11;
80:15;  81:4;
82:19;  83:9,
12;  84:24;
85:6,  10,  18,
24;  86:8, 22;
87:1, 17;  88:5,
10, 12;  89:8,
12;  90:2, 23;

91:4, 8;  92:3,
10;  93:25;
94:13,  15;
95:5, 14,  18;
96:9; 97:5, 21;
98:4,  11,  12,
19;  99:17, 22;
100:5,  16;
101:4,  24;
102:8, 15, 25;
103:19;
104:11, 14;
105:2,  9,  18,
23;  107:3, 9,
12, 16;  108:3,
10, 11,  22;
110:5;  111:16,
17;  112:3, 10,
15, 18
**Honor's**   [3]
106:15;  109:2;
111:19
**Honorable**  [1]
1:21
**hope** [1]  40:25
**hopefully**  [2]
63:8;  110:25
**Hopkins**   [1]
56:17
**housing**   [2]
37:15;  38:8
**Houston**   [4]
1:22;  2:11, 23;
113:18
**however**   [1]
40:23
**human** [1]  22:5
**hundred**   [2]
52:19, 23
**hung**   [2]
104:23; 106:16
**hypothetical**
[11]  15:9, 10,
18;  16:4;
24:10;  30:18;
31:23;  33:10;
34:23;  41:4;
43:3

**- I -**

**I'll** [11]  6:1, 7;
14:4;  21:2;
27:10;  55:13;
65:1;  68:19;
74:10;  75:11;
107:14
**I've** [8]  38:24;
40:5;  55:18;
59:14;  70:19;
100:6;  104:1;
111:10
**idea** [4]  8:11;
33:25; 64:1, 5
**identified**  [6]
39:7, 8;  43:2;
49:12;  57:9;
58:24
**identifies**  [1]
57:21
**identify**   [5]
7:19;  49:8;
51:1;  104:9, 10
**identity** [1]  6:8
**idiosyncratic**
[2]  16:15, 18
**ignored**   [1]
103:10
**imagine**   [5]
4:24;  21:25;
32:4;  45:22;
99:22
**immaterial**  [2]
15:1;  33:2
**immediately** [3]
5:21;  9:18;
47:18
**impact**   [2]
39:14;  41:10
**impacted**   [3]
32:2;  36:8;
77:20
**impacts**   [3]
41:12, 15;  52:8
**impermissible**
[1]  34:10
**import**   [2]
23:9, 10

**important** [31]
12:10;   15:24;
21:9;   26:18;
30:18;   31:10,
13, 22;  33:11;
34:23;   35:2,
22;   36:6, 7;
37:4,  17,  23;
40:8, 15;  41:3,
10,  11,  15;
45:12;  46:1;
97:6;   99:13;
101:17,  19;
102:8
**imports** [1]  6:3
**impossible** [2]
41:19; 42:5
**improper** [4]
30:17;   52:25;
99:6;  112:3
**inadmissible**
[1]  38:15
**inappropriate**
[1]  96:2
**incentives** [1]
72:4
**incentivize** [1]
71:1
**inclined**   [1]
84:10
**include**   [3]
53:11;   58:18;
78:8
**included**  [2]
98:8;  113:6
**includes**  [1]
96:20
**including**  [4]
14:22;  51:15;
94:17;  99:21
**income**  [37]
60:18,   22;
61:12;  62:22;
63:5,  14,  17,
19,  20,  21;
64:23;   65:9,
12, 18, 22, 23;
66:8,  17,  18,
23;   67:1,  2,
13,  17,  20;

72:8;   75:2;
76:1,  13,  19,
22, 25;  81:20;
82:6; 86:18, 20
**inconsistent**
[2]   71:22;
82:16
**incorrect**  [2]
74:10; 95:25
**INDEX** [2] 3:3;
114:1
**Index** [2]  3:6,
11
**indicates**  [1]
108:17
**individual**  [1]
6:8
**industry**  [3]
17:15;  25:17;
26:7
**ineligible**  [4]
97:4, 7, 12, 13
**infer**   [2]
13:11; 26:14
**inference**  [2]
12:11; 99:7
**inflated**  [2]
25:20;  39:10
**information**
[50]   5:10, 12,
14, 18, 19, 20,
24;     6:12;
11:2;   12:1;
14:15,  17,  21,
25;   15:3,  6;
16:2,  8,  14;
17:1,  23,  24;
19:1;   21:13;
24:7;   27:24;
29:11,  13,  15,
25;   30:11;
31:3,  9,  12;
32:9;   33:6;
34:11;   35:18,
24;  36:8,  11;
38:9;   41:20;
42:6;   46:13;
47:16;   48:5;
109:22

**initial** [2]  7:5;
105:2
**initially**   [1]
56:25
**injecting**  [1]
27:14
**inquiry**  [10]
7:16;   8:1,  9,
16;    27:24;
28:7,  11,  12;
29:2, 5
**insofar**   [1]
57:21
**inspected**  [1]
24:11
**inspection**  [1]
24:10
**instances**  [2]
46:13;  56:6
**instruct**   [1]
84:17
**instruction**  [1]
30:10
**insufficient** [1]
37:12
**INSURANCE** [3]
1:4;  2:6, 13
**Insurance**  [1]
70:16
**insurance**  [1]
61:3
**intended**   [9]
9:12, 23;  10:1,
2;    56:24;
57:16, 17, 18
**intending**  [1]
18:10
**intents**  [1]
68:25
**Interest**   [1]
50:18
**interest**  [67]
9:3;  52:10, 13,
23;   53:1,  3,
11, 21;  54:13,
22;   55:1, 10,
21;    56:7;
57:16,   25;
58:7;   59:15;
60:10, 11, 15,

19,  22,  23;
61:11,  13,  21;
62:7, 9, 13, 17,
22;   63:5,  14,
19;  64:1,  23;
65:17,   18;
66:9, 16,  25;
67:2, 6, 10, 18;
69:5;   71:11,
12,  15,  23;
72:8, 24;  75:2;
76:5, 6, 7, 9;
77:3;  78:9, 16,
22,  23;  80:23;
81:18;   82:5;
87:21
**interested**  [1]
65:1
**interesting**  [4]
53:17,   20;
54:3;  64:5
**interpret**  [2]
66:6;  87:10
**interpretation**
[2]    79:1;
87:14
**interpreted** [2]
8:15;  56:14
**interrupt**   [3]
75:10;   94:2;
105:15
**into** [23]  6:4,
15,  18;  9:18;
13:9;    39:3;
42:22;  45:17;
50:25;   53:5;
55:11;  77:13;
79:3;   81:13,
20;    82:22;
86:2;   90:15,
25;   102:21;
106:19,   25;
113:10
**introduce**  [1]
9:8
**introducing** [1]
6:12
**investigate**  [4]
6:19;     8:4;
26:22; 103:24

investigated
[1]  9:16
investigation
[3]  8:8;  23:11;
103:20
investment  [21]
10:20,      22;
13:19;    17:11;
22:10,      18;
29:12;    30:19,
21;      34:12;
35:2;   36:1, 3;
40:9;      41:18,
20;    42:6, 15,
23;  45:13
investor  [37]
9:7;      11:21;
13:18;    14:16;
15:9,  10,  13,
19,  20;    16:5;
17:5,  18,  22;
18:3;    23:11;
24:11;    26:3,
21, 23;  29:17;
30:18,      19;
31:23;    33:10,
11;  34:12, 23;
36:6, 8;  38:10;
41:4,  12,  16;
43:3;    56:24;
57:1;  71:9
investor's  [1]
41:12
investors  [12]
6:13;    12:10;
15:17,      25;
17:25;    31:10,
13;      35:22;
36:21;    37:20;
40:8;  45:13
involved  [1]
109:4
involving   [2]
93:18, 19
irrational   [1]
66:3
irrelevant  [10]
7:9;        8:13;
28:1,      13;
37:24;      96:8,

21;      97:14;
98:14;  105:5
irrespective  [2]
8:13;  38:7
issue    [43]
16:23;    18:22,
23;    29:22;
39:11;    40:11,
17;      45:7;
51:6, 9;  52:4;
55:2;      56:1;
59:17,  18,  19;
69:23;    74:1;
75:5, 16;  77:4;
80:8,      15;
82:20,      21;
83:15,      16;
85:9, 11;  87:4,
25;      88:9;
92:1;    95:11,
23;    97:16;
100:1,      2;
101:19,      20;
103:12; 106:23
issues     [1]
96:21
It's  [32]   13:6,
8;      18:19;
22:15,      16;
26:8,  10,  18;
31:6;    32:22;
36:9;    42:9;
43:3;    48:24;
54:6;    63:9;
66:14;    75:7;
78:19,      20;
79:5;    80:5;
88:22;    90:15,
17;    93:19;
94:12;  102:14,
15;    104:7;
106:7
it's  [92]    4:22,
24;    5:9;    7:6,
9;        11:1;
18:15, 16,  20;
19:2;    20:13,
18;  21:12, 17;
22:4,      16;
29:12;    33:19;

34:17,      22;
38:9;    39:18,
19;    41:13;
42:8;    43:8;
44:9;  45:14;
46:9, 15;  48:6;
49:17;  53:7, 8,
21;  54:10, 20;
55:15;    57:4;
60:10;  61:18;
63:10;    64:8;
66:12,    14;
67:21;  68:10;
72:14;    75:6;
76:8,      23;
79:19,      21;
80:8,  12,  25;
81:6;  83:4, 18,
23;  84:14, 23;
85:9, 21;  86:6;
88:6, 18;  91:7;
92:17;  93:14,
17;    95:16;
96:2,  3,  19;
97:5;  98:15;
102:4;  103:18;
104:5,  7,  18;
106:4;  107:17;
108:11, 24, 25;
109:6, 7
itself     [9]
17:15;  28:3, 5;
48:16;  94:25;
99:9,      18;
106:22; 109:22

---

- J -

James     [36]
10:16;  12:18;
14:6;    30:3;
31:11,    20;
33:16;    34:3;
35:23;  36:15;
37:14,    25;
38:14;  39:12;
40:3,  18,  23;
44:12;  48:23;
91:5, 6, 18, 23;
92:4, 14;  93:2;

96:14,    15;
98:9;  101:10;
104:8,    21;
105:4; 111:20;
112:1
James's    [7]
10:20;  30:16;
39:6;  43:20;
95:21;  97:9;
112:2
January   [1]
110:12
JAWORSKI  [1]
2:22
Johns     [1]
56:17
Judge    [21]
1:22;    8:24;
27:4;  28:9;
59:10,  15,  24;
60:6;    61:3;
63:8;  69:4,  9,
15;    70:5;
81:9;  89:23;
91:15;  93:17;
106:7; 111:13;
112:25
judges    [1]
63:12
judgment  [7]
7:5;      53:5;
55:4;    64:2;
68:23;  69:9;
73:21
JUDICIAL   [1]
1:8
Julia [1]  2:16
July     [6]
110:13, 14, 15,
17, 18
jump [1]  50:15
JUNE [1]  3:4
June [3]  1:19;
111:9; 113:14
juror     [2]
98:20, 24
jurors     [1]
99:16
jury [61]  6:15;
13:11;    18:12,

21;      26:14;
30:10;      38:18,
19;      39:20;
52:2;   53:6, 8;
54:7,  16,  17;
55:19;    63:11,
12,  25;   64:3,
8,  18,  19;
65:3;      70:1;
72:14;      73:1,
10;   74:2,  19,
20;   75:5,  6,
15,  17,  19;
77:22;   78:7;
79:7, 14;  80:3;
81:13,     25;
82:4, 23;  83:3,
16;  84:5, 7, 9,
14,  19,  21;
87:8,  12,  13;
99:13;  102:18;
103:9, 25

**jury's**      [2]
64:12;  82:7

**Justice**      [4]
91:1;      92:12,
19;  108:2

---

**- K -**

---

**Kapps**      [1]
14:23
**Keep** [1] 67:22
**keep** [1] 39:4
**Kiechel**      [1]
2:16
**kind**      [10]
11:17;      12:3;
15:2;    24:21;
53:2;   61:1,  5;
86:2;  89:15, 16
**kinds** [1] 61:4
**knew** [12]  9:2;
13:18;    16:7;
19:6,      17;
22:21,     22;
24:25;    25:4;
26:14,     23;
37:18

**knock** [2] 89:4;
90:16
**know**      [28]
5:10;      19:23;
21:15;   24:3, 8,
19;      25:24;
40:12;    43:6;
49:14;   54:15;
70:18;   77:24;
78:1,      21;
79:13;    81:6;
82:11;   86:10,
23;      88:22;
90:17;  101:21,
23;      107:22;
109:6;  110:24;
111:10
**knowing**      [2]
82:10;  99:24
**knowledge** [57]
4:6;      6:2,  6;
8:19;   9:6,  11,
17;    10:5,  10,
13;      14:3;
17:8;     19:10,
12,  16;   20:3,
4,  5,  6,  9,  10,
14,  15,   22;
21:6, 9, 10, 17;
22:2,  5,  9,  16,
20;   23:3, 7, 8,
18;    24:12;
25:3,   11,   12,
17,  19;   26:1,
4,  6,  7;   27:7,
15,   20,   21;
48:19
**known**      [16]
5:20;  9:15, 16;
12:7, 10;  15:6;
17:2, 18;  19:7;
23:2, 21;  25:7;
27:25;   28:13;
46:14
**knows**      [3]
35:18;   65:24;
77:14

---

**- L -**

---

**lack** [3]  19:11;
42:9;  58:6
**language**  [14]
27:6;   60:8, 9;
63:24;   64:10,
11,  21;   65:11;
78:18;   80:22;
84:6;   85:22;
87:22;  88:2
**large** [1] 32:24
**laser-focused**
[1]  22:1
**last** [6]  27:11;
29:21;   36:25;
38:12;   94:8;
104:17
**lastly** [1]  8:17
**later** [2]  12:5;
61:12
**Laughing**      [5]
44:21;    50:4;
89:11;   106:5;
110:10
**Lauren**      [2]
2:20;  113:12
**laws** [4]  21:21;
70:14, 21;  88:4
**lawyers**      [1]
59:11
**learned**      [1]
103:17
**learning**      [1]
25:7
**least**      [5]
21:13;     51:8;
53:9;    55:11;
71:11
**leave**      [2]
110:1;  112:12
**leaves**      [1]
111:8
**left** [1]  74:21
**legal**      [13]
73:21;   74:19;
75:8, 20;   79:2;
80:12;   81:18;
83:22,     23;
84:2;  85:9, 11;
105:13

**legally**      [4]
68:18;   74:16;
83:1, 12
**legion**      [1]
29:18
**legions**      [1]
98:21
**legislative** [1]
68:25
**legislature** [13]
6:4;      9:19;
23:12;   60:8;
66:2,  4,  15;
68:11;  71:6, 8,
17;  86:24
**legislature's**
[1]  72:1
**lend** [1] 48:16
**less** [4]  61:12;
71:16;    81:19;
97:20
**lesser**      [1]
62:23
**Let's** [5]  26:5;
44:15;    81:8;
89:3;  110:11
**let's** [4]  26:3;
32:11;   50:14;
106:22
**letlinger**      [1]
2:21
**level** [1] 39:17
**Lexington**   [1]
2:17
**liability**      [3]
19:19;    46:1;
57:14
**Life** [1] 61:3
**life** [1] 71:18
**light** [1] 5:18
**lightly**      [1]
109:16
**Like** [1] 19:4
**like** [34]  4:4;
7:23;     10:10;
15:20;    16:4;
21:19;    24:1;
26:22;   29:20;
30:4;    39:10;
41:6;  44:2, 3,

4;       47:23;
58:21;    59:25;
62:24;    63:2;
66:15,      17;
67:8;    75:11;
77:6,       10;
78:20;    82:3;
86:1,      11;
101:23;
105:17;
107:25; 110:6
**likelihood**   [1]
14:14
**likely** [3]  51:9;
52:7;  99:13
**LIMINE**     [2]
1:14;  3:2
**Limine**     [2]
50:17;  111:21
**limine**     [12]
10:13;      21:7;
30:8;  73:3, 19;
74:13;    82:20;
89:20;      90:9,
11, 19;  93:6
**limitations** [9]
6:7;     20:21;
23:3;      27:16,
21;    29:22;
30:1, 9;  48:12
**limited** [3]  8:1;
10:5;  100:9
**limits** [1]  27:7
**line** [3]    66:7;
86:5, 12
**liquid** [2]  11:7;
12:13
**listen**      [1]
79:24
**lists** [1]  49:16
**literally**    [1]
60:25
**Litigation**   [1]
111:22
**litigation**   [1]
5:2
**little** [7]  22:3;
29:21;    59:5;
86:11;   91:3;
101:23; 102:4

**loan**     [13]
16:18, 21, 23;
24:9, 11;  25:1;
32:2;     34:10;
36:9;    39:16;
41:10;  46:6
**loans**    [62]
5:23;  13:2, 9;
24:13,    25;
25:4;    26:16,
19;  34:4, 6, 7;
36:22;   37:16,
21;   38:1,  6;
39:7, 9, 12, 18;
41:23,    25;
42:3;   45:20;
46:2;  91:9, 11,
16, 19, 20, 21,
25;  92:1, 5, 6,
7,  12, 15, 24,
25;        93:1;
95:23;  97:2, 3,
7,  11, 17, 25;
98:6,  7,  10;
100:20;  102:2;
103:4, 5, 6, 23;
104:2, 9
**Loftsgaarden**
[1]  56:16
**long** [3]  88:23,
25;  102:12
**long-standing**
[1]  70:16
**look**     [26]
12:17;    15:8;
21:19;    22:3;
24:1;   31:3, 8;
33:22;      34:4,
14, 21;  39:21;
42:14, 16, 20;
45:3;  47:3, 16,
23;       59:25;
72:21,    22;
85:21;   88:7;
107:14; 108:9
**looked**     [3]
14:25;    28:3;
37:3
**looking**    [20]
12:22,    25;

30:25;  33:3, 8,
15, 24;   35:12,
17, 23;   36:10;
37:20;    38:10,
16,  24;   45:5,
16,  19;   47:4;
107:6
**looks**     [4]
32:20;    77:10;
85:10;  105:17
**loss** [5]  43:19;
91:7, 13;  93:3;
101:19
**lost** [3]    9:25;
45:1;  50:10
**lots** [5]  29:10;
42:21;    65:7;
72:11;  82:11
**LTVs**     [2]
36:22;  38:7

---

**- M -**

**M-e-r-c-k**   [1]
7:3
**machine**   [1]
1:25
**made**    [24]
10:22,    24;
14:18;    22:7,
25;   24:9, 12;
26:15;    36:19;
37:6;    41:20;
45:13;    62:3;
69:9,     15;
79:12;    91:22,
23;     92:24;
95:10;  101:15;
104:18;  105:2;
112:17
**make**     [27]
13:18;    19:25;
24:2;     26:19;
69:11;    71:3;
72:13;    73:21;
74:17;    75:19;
76:25;    77:24;
78:1;  79:4, 8;
81:13;    82:25;
84:11, 20, 25;

91:18;      101:8,
14, 15;  103:9;
106:14;  112:10
**makes**     [7]
7:18;     12:12,
14;     22:19;
71:7;   72:14;
101:11
**making**    [1]
42:23
**mandatory**   [1]
78:23
**manner**     [1]
78:15
**Many** [1]  36:21
**many**      [7]
11:19;    30:24;
42:16;    46:25;
47:1;    71:16;
97:3
**Mark** [2]   2:3;
90:2
**market**     [12]
5:21;     10:10;
11:2, 8;   12:14;
13:17;    15:15;
17:15;    21:14;
29:4;    31:19;
42:1
**markets**     [3]
11:15;    12:19;
15:14
**material**    [16]
5:5;        8:5;
10:23;    12:12;
14:12,    13;
21:9;     22:9;
32:10,    12;
33:4;     41:9;
42:6, 9,  43:2;
51:12
**Materiality** [3]
11:18;    13:14;
42:21
**materiality** [67]
4:13,   15,  21,
23;  5:2, 6, 9;
6:1,       10:19;
11:16;    12:6;
14:6,  9,  11;

15:4, 8, 22, 23;
16:12, 14, 25;
17:4, 9, 12, 20;
18:4,      24;
29:25;     30:8,
20, 24;    31:1,
4, 6, 8, 17, 18;
32:3, 7;   33:8;
34:22;   35:5, 8,
9, 21;    36:11,
18;    38:9, 20,
25;   39:15, 21,
22;       41:7;
42:10, 12, 15,
16, 21, 25;
44:5;    47:17;
48:7,     18;
111:18; 112:2
**math**     [2]
72:16; 78:24
**mathematical**
[2] 84:15, 16
**mathematically**
[2]     76:23;
77:10
**matter**   [22]
7:10;   8:6, 14;
15:2;  21:4, 18;
28:23,    25;
29:8;     55:3;
73:15,    22;
79:2;   81:12;
84:2;    92:4;
93:13;  94:21;
100:14;  104:6,
19; 105:8
**matters**    [2]
53:14; 110:25
**Maybe**    [1]
59:25
**maybe**    [7]
29:21;  72:22;
77:25;    82:2,
20;     89:5;
110:5
**McKinney**  [1]
2:22
**mean**    [17]
33:20,    21;
38:24;  42:20;

44:2;     48:4;
54:10;  65:14;
66:1;    71:17;
73:20;   77:21,
24;   106:18;
108:19;  109:1,
12
**meaning**   [1]
109:1
**meaningful** [1]
108:25
**means**    [2]
52:18; 97:6
**meet** [1] 97:11
**mentioned**  [3]
16:11;   99:8;
106:15
**Merck** [16] 7:1,
3, 4, 7, 15, 23,
24;   8:10, 14;
26:25;  28:1, 3,
7,  12,  14;
111:21
**mere** [2]   7:7,
11
**merits** [1] 6:17
**Method**   [1]
50:18
**method**   [19]
50:24;   51:11,
14;     52:8;
55:20;  57:12;
58:8, 11, 25;
68:18,    19;
74:11;   75:7;
76:4,    18;
85:13, 16
**methodology**
[14] 56:10, 12;
57:24;    74:4,
10, 19, 25;
75:23;   77:15,
17, 23;  78:14;
83:1; 87:23
**metrics**   [1]
5:23
**might** [5] 9:1;
49:18;  86:11;
90:16; 107:10
**Mike** [1] 1:22

**Miller** [2] 2:20;
113:12
**million**   [1]
74:15
**millions**   [1]
11:10
**mind** [3]   8:3;
42:19; 75:16
**minds**    [1]
99:16
**minus**    [4]
58:1;  76:5, 8;
82:6
**minutes**   [1]
81:9
**misconceptions**
[1] 4:10
**misconduct** [1]
96:8
**misconstructio**
**n** [1] 8:19
**misinterpretati**
**on** [1] 7:1
**mislead**    [1]
6:15
**misleading** [18]
5:11, 17;  8:23;
9:13;   10:1, 6,
23;     11:3;
12:2, 4, 16, 20;
13:12;   22:21,
23;    23:19;
24:13; 27:8
**misread**   [1]
102:5
**misrepresentat**
**ions** [3] 25:13;
71:7; 92:24
**misrepresents**
[1] 71:7
**missed**    [2]
29:22; 66:21
**missing**   [1]
10:3
**misstated**  [4]
14:15;  22:17;
32:2; 41:3
**misstatement**
[3]      14:13;
32:12; 33:7

**misstatements**
[11] 19:18, 23;
20:15;  25:19;
26:15;  36:18;
38:21;  39:11,
16; 43:1, 14
**mister**    [2]
39:4, 5
**moment**    [8]
9:23;    20:21,
24;    24:17;
43:5;  53:24;
55:13; 74:11
**money** [1] 62:3
**monies**    [2]
52:22; 58:19
**months**   [3]
13:9;   32:25;
33:4
**more**    [23]
17:14;  20:17;
21:12;  22:12;
23:23;    39:4;
41:6;  42:1, 4;
44:14;  47:24;
51:10;  53:25;
54:20;   60:5;
71:12;   81:9;
83:14;  85:19;
86:23;   89:4;
108:25; 110:25
**Moreover**   [1]
99:11
**MORGAN**    [4]
1:7,  8;   2:19,
24
**Morgan**   [63]
4:8, 12, 13, 19;
5:5, 8, 19, 25;
6:14,  20,  25;
7:14;     8:18;
9:5, 17;  10:25;
11:18;   14:8;
15:3,  19,  21;
19:9,  10,  16,
24;  22:13, 17;
24:6,  8,  12;
26:14;  36:19;
42:25;  43:11;
55:25;   56:2;

59:18;    60:7;
61:4, 8;  62:15;
63:16;    64:11;
65:2;     66:10,
18;       68:12;
70:23;    71:20;
74:4, 5;  81:15,
24;       82:10;
84:5;     86:13;
90:11,    24;
93:18;    94:25;
98:17;    99:3;
100:6
**mortgage**   [3]
5:21;     15:14;
36:22
**Mortgage-back
ed** [1]  11:11
**mortgage-back
ed**  [5]   15:16,
24;       16:5;
40:7;  61:19
**most**      [5]
11:10;    41:11,
14;       45:25;
46:25
**MOTION**     [2]
1:14;  3:2
**Motion**     [2]
50:17; 111:20
**motion**    [26]
4:5, 6;   14:5;
21:7;     28:18;
30:8;     32:5;
48:24;    49:15,
16;       50:21;
51:2, 24; 55:4;
73:2, 17, 22;
74:12;    82:20;
90:16,    24;
94:1, 3;  95:14
**motions**   [11]
4:4, 9, 11;  7:5,
18;       10:13;
14:3;     18:23;
48:10,    12;
88:17
**moved**      [1]
51:13

**movement**   [1]
31:9
**movements**  [1]
36:10
**moves**      [1]
31:10
**mtabolsky**  [1]
2:10
**much**       [9]
54:24;    60:14,
21;       63:2;
71:16;    81:7;
82:6;     90:7;
112:14
**Multiple**   [1]
110:16
**multiple**   [1]
34:24
**must** [3]  7:19;
99:4;  105:19

---
**- N -**
---

**name** [2]  94:5,
8
**narrow**     [1]
26:8
**narrowly**   [1]
102:5
**naturally**  [1]
48:5
**nature**     [6]
10:6;     16:15;
20:8;     58:22;
68:14;  83:24
**necessarily** [5]
29:9, 12;  33:6;
35:17;  104:6
**necessary**  [4]
5:9,      22;
102:19;  105:3
**need** [6]  30:9;
72:25;    74:12;
81:11;  91:3
**needs** [3]  71:1;
81:13
**negate**     [2]
9:13;  10:1
**negative**   [9]
10:17;    19:14;

43:6,  22,  23;
44:3, 6;  45:21;
48:5
**negotiated**  [1]
108:23
**negotiator**  [1]
108:2
**neither**    [3]
23:20;    68:17;
96:22
**never** [6]  5:15;
9:12;     42:18;
66:3;     69:15;
80:2
**newspaper**   [6]
4:7;  7:8;  8:11;
10:14;    20:7;
28:19
**newspapers** [1]
48:13
**next**       [2]
101:16; 111:2
**nice** [2]   18:5;
112:13
**Nobody**     [1]
75:18
**nobody**     [1]
37:18
**Nomura**    [10]
28:10;    55:5;
56:4, 9;  68:15;
69:13;    76:16;
87:17;  88:3
**nondefective**
[1]  34:7
**nondiligent** [1]
8:3
**Nope** [1]  61:1
**normal**     [1]
37:11
**NORTON**     [2]
2:22; 113:12
**note** [5] 80:16;
85:10;    87:16;
88:11;  105:6
**noted**      [2]
16:10;  91:5
**notes**      [3]
106:1, 3;  108:5

**nothing**   [15]
6:8;  7:12, 23;
10:21;    11:15;
13:4;     18:13;
35:8;     50:1;
57:9,     20;
58:23;    80:21;
81:2; 82:16
**notice**    [11]
7:16;     8:1, 9,
16;       27:24;
28:8,  11,  12;
29:2, 5, 17
**noting** [1]  51:7
**notion**     [3]
18:11;    45:7;
47:15
**nuance**     [1]
10:3
**Number**     [1]
50:17
**number**     [8]
30:22;    47:15;
63:9;     72:15;
78:6;     79:16;
94:16;  96:20
**numbered**   [2]
1:21;  113:6
**numbers**    [7]
33:1;     77:13,
18, 19;   79:3;
82:17;  83:9
**numeric**    [1]
77:18
**nutshell**   [2]
40:6;  98:12

---
**- O -**
---

**objection**   [1]
90:9
**objective**   [5]
4:14,  22;   5:7;
14:11;  17:20
**obliterate**  [1]
36:18
**obtain**     [1]
41:13
**Obviously**  [2]
51:2;  84:1

**obviously** [16] 13:4; 19:2; 20:4; 28:14; 40:5, 16; 53:22; 54:4, 8, 13, 24; 66:5; 85:8; 91:15; 93:4; 109:1

**occupancy** [1] 26:12

**occurred** [1] 113:7

**offended** [1] 39:5

**offer** [3] 89:2; 102:16; 113:9

**offered** [11] 8:6; 15:22; 22:11; 28:22, 24; 29:1; 58:4; 95:19; 96:15; 104:18; 113:10

**offering** [9] 5:19; 9:6; 31:17; 39:19, 24; 97:15; 100:12, 13, 16

**offers** [2] 100:3, 4

**OFFICIAL** [1] 113:13

**Official** [2] 113:3, 17

**offset** [1] 56:18

**Okay** [26] 6:23; 10:8, 12; 13:20; 23:22; 27:19; 34:13; 45:3, 14; 47:22, 23; 48:22; 55:16; 59:12; 62:1; 64:14; 65:5; 66:24; 67:22; 81:8; 88:6, 25; 94:7; 105:1, 22; 111:15

**okay** [7] 18:19; 38:23; 41:1; 62:12; 90:5; 101:6; 106:8

**Okie** [1] 50:14

**omission** [2] 8:21; 32:20

**omissions** [7] 19:18, 23; 20:11, 16; 38:21; 43:1, 16

**omitted** [5] 14:12, 13, 15; 23:13; 32:20

**omnibus** [1] 48:24

**once** [1] 79:4

**ones** [3] 46:24; 49:8, 12

**Only** [2] 36:2; 100:20

**only** [23] 4:20, 22; 8:1; 9:12; 12:13, 14; 17:10; 21:8; 22:9; 26:8, 22; 32:7; 51:20; 55:24; 56:25; 59:14; 67:21; 71:23; 76:22; 77:2; 91:16; 92:14; 104:3

**Open** [1] 4:2

**open** [1] 113:7

**opening** [2] 18:6; 95:1

**opine** [5] 40:14; 45:11; 55:19; 77:16; 80:6

**opined** [1] 18:3

**opines** [1] 16:3

**opinion** [14] 14:6; 16:6; 27:4; 30:17; 32:19; 38:15; 50:23; 52:12; 74:16; 75:17;

78:11, 12; 107:1; 112:2

**opinions** [17] 15:23; 16:13, 19; 31:18; 35:1, 20; 39:24; 51:8; 53:12, 13; 56:13; 58:5; 74:14, 21; 79:25; 109:24

**opportunity** [1] 19:24

**oppose** [1] 50:16

**opposed** [9] 10:9; 21:11; 51:19; 53:5; 62:25; 64:3; 89:21; 107:23, 24

**opposing** [2] 49:10; 103:8

**opposition** [7] 4:11; 7:18; 49:5, 13; 51:16; 111:20, 25

**order** [12] 5:11; 14:1; 29:19; 48:9; 89:20; 90:9, 11, 19; 95:20; 104:17; 105:3; 112:23

**orders** [1] 112:16

**originated** [1] 16:22

**originators** [1] 25:3

**other** [34] 8:5; 10:2, 8; 11:18, 19; 12:9; 19:1; 21:20; 27:5; 33:15, 23; 34:6; 39:14; 45:18; 47:3; 48:9, 15; 50:16; 54:20;

55:2; 56:13; 69:12, 16; 71:3; 80:11; 82:3; 84:18; 85:15; 87:25; 96:21; 100:13; 101:5; 113:5

**others** [6] 4:18; 25:21; 40:12; 49:11; 68:10; 112:4

**otherwise** [10] 39:14; 41:13; 51:24; 54:8; 58:17; 74:13; 81:3; 83:2; 96:22; 97:4

**ought** [2] 80:5; 111:9

**outside** [1] 101:1

**outweighs** [1] 109:20

**over** [13] 45:16, 20; 47:5; 52:16; 54:25; 56:15; 83:17; 88:20; 89:17; 99:1, 19; 104:1; 112:20

**over-the-count er** [1] 11:12

**overall** [1] 33:5

**overcompensat e** [1] 57:17

**overcompensat ory** [1] 71:22

**overlaps** [1] 99:2

**overly** [2] 4:12; 14:8

**overnight** [1] 64:7

**overwhelmed** [1] 37:9

**owed** [1] 41:13

**owner-occupan cy** [5] 25:5, 8, 9, 12; 40:13
**owns** [1] 92:20

---

**- P -**

---

**PAGE** [1] 3:4
**Page** [3] 7:17; 107:17; 111:20
**page** [3] 105:16; 107:17; 111:22
**paid** [35] 41:16; 46:7; 52:13, 21, 22; 58:1, 2, 3, 14, 16; 60:12, 14, 22, 23; 61:10, 12, 21; 65:15, 16, 23; 66:16, 25; 68:4; 69:5, 6; 72:7; 76:5, 7, 8, 19, 21; 80:23; 81:17; 87:21; 113:12
**paper** [1] 86:11
**papers** [5] 14:10; 28:7; 49:5; 56:3; 88:24
**Paragraph** [2] 95:9; 108:16
**paragraph** [1] 102:13
**paragraphs** [3] 102:15; 105:7
**part** [32] 9:22, 25; 14:21, 25; 17:2; 18:3; 21:13; 23:11; 29:25; 38:24; 40:9; 43:21; 48:19, 23; 52:10; 53:8, 9, 12, 13; 54:6, 11, 18; 55:5, 14; 66:22;

70:14; 78:19; 80:2; 94:11; 98:5; 102:8; 104:24
**particular** [7] 5:18; 6:13; 7:17; 22:18; 25:14; 32:24; 83:16
**Particularly** [2] 33:9; 100:9
**particularly** [2] 9:6; 99:7
**parties** [12] 4:8; 8:12; 14:10, 19, 21; 16:25; 48:14; 52:3; 69:14; 95:8; 96:5; 113:6
**parts** [1] 65:13
**party** [1] 98:18
**pass** [1] 49:16
**past** [1] 31:13
**pattern** [1] 63:11
**Paul** [2] 2:7; 59:3
**Pause** [2] 9:24; 21:1
**pause** [2] 20:21, 23
**paying** [1] 55:21
**payment** [2] 81:19; 87:22
**payments** [2] 60:19; 76:21
**Pension** [1] 28:6
**People** [1] 34:18
**people** [3] 61:18; 64:6; 70:20
**percent** [6] 36:23; 37:1, 3; 53:22; 71:16, 18

**performance** [13] 13:2; 31:14; 32:2; 34:4, 5, 11; 36:9; 39:15; 41:10, 11; 45:16; 47:5; 91:12
**performed** [7] 13:4; 33:22; 34:7; 37:16; 38:1, 7; 40:20
**Perhaps** [1] 13:25
**perhaps** [7] 24:11; 38:13; 40:10; 71:15; 87:6, 24; 90:10
**period** [4] 54:22; 92:8, 13; 103:6
**permission** [2] 4:4; 59:14
**permitted** [1] 55:19
**perspective** [9] 15:9; 17:5; 25:18; 28:16; 31:15, 21; 33:9; 44:8; 45:11
**perspectives** [1] 42:17
**persuasive** [1] 54:20
**pertinent** [3] 10:18, 22; 109:23
**pervading** [1] 8:18
**phrasing** [1] 21:15
**pick** [3] 79:18, 23; 110:23
**picked** [1] 75:25
**place** [1] 8:1
**plain** [2] 27:6; 85:21

**PLAINTIFF** [2] 2:6, 13
**Plaintiff** [21] 1:5; 5:3; 6:9; 7:12, 21; 8:3; 9:14, 18; 13:8; 15:6; 16:15; 19:22, 25; 21:8; 23:5; 26:14; 32:23; 56:9; 57:17, 18; 69:17
**Plaintiff's** [3] 6:17; 15:11; 19:22
**Plaintiffs** [3] 4:16, 23; 16:16
**plaintiffs** [3] 4:16, 17
**play** [2] 24:21; 44:20
**pleadings** [1] 28:3
**Please** [1] 18:17
**please** [4] 20:23; 24:19; 105:16; 112:17
**plenty** [1] 112:10
**plus** [12] 60:22, 23; 63:13; 64:22; 66:16, 25; 69:5; 72:7; 80:23; 81:17; 82:5; 87:21
**point** [33] 23:1; 26:23; 38:12; 53:16, 18, 20; 62:6; 64:14, 15, 17; 65:5, 6; 70:3; 71:3; 73:3, 19; 75:19; 76:25; 79:12; 81:24; 82:19; 87:5, 16; 93:6; 101:14; 104:17; 105:2;

106:15, 21, 24;
110:3; 111:10
**pointed** [1]
57:10
**points** [8]
27:13; 51:1,
22; 54:2;
75:15; 77:5;
101:10; 104:13
**policies** [1]
61:3
**policy** [1]
93:13
**POLK** [1] 2:17
**poorly** [1] 38:7
**populations** [1]
41:23
**portion** [5]
96:11, 17, 19,
23; 108:13
**portions** [1]
113:5
**portrayal** [1]
73:25
**pose** [1] 97:9
**position** [24]
4:9; 6:25;
14:7; 17:21;
24:2, 23; 25:2;
28:2, 15;
29:15; 35:7;
47:13; 51:16;
55:17, 24;
56:2, 24;
57:19; 80:25;
83:8; 84:5;
85:17; 86:22
**posits** [1]
26:11
**possible** [1]
24:6
**possibly** [1]
105:9
**post** [3] 53:4;
72:16; 98:5
**post-facto** [2]
38:3, 6
**post-judgment**
[2] 73:17;
84:10

**potential** [1]
45:17
**practical** [5]
5:13; 21:4, 5,
18; 105:8
**practically** [1]
22:13
**precisely** [3]
21:16; 46:7;
70:24
**preclude** [1]
90:24
**precludes** [2]
35:10; 90:12
**predict** [1]
37:22
**preference** [1]
13:24
**prejudgment**
[15] 52:9;
53:1, 3, 21;
54:13, 22;
55:1; 56:7;
57:15, 25;
71:10; 75:2;
77:3; 78:8, 16
**prejudice** [6]
98:21; 99:23;
102:7, 23;
103:12; 109:20
**prejudicial** [7]
95:17; 98:16,
17; 99:8;
100:7; 105:5,
11
**preliminary** [1]
94:20
**prepaid** [1]
67:14
**preparation** [1]
113:11
**prepared** [3]
54:1; 83:9;
84:12
**prerogative** [1]
68:11
**present** [3]
34:8; 98:23;
102:9

**presentation**
[4] 59:5;
75:10; 80:19;
86:3
**presented** [2]
54:7; 87:13
**presently** [1]
110:4
**preserved** [1]
7:16
**Presiding** [1]
1:22
**pretrial** [2]
83:2; 110:25
**pretty** [2]
48:25; 86:25
**prevalent** [1]
25:9
**previously** [4]
36:11; 51:25;
108:7; 112:4
**price** [15]
12:7, 11; 31:8;
32:19; 36:10;
58:1, 2, 14;
62:9; 63:4, 13,
18; 64:22;
65:16
**prices** [3]
11:12; 31:10;
38:8
**principal** [39]
51:11; 52:15,
20; 55:21;
56:8, 9, 12;
57:12, 22;
58:10, 11, 13;
60:19, 23;
61:16; 65:8,
19, 22; 67:3,
5, 14; 68:5;
69:15; 74:4,
24, 25; 75:6;
76:4, 7, 9, 14,
18, 21; 81:1,
2; 85:16;
86:20; 87:23;
108:2

**prior** [3]
32:12; 51:4;
111:19
**private** [1]
57:13
**probably** [3]
26:3; 59:9;
110:6
**probative** [3]
25:18; 100:10;
109:20
**problem** [6]
5:25; 46:7;
90:1; 97:8, 9;
104:4
**Proceedings**
[2] 1:24; 3:7
**proceedings** [3]
1:20; 113:5, 9
**proceeds** [9]
60:20, 24;
63:6, 15;
64:24; 65:20;
67:3, 18, 19
**process** [4]
35:2; 86:6;
104:8; 105:4
**profile** [1]
15:18
**prominently** [1]
32:17
**promised** [1]
111:17
**proof** [1]
113:10
**proper** [1]
77:16
**properly** [3]
8:14; 21:24;
46:4
**proposed** [1]
65:3
**proposes** [1]
78:5
**proposing** [1]
61:20
**proposition** [2]
4:19; 46:21
**propositions**
[1] 41:1

proscribe [1]
30:22
protect [2]
37:11, 12
protecting [1]
9:3
protection [1]
37:2
protections [1]
37:10
prove [3] 32:7;
97:22, 23
proved [1]
37:12
provide [6]
9:19; 13:13;
25:21; 40:19;
47:18; 58:17
provided [1]
88:12
provides [1]
8:20
providing [1]
57:1
province [1]
82:7
provision [1]
108:23
provisions [1]
56:15
public [4]
12:19; 17:24;
28:4; 29:16
publication [2]
7:8, 11
Publications
[1] 8:5
publicly [3]
14:25; 15:2;
17:1
pulled [1]
112:5
pulling [1]
74:22
punish [1]
57:16
punitive [1]
58:23
purchase [9]
13:5; 62:9, 10;

63:4, 13, 18;
64:22; 65:16;
98:5
purchased [2]
16:22; 71:15
pure [2] 37:24;
53:21
purely [1] 23:7
purports [1]
104:10
purpose [5]
8:25; 13:12;
30:11; 81:3;
104:6
purposes [8]
34:8; 57:6, 8,
11; 70:1, 4,
11, 16
pursuant [2]
97:18; 109:19
Putting [1]
79:3
putting [2]
12:24; 103:25
pyetter [1] 2:8

- Q -

qualification
[1] 90:19
quality [1]
37:17
quarterback [1]
44:19
question [24]
23:7, 23;
24:16; 29:11,
14; 39:17;
42:24; 48:9;
52:1, 2; 75:8,
20; 79:1, 5, 6;
81:10, 14;
83:23; 84:19;
87:9; 107:20;
109:2; 111:19
questions [3]
20:22; 77:2;
104:11
quick [5]
27:13; 77:5;

89:4; 94:4;
104:15
quickly [3]
63:8; 90:17;
106:19
quite [2]
12:18; 16:12
quote [8]
27:25; 70:16;
95:2, 10; 97:3,
20, 25; 100:19
quoting [1]
70:15

- R -

Racker [1]
2:21
raised [1] 51:4
rampant [1]
25:4
range [1]
74:15
rate [3] 60:15;
71:15; 81:18
rather [3]
14:13; 52:24;
90:17
rationale [1]
31:6
ratios [3]
40:12; 41:2, 3
reacted [1]
12:8
reaction [1]
12:19
read [5] 70:19;
85:20; 102:5;
109:13; 112:10
readily [1]
72:15
reading [1]
6:20
ready [3] 77:7,
8; 112:5
Real [2] 94:4;
104:15
real [5] 4:17;
21:19; 27:11;
38:3; 89:4

real-world [1]
22:5
realize [1]
88:15
Really [1]
59:17
really [20]
13:17; 18:6;
21:19; 34:2;
37:25; 44:1;
52:12, 14;
54:25; 61:20;
66:20; 67:25;
73:20; 87:6;
89:15; 102:8;
103:1, 11, 12,
18
reanalyzing [1]
46:12
reason [11]
26:22; 38:15;
52:5; 54:8;
58:13, 15;
63:9; 65:10;
74:3, 12; 104:4
reasonable [22]
9:9; 14:16;
15:9, 10, 13,
18; 16:4;
17:5, 17, 21,
25; 18:3;
30:19; 31:13,
22; 33:10;
34:22; 35:22;
36:6, 7; 41:4;
43:3
reasons [8]
51:4; 57:15;
63:3, 7; 65:7;
72:11; 85:1;
100:5
rebut [3]
19:11, 24;
45:22
rebuttal [7]
35:21; 39:23;
45:23; 53:13;
92:4; 96:14;
101:10

receive [3]
52:20, 22;
61:12
received [4]
52:16, 55:22;
58:1; 81:22
RECEIVER [1]
1:4
Recessed [1]
3:9
recession [5]
36:17, 24;
37:9, 24; 38:6
recessionary
[1] 56:23
recessions [1]
37:5
recital [1]
108:12
recognize [1]
14:9
recognized [2]
58:5; 91:8
recommend [1]
46:25
reconcile [1]
80:25
RECORD [1]
1:1
Record [3]
113:6, 8, 11
record [7]
60:2; 73:11,
13; 81:6;
106:10, 12, 19
recover [2]
57:5; 81:16
recovery [4]
58:20; 62:25;
63:1; 66:13
redact [2]
100:3, 4
redacted [1]
105:7
reduce [2]
67:10; 76:6
redundant [1]
26:2
refer [1]
106:25

reference [2]
91:22; 102:10
referenced [1]
56:5
references [2]
99:19; 100:4
referencing [1]
51:25
referred [1]
16:17
reflect [4]
56:18; 75:18;
77:19; 95:6
reflected [4]
34:19, 20; 71:4
reflective [1]
18:2
reflects [1]
113:9
regard [2]
61:19; 90:8
regarding [1]
98:20
relate [1]
29:24
related [5]
17:10; 23:1;
25:13; 91:7
relates [4]
21:7; 22:2;
27:16; 41:22
relating [2]
91:2; 99:1
relationship [1]
33:25
relayed [1]
29:10
relevance [4]
39:2; 93:22;
95:18; 100:17
relevant [29]
8:7; 15:4, 7;
16:8; 17:4, 17;
18:23; 19:2, 9;
20:5, 15, 20;
26:7, 23;
28:20; 38:17,
22; 39:18;
43:21; 48:5, 6;
80:12; 92:8,

13; 95:16;
100:9, 21;
103:6; 107:17
reliance [6]
6:3; 9:10;
18:12, 13, 14,
21
relied [3]
28:11; 32:3;
106:23
relies [2] 7:17;
32:18
rely [5] 29:18;
104:21, 25;
105:5; 106:17
relying [1]
96:18
remaining [1]
8:9
remarked [1]
25:5
remedied [1]
102:25
remember [2]
26:18; 43:7
reminded [1]
103:18
removed [1]
46:5
render [4]
15:1; 32:9;
35:20; 38:15
repaid [10]
56:19; 58:19;
60:19, 24;
65:9, 19, 22;
67:2, 5; 86:19
repayment [1]
76:7
repayments [7]
52:15; 58:10,
12, 14; 75:1;
76:9, 14
repeatedly [1]
27:23
reply [1] 14:24
report [3]
4:20; 12:23;
101:15

reported [5]
1:24; 11:13;
25:2; 33:1;
113:7
REPORTER [3]
70:6; 94:5, 7
Reporter [2]
113:3, 17
REPORTER'S
[1] 1:1
Reporter's [4]
3:10; 113:6, 8,
11
reports [2]
65:21; 77:7
represent [1]
65:1
representation
s [7] 17:10;
20:11; 21:10,
17; 22:2; 24:4
repurchase [1]
98:6
repurchased
[2] 98:8, 10
requested [2]
98:5; 113:5
require [1]
84:6
required [1]
68:19
requirement [7]
9:8, 11; 23:10,
18, 25
requirements
[1] 9:18
requires [3]
65:6; 69:11;
72:9
rereviewing [1]
46:11
residential [4]
15:16, 24;
40:7; 61:19
resolving [1]
91:2
respect [3]
48:12; 68:16;
70:19

**respectfully** [3]
18:9;      57:7;
104:19
**respond**      [3]
24:16;     75:9;
111:18
**responded**  [1]
74:8
**Response**   [3]
13:20;   36:12;
59:2
**response**   [4]
38:14;   75:11;
80:20;  104:14
**rest** [2]   54:2;
102:22
**restate**    [2]
10:3;  32:8
**restatement** [2]
32:13, 14
**restatements**
[2]         32:10;
34:21
**restore**    [1]
57:18
**rests** [2]   4:9;
7:1
**result**     [3]
28:18;   63:20;
99:23
**resume**     [1]
110:2
**retail** [1]  15:17
**reunderwriting**
[1]  46:19
**reverse**    [1]
104:17
**reviewed**   [1]
46:6
**reviewing**  [1]
107:5
**rewards**    [1]
55:21
**Richard**    [5]
15:22;    16:3;
31:16;   35:21;
39:22
**Richards**   [1]
4:20

**Right**      [6]
19:20;   48:15;
67:16;   73:18;
79:21;  91:14
**right**      [26]
10:12;   24:15;
27:10;   30:13;
34:13;   44:14;
45:8;     47:2;
50:7;     53:5;
59:13;   63:15;
67:7,      24;
72:19,     20;
78:13;    81:5;
83:1;     86:7;
89:3,      19;
109:18;
110:12,    18;
111:1
**rightful**    [1]
26:8
**rise** [2]   33:5;
44:12
**risk** [1]  6:14
**RMBS**      [19]
15:13, 15, 19;
17:5, 21, 25;
18:3;     26:1;
31:13;   35:22;
41:4, 11;  42:1;
45:13;   52:18;
55:25;   56:20;
91:2;  99:1
**RMBs** [1]  61:5
**RMBSs**      [1]
61:5
**Rodney**     [1]
2:20
**role** [3]   7:16;
8:9, 15
**ROSE** [2]  2:22;
113:12
**Ross** [1]  2:22
**roundabout** [1]
17:13
**routinely**   [1]
104:24
**Ruiz** [3]  113:3,
16
**Rule** [1]  73:22

**rule** [5]   30:7;
48:2;  68:6, 10;
109:19
**ruled**      [2]
68:23;  84:18
**RULING**     [2]
30:5;  109:17
**Ruling** [1]  3:8
**ruling**      [7]
69:10, 12, 15,
19;      73:9;
74:13;  84:20
**rulings**     [2]
84:10;  112:17
**Rutherford** [2]
44:16, 19
**Rutledge**   [25]
31:16,     24;
33:12;    35:1,
12, 16;  39:23;
40:2, 4;  44:17,
18, 19;  45:3;
50:22;    51:2;
52:9,      23;
55:18;    58:4;
74:8, 24, 25;
76:3, 12;  78:4
**Rutledge's**  [7]
51:7;   53:12;
56:13;   74:11,
21;      75:23;
77:15

_____

- S -

_____

**S.S.B.** [1]  1:5
**safety**      [2]
37:7;  59:15
**said** [32]   9:22;
23:24;   37:21;
43:5;     48:11,
17;       49:9;
58:7;      65:4;
66:15;    68:7;
69:16;     70:8,
13;   71:1,  17;
73:14;    77:17;
80:21;    81:15,
16;       82:12;
83:11;      93:5,

12;       94:22;
95:25;  101:21;
108:17;
109:13,    14;
112:4
**sake** [1]  26:5
**sale** [6]   13:6;
60:20,     24;
97:4, 7, 13
**sales** [7]  63:6,
15;       64:23;
65:20;     67:3,
18, 19
**same**      [25]
11:7;    13:25;
16:22;   23:17;
31:6, 11, 25;
35:3, 4;   36:9;
55:15;   58:15;
65:14,     22;
66:1;     76:23;
80:2,      24;
81:25;   83:22;
91:12;   98:20;
99:4, 5;  111:22
**Saturday**   [1]
111:8
**saying**     [36]
17:9, 11;  21:8,
11;    22:8, 20;
23:14;     25:23,
25;       33:3;
34:2,      17;
37:14;    42:10;
61:1, 4, 9, 17,
24, 25;   64:5,
12;       66:20;
67:8,      25;
70:23;    71:21;
75:18;   78:4, 5;
80:1, 9;  101:7;
104:1
**says** [33]   7:15,
23, 24;   10:25;
60:10,     25;
61:8, 15;  62:2,
8, 15;  63:3, 4,
11, 22;  64:13,
15, 20;   65:8;
66:8;    67:21;

69:3, 5;   81:3;
84:3;  86:6, 16;
91:11;  96:19;
97:5; 107:7, 20
**scenarios**  [1]
38:2
**scheduled**  [2]
110:2; 111:11
**schedules**  [1]
111:4
**Schwab**  [4]
56:2;  68:16,
20;  88:1
**scope** [1]  4:25
**screen**  [3]
59:9, 24
**screens**  [1]
59:11
**Second**  [7]
64:14;  65:5;
95:5;  96:9;
97:24;  98:11;
99:6
**second**  [14]
5:8;  63:21;
65:5, 17, 20;
86:19;  87:16;
89:7;  90:20;
95:16;  98:15;
106:11;  107:8;
111:9
**Secondly**  [2]
6:24;  11:7
**seconds**  [1]
85:5
**Section**  [37]
14:23;  19:12,
16, 21;  31:7;
35:5, 6;  51:15,
17,  20,  22;
52:11;  53:10;
55:11, 13, 14;
56:15,  22;
57:23;  58:15,
17, 18, 21, 25;
69:22;  76:17;
80:18, 20, 22;
81:1;  87:18;
88:4

**section**  [2]
32:19; 102:12
**Sections**  [1]
6:10
**Securities**  [10]
6:10;  59:20;
60:9;  65:12;
68:2, 20;  69:2,
4, 21; 111:22
**securities** [30]
5:1, 15;  6:20;
11:11;  13:6;
15:16,  25;
16:1,  5,  23;
22:25;  26:2;
31:3;  34:18;
40:8;  52:14;
56:21;  58:19;
61:3,  4,  19;
68:2,  8,  10;
71:14;  82:4;
86:15,  17;
97:16
**securitization**
[1] 13:10
**securitizations**
[1] 13:3
**security**  [20]
11:17;  41:14;
52:20;  56:20;
60:12, 13, 18;
61:2, 5;  62:4;
65:16;  68:1, 3,
4,  14;   71:8,
13,  19,  25;
80:23
**seeing**  [2]
59:22, 24
**seek** [1]  15:8
**seeking**  [2]
93:22;  94:14
**seem**  [2]
48:16;  78:18
**seems**  [2]
7:14;  44:4
**seen** [3]  17:4;
36:25; 103:22
**sees** [1]  42:25
**seller** [2]  92:7;
103:5

**selling**  [2]
22:25;  71:8
**semantic**  [2]
108:6, 25
**send** [1]  88:20
**sense**  [3]
12:13,  14;
77:24
**separate**  [3]
44:10;  55:9;
99:19
**separated**  [1]
39:12
**separately**  [1]
43:4
**SESHENS**  [82]
13:21,  23;
14:2;  17:16;
18:9, 18, 20;
19:5, 15, 21;
20:12,  25;
24:18;  27:12,
19;  29:3, 9,
23;  30:15;
34:3,  16;
35:15;  36:4;
38:11,  19;
39:3;  40:4;
41:8, 22;  42:2,
8,  13,  24;
43:9, 13, 16,
19, 24;  44:7,
17,  22,  25;
45:6, 10, 23;
46:8;  47:7, 11,
22, 25;  49:3,
21, 23;  50:9,
20;   53:7;
54:4,  23;
55:17;  73:24;
75:14;  77:11;
78:17;  79:11,
21;  80:14;
83:11;  85:6;
87:2, 5;  88:10,
25;   89:7;
105:20,  23;
110:4,  19;
111:16;  112:1,
9, 14, 19

**Seshens**  [8]
2:14;   21:3;
26:11,  13;
30:14;   38:4;
91:5;  93:11
**setting**  [1]
100:23
**settled**  [2]
99:24;  100:1
**settlement** [44]
90:18, 21, 25;
92:9, 11;  93:7,
14, 17, 19, 23;
94:15,  23, 24;
95:8,  10,  15,
19;   96:2,  4,
10;   97:23;
98:13,  18,  22,
25;  99:10, 14,
18, 19;  100:8,
24;   101:1;
102:11, 20, 21;
104:21;
105:10;
107:11, 16, 21;
108:4,   12;
109:5
**several**  [2]
14:22;  62:4
**severity**  [1]
38:8
**share**  [1]
112:22
**shares**  [1]
11:10
**she'll** [3]  40:9,
14, 19
**she's**  [5]
35:19;  40:20;
45:15;  51:3;
82:17
**shoes**  [3]
15:11;  17:6, 18
**short**  [4]
12:15;   59:4;
89:5; 102:14
**shot** [1]  26:9
**should**  [32]
5:16;   9:15;
16:16;   19:7;

23:2, 5, 20; 27:25; 28:13, 20; 29:1, 5; 37:25; 46:21; 47:3; 54:21; 57:22; 58:7, 14, 16; 59:4, 8, 23; 61:11; 85:20; 88:15; 103:10, 13, 21, 22; 106:18

**should-have-kn own** [2] 23:9; 27:14

**shouldn't** [5] 61:9; 73:4; 75:18; 93:14, 24

**show** [22] 9:9; 16:20; 18:7; 19:17, 22; 29:1, 3, 5; 31:1; 32:3; 33:11, 14; 34:25; 35:2; 42:15; 57:10; 91:24; 93:3; 98:2; 100:13; 101:1; 105:3

**showing** [8] 5:16; 18:8; 19:11, 25; 31:14, 20; 35:8; 91:18

**shown** [3] 20:16; 31:1, 25

**shows** [1] 42:8

**side** [1] 50:16

**sides** [8] 64:17, 19, 24; 65:8; 66:19; 67:13, 20; 88:12

**significance** [2] 99:16; 105:14

**significant** [1] 68:22

**significantly** [1] 14:17

**similar** [5] 15:11; 18:2; 25:15; 99:25; 100:2

**Similarly** [2] 15:5; 16:9

**similarly** [1] 98:23

**simple** [6] 60:11; 63:9, 10; 78:24; 82:5; 85:25

**simplifying** [1] 34:8

**simply** [11] 8:15; 31:20; 41:5; 69:16; 77:15; 80:11; 93:23; 97:10, 22; 98:9; 99:3

**since** [2] 35:19; 36:17

**single** [3] 4:23; 55:23; 85:11

**situation** [1] 52:19

**skip** [1] 89:5

**Slide** [2] 70:5, 7

**slide** [2] 70:19; 71:5

**slightly** [1] 70:24

**slips** [1] 9:18

**slow** [2] 18:17; 70:9

**small** [1] 96:19

**smart** [2] 89:9, 17

**Smarter** [1] 64:6

**snapshot** [2] 13:13, 15

**Snow** [4] 96:13, 16; 101:10, 14

**Snow's** [1] 96:11

**sold** [12] 16:22; 81:21; 91:20, 21; 92:12, 23, 25; 97:2; 98:1; 100:19; 103:4, 6

**some** [21] 5:16; 13:9; 18:12; 25:21, 25; 30:10; 39:3; 40:12; 46:13; 54:9; 75:24; 83:15; 93:21; 97:25; 99:14; 110:2, 20; 111:10, 17; 112:16

**somebody** [3] 39:22; 50:15; 107:25

**somehow** [5] 5:9; 6:19; 7:15; 8:13; 18:21

**someone** [3] 24:1; 26:11; 71:6

**something** [18] 12:18; 33:22; 44:3; 46:16; 47:5; 53:2, 3, 6; 59:22, 24; 66:3; 72:16; 73:22; 89:25; 100:13; 102:24; 103:24; 109:16

**sometimes** [1] 11:1

**sooner** [1] 8:4

**sophisticated** [3] 4:16; 6:13; 9:7

**sophistication** [2] 6:16, 18

**Sorry** [1] 50:12

**sorry** [12] 9:21; 19:13; 43:18; 50:2;

60:5; 66:21; 67:18; 70:9; 76:20; 81:15; 90:21; 96:13

**sort** [10] 11:13; 13:13; 30:10; 34:8; 45:19; 51:24; 73:21; 93:13; 94:2; 97:6

**sorts** [1] 61:2

**Sotto** [2] 79:9; 103:15

**sought** [1] 16:6

**sound** [1] 41:6

**sounds** [5] 29:20; 44:1; 67:7; 83:2; 101:23

**speak** [5] 24:22; 77:12, 25; 88:19; 93:11

**speakers** [1] 110:16

**speaking** [1] 15:17

**specific** [16] 4:5; 8:22; 10:6, 7; 20:10; 21:10; 22:10, 24; 24:25; 25:1; 26:15, 24; 27:9; 39:16; 41:23; 69:3

**Specifically** [1] 9:14

**specifically** [10] 6:21; 8:20; 9:19; 22:16; 23:19; 46:5; 69:22; 95:21; 97:16; 103:14

**Spell** [1] 94:8

**spend** [2] 81:8; 110:24

**spot** [1] 39:20

**squeeze** [1] 111:5

**stand** [2] 42:11; 49:6

**standard** [21] 4:14, 15, 21, 23; 5:2, 5, 6; 7:7, 17; 14:10, 18; 15:7; 16:25; 17:20; 23:4; 27:14; 28:11; 31:4, 6; 35:4, 9

**standards** [6] 21:6; 46:3; 97:11, 18, 19, 21

**standing** [3] 15:11; 17:5; 89:20

**standpoint** [1] 5:13

**stands** [1] 46:20

**STANLEY** [4] 1:7, 8; 2:19, 24

**Stanley** [46] 4:13, 19; 5:5, 19; 6:14; 7:14; 9:5, 17; 10:25; 11:18; 14:8; 15:3; 19:16; 22:17; 24:6, 8, 12; 26:15; 36:19; 42:25; 43:11; 55:25; 59:18; 60:7; 61:4, 8; 62:15; 63:17; 64:11; 66:10, 18; 68:12; 70:23; 71:20; 74:5; 81:16, 25; 82:10; 84:5; 86:14; 90:11, 24; 93:18; 98:17; 99:3; 100:6

**Stanley's** [17] 4:8, 12; 5:8; 6:1, 20, 25; 8:18; 15:19, 21; 19:10, 11, 24; 22:13; 56:2; 65:2; 74:4; 95:1

**Start** [1] 42:19

**start** [5] 50:14, 21; 52:6; 60:21; 61:23

**started** [1] 61:24

**starts** [1] 110:24

**STATE** [1] 113:1

**State** [3] 2:8, 9; 113:4

**state** [3] 17:8; 86:24; 94:17

**state's** [1] 70:13

**stated** [4] 7:10; 8:7, 14; 30:16

**statement** [31] 5:12; 7:19; 9:2; 11:3, 22; 12:2, 4, 6, 16, 20; 27:8; 42:19; 94:18; 95:3; 96:17, 18, 20; 98:13; 99:12; 100:18; 101:22; 107:7, 20; 108:6, 14, 15, 20; 109:13, 15

**statements** [18] 5:17, 22; 8:23; 9:4, 13; 10:2, 7, 9, 23; 13:11; 22:21, 22, 24; 23:19; 24:13; 26:24; 32:11; 108:15

**States** [2] 36:25; 37:6

**states** [2] 95:1, 9

**statute** [60] 6:4, 7; 8:20; 13:13; 20:20; 22:19, 23; 23:3; 27:6, 16, 21; 29:22; 30:1, 9; 48:12; 55:11; 59:20; 60:9, 25; 61:14; 62:2, 8, 14; 63:3, 22, 25; 64:13, 15, 21; 65:6, 24; 66:8; 67:1, 21; 68:21, 24; 69:24; 70:2, 4, 11, 14, 20; 71:5; 72:9; 74:20; 76:15; 79:1, 23; 81:3; 84:3, 25; 85:24, 25; 86:6, 12; 87:9, 11; 88:1

**statutes** [5] 6:22; 20:2; 56:23; 75:8, 19

**statutorily** [1] 54:11

**statutory** [14] 53:9, 21; 55:10, 14; 57:6, 8; 60:15; 61:9; 71:10; 78:18, 19, 22, 23, 25

**stenograph** [1] 1:25

**step** [16] 65:17, 20; 66:9, 16, 24; 67:1, 5, 14, 19, 21; 81:19; 86:19, 21; 92:2; 101:16

**still** [3] 39:1; 103:1; 105:2

**stock** [9] 11:9; 12:5, 8, 11; 31:8, 10; 32:18; 36:10; 38:17

**stock-drop** [6] 11:1, 14, 24; 34:19; 35:4; 38:5

**stocks** [3] 11:8, 10; 42:18

**storm** [3] 7:20; 8:9; 27:24

**straight** [1] 22:4

**streamline** [1] 53:23

**Street** [3] 2:11, 22; 99:5

**strict** [1] 57:14

**strictly** [1] 13:6

**stringent** [1] 97:20

**struggling** [1] 39:2

**studies** [5] 10:18; 32:7; 38:5; 40:20; 44:11

**study** [8] 10:21; 11:14; 31:25; 32:4, 18; 33:21; 39:6

**subject** [1] 90:13

**submit** [1] 84:8

**subsequent** [2] 11:25; 13:15

**substance** [1] 50:25

**substantial** [1] 14:14

**substantially** [1] 99:2

**substantively**
[1] 88:2
**subtract** [10]
60:17, 20, 22;
62:4, 11;
63:19, 20;
64:23; 67:2
**subtracted** [2]
62:4; 66:8
**subtracting** [1]
63:21
**subtraction** [1]
62:13
**successor** [1]
97:1
**such** [8] 8:8,
21; 22:21, 22;
23:6; 27:8;
56:20; 99:6
**suffice** [1]
26:21
**sufficient** [3]
29:16; 36:23;
37:11
**suggested** [2]
82:2; 90:14
**suggesting** [1]
93:18
**Suite** [1] 2:11
**suited** [1] 68:9
**summary** [5]
7:5; 55:4;
68:23; 69:9;
73:21
**supplier** [1]
32:23
**supplies** [1]
32:21
**support** [10]
28:15; 32:6;
33:17; 44:9;
47:3, 12;
55:24; 85:17;
95:20; 96:10
**supported** [2]
56:1; 85:15
**supporting** [1]
25:1

**supports** [3]
47:8; 58:24;
85:12
**suppose** [2]
24:8; 110:6
**supposed** [2]
59:22; 96:24
**supposedly** [1]
4:14
**Supreme** [8]
7:4; 8:2; 28:5;
63:10; 68:7;
70:12, 17;
71:17
**Sure** [13] 14:2;
20:25; 27:12;
34:3; 47:21,
25; 59:7;
60:6; 86:9;
94:4; 104:15,
16; 107:13
**sure** [11]
35:24; 46:23;
88:18, 19;
99:22; 105:8;
108:8, 23;
109:5; 110:20;
112:10
**surprisingly** [2]
40:10; 64:19
**surreptitious**
[1] 6:3
**surreptitiously**
[1] 9:7
**survive** [2]
8:14; 70:25
**systematically**
[1] 11:13

─ T ─

**tacitly** [1] 7:14
**take** [26]
18:10; 45:6;
60:13; 62:8,
21; 63:4, 14,
17, 18, 20;
65:17; 66:18;
67:1, 4, 8;
72:21, 22, 23;

76:20; 77:17;
82:13; 84:21;
99:15; 104:16;
107:14; 108:9
**taken** [6]
13:15; 24:8;
51:15, 16;
76:4; 86:18
**takes** [3]
76:11, 13, 14
**taking** [8]
13:2; 14:8;
62:25; 66:17,
22; 67:6, 13,
14
**talk** [7] 15:5,
25; 21:16;
59:14; 106:11;
107:1; 111:2
**talked** [5]
30:1; 43:6;
66:11; 87:17;
90:5
**talking** [11]
17:13; 21:6;
24:22; 27:15,
19, 20; 29:21;
33:12; 44:2;
90:22; 102:24
**talks** [3]
12:24; 32:17;
108:13
**technology** [1]
89:18
**Telecopier** [2]
2:19, 24
**Telephone** [4]
2:5, 12, 18, 23
**Tell** [1] 85:19
**tell** [3] 42:4;
44:22; 50:16
**telling** [3]
21:20, 22;
25:24
**tells** [2] 63:23;
64:16
**tenable** [2]
28:2; 74:16
**tend** [1]
109:15

**tendered** [1]
113:9
**tens** [1] 11:9
**terms** [3]
33:21; 50:23;
75:22
**test** [2] 41:1, 2
**tested** [1]
39:15
**testifies** [1]
51:3
**testify** [4]
40:6; 43:22;
46:2; 78:4
**testimony** [2]
73:4; 83:24
**testing** [1]
12:19
**TEXAS** [2] 1:6,
113:1
**Texas** [33]
1:23; 2:11, 21,
23; 6:10, 22;
8:19; 22:19;
23:15; 27:6;
50:6, 13;
53:22; 59:19;
60:9; 63:10;
65:11; 68:1, 7,
20; 69:2, 4,
21; 70:17;
71:5, 10;
85:23; 87:24;
113:4, 16, 18
**text** [2] 65:6, 8
**than** [16]
21:12; 22:12,
13; 31:5;
41:7; 54:20;
64:6; 68:10;
71:12, 16;
84:11; 86:23;
97:20; 100:13;
108:25; 110:25
**Thank** [15]
9:20; 30:12;
48:21; 81:4;
85:7, 18; 87:3;
88:5; 90:6;
94:7; 106:20;

111:13,  16;
112:11, 14
**That's**  [25]
18:5;    20:1;
28:5;    29:23;
34:13;    38:4;
42:19;   48:25;
53:17;    56:2;
60:24;   61:16;
62:14,    24;
64:4;    69:2;
72:8, 9;  73:5;
80:14;   81:19;
84:22;   86:16;
106:24; 107:4
**that's**  [52]
17:3, 16;  21:9,
18;    23:14;
24:14;   25:14;
26:2,    25;
33:16;    34:9,
10;    40:17;
41:4;   46:16;
48:13;   49:7;
53:20;  54:2, 8;
56:25;   61:14,
15;   62:18;
63:15;   64:15,
16, 24;  65:20;
71:4,  21,  22;
73:15;    79:4,
17;    82:6;
83:12;   86:22;
89:1;   90:19;
92:9,    18;
95:13;   97:10;
98:18;  103:11;
106:23;
107:12; 111:24
**Their**    [2]
80:19;  86:19
**their**   [28]
4:25;   16:10;
17:7;    21:9;
22:2, 9;  24:23;
29:4;    31:17,
18;   36:24;
38:7;    40:9;
42:6;   45:21;
49:12;   59:11;

61:8,    16;
71:13;   80:25;
81:25;    82:11,
13;    90:16;
98:5;   101:11;
103:20
**theirs**    [1]
45:18
**them**    [26]
6:21;  13:2, 12;
16:2;    18:25;
22:11;   26:20;
29:7;    32:8;
41:19;    42:5;
44:10;   47:18;
54:19;   64:10;
71:10;  78:1, 3;
79:17;   84:17;
88:13,  14,  23;
104:12,    16;
112:5
**themselves**  [4]
10:9;    25:5;
53:11;  77:7
**Then**    [8]
60:16;   62:11;
64:8;   65:17;
76:11;  105:1;
108:19
**then**  [58]   9:2,
16;   12:2,  11;
13:10;   14:5;
19:24;    21:3;
23:10,    23;
25:23;   32:19;
34:1;   35:19;
37:6;   39:13;
42:4;   44:15;
45:14,    15;
48:17;   49:10;
50:15;   52:20;
54:12;    55:9;
60:24;   61:10,
12,  21;  62:9,
17,  22;   63:4,
5,  14,  18,  19;
64:23;  67:1, 9,
17;    70:25;
72:8;    76:12,
20,  22;   78:5,

10,  13,  14,  22;
81:20;   84:16;
101:8;  110:21,
22;  111:3
**theories**    [3]
83:18, 20, 21
**theory**    [5]
31:9, 11;  35:3;
36:9;   56:22
**There**    [11]
4:22;     8:15;
25:15,    16;
49:9;    57:24;
60:3, 4;  85:11,
25;  111:21
**there**    [59]
4:14;  5:15, 16;
6:14, 24;  7:20;
8:8;     10:3;
11:7, 8;  14:14;
16:12,    13;
18:12;   19:1,
18;  23:2, 4, 6,
20;   25:9, 25;
26:12;    43:5;
45:18;   46:25;
47:14;    49:8;
50:21;  57:3, 9,
25;    58:2;
59:25;   69:18;
70:20;   72:11;
73:3;    74:6;
75:24;   77:18;
83:15;    85:16,
23;  89:4, 25;
97:24;   99:11;
101:13;
103:20;  104:4;
105:3;  108:18;
109:8;   110:2;
111:10;  112:12
**There's**    [10]
15:17;    22:4;
52:2;    55:12;
79:16;    81:2;
82:16;   86:17;
88:16
**there's**    [30]
18:11,    14;
21:21;   26:12;

30:25;    32:19;
33:17;    35:8;
48:25;   49:11;
52:5;  54:7, 23;
55:9;    57:20;
58:6,    23;
62:19;    63:7;
65:7;  69:3, 21;
76:24;    78:22,
23;    82:11;
83:15;   88:17;
98:2; 107:20
**therefore**   [8]
11:3;    32:25;
33:19;   34:15;
51:21;   85:16;
97:12, 21
**therein**   [6]
7:10;   8:7, 14;
28:23,    25;
100:14
**Thereon**   [1]
69:6
**thereon**   [5]
69:5, 8;  80:24;
81:18;  87:21
**These**   [2]
15:16;  93:1
**these**  [39]  4:9;
5:23;   13:3, 9;
16:23;   18:23;
22:2, 6, 10, 17,
18;   24:2,  3;
25:3;   26:1,  6,
19;    31:21;
32:1;    37:13,
21;  39:18, 19;
41:1,  23,  25;
42:2, 3;  45:20;
53:14;   71:16;
74:9;   77:13;
78:12;   82:11;
86:15;   91:12;
103:22; 110:22
**They**   [10]
16:10;   45:23;
46:10;   51:19;
58:22;   65:13;
68:8;    80:19;
82:7;  105:6

**they** [69]
10:24; 13:4;
15:25; 16:18;
24:7; 25:1, 6;
26:3, 5; 28:21,
25; 29:1, 3, 5;
30:11; 37:1;
41:17, 18, 20;
45:13, 20;
46:6, 11, 15;
49:6, 9, 12;
51:23; 56:20;
63:17, 18, 20;
66:11, 17, 20;
67:4, 6, 19, 24;
68:4, 15, 23;
71:12, 13, 23,
24; 73:3;
74:22; 77:9;
78:9; 81:20,
21, 24; 82:12;
84:14; 86:14;
90:13; 93:5;
98:8; 99:3;
102:1, 4;
105:4; 109:13,
14

**They're** [5]
28:24; 61:1;
67:14; 72:2;
79:24

**they're** [34]
17:13; 18:7;
28:22; 34:16;
44:10; 49:10;
61:15, 17, 20;
66:12, 22;
67:8, 12, 25;
68:14; 72:3,
20; 73:5;
79:13, 17, 18,
22; 88:24;
93:22; 96:1,
23; 97:22;
100:12, 13, 15,
25; 101:13;
102:23; 104:20

**They've** [2]
51:20; 80:21

**they've** [5]
30:16; 57:8;
66:11; 93:10,
12

**thing** [9]
59:15; 65:14,
23; 66:1;
76:23; 80:2;
82:25; 88:11;
99:4

**things** [11]
10:10; 18:7;
46:14; 53:23;
60:17; 62:5;
69:1; 77:14;
91:6; 94:21;
110:22

**think** [97]
12:10; 14:7,
10; 17:16, 23;
18:21, 22, 25;
19:2; 20:3, 13,
14, 18; 24:20,
22; 25:2;
27:13; 28:16,
19; 29:24;
33:16, 19;
35:16, 23;
38:12; 40:4,
16; 41:8;
44:7, 8; 45:10;
46:8, 9, 17;
47:7, 13; 48:4;
49:8; 51:8;
52:3; 53:7;
54:8, 16, 23;
59:10; 66:10;
69:23; 72:6,
14; 73:12, 24;
74:6, 18; 75:4,
17, 23, 25;
77:1, 12, 23;
78:17; 79:6, 7,
13; 80:1;
82:6, 24, 25;
83:12, 22;
84:4, 13, 25;
85:2, 9, 16;
86:4, 25; 88:6;
90:13; 91:8;

92:3; 93:3;
100:12;
101:13, 16;
102:19, 25;
103:11, 13;
104:4; 106:6;
108:1, 3, 4, 22,
24

**thinking** [3]
6:15, 18; 64:7

**thinks** [3] 5:5;
40:5, 8

**Third** [1] 28:6

**third** [5] 4:8;
5:25; 8:12, 17;
48:14

**This** [7] 50:21;
54:19; 69:16;
70:17; 78:25;
86:25; 107:15

**this** [146]
3:12; 4:19;
6:2, 12; 8:25;
10:20; 11:5,
16; 13:21;
17:8; 21:7, 23;
22:3, 22;
23:16; 24:20;
25:10; 26:7;
27:14; 29:17,
21; 31:17;
32:5; 33:19;
35:16; 37:15;
38:5; 39:3, 11,
17; 40:6, 11;
42:5; 43:15;
44:15; 46:7;
47:4; 49:15;
51:2, 14, 17;
52:4, 7, 25;
53:2, 18;
54:19, 21;
55:2, 12;
59:17, 18;
61:1, 5; 63:25;
64:9, 14, 20;
67:20; 68:1, 3;
69:12, 14, 23;
70:4, 11, 14,
15, 23; 71:4,

5, 21; 73:2,
11, 12, 15, 18,
19, 25; 74:3,
6; 75:5, 15,
17, 19; 76:11,
12; 77:20, 25;
78:5; 79:1;
80:3, 6, 15;
81:9; 82:2, 13,
15, 20, 21;
83:16; 84:9,
17; 85:10, 14,
21, 24; 86:2,
11; 87:4, 25;
88:8, 12, 16;
90:24; 92:8;
95:23; 96:1,
21; 97:14, 16,
17; 100:21, 24;
101:7, 18, 19,
20; 102:1, 8,
19; 103:23, 25;
105:3; 107:16,
22; 109:21;
110:2;
113:6, 8, 11, 13

**Those** [3]
25:20; 47:12;
76:10

**those** [30]
20:10; 25:22;
26:24; 28:20;
31:5; 33:4, 25;
37:9; 38:1;
39:10, 13;
40:14; 46:1;
47:18, 24;
51:21; 54:13;
55:7; 56:6, 16,
20; 57:11, 15;
74:10; 76:15;
91:18; 97:3;
100:2; 105:7;
112:20

**though** [1]
26:11

**thought** [12]
45:2; 49:18;
53:20, 25;
54:3; 61:24;

71:13,    24;
86:11;  88:15;
106:4
**three** [7]  4:9;
49:11;    63:7;
70:3, 15;  89:6
**through**    [13]
13:3;    18:7;
20:16;    31:1;
34:25;  42:16;
49:13;   59:6;
63:8,    11;
96:15;  104:8;
111:8
**thus**    [2]
112:17, 23
**tightly**    [2]
20:14, 18
**till** [1]  37:6
**time** [51]  7:20,
21;    10:19;
11:21;   12:15,
24;   13:5, 13,
15, 18;  21:19;
22:6,    11;
23:23;   30:19,
21, 25;  34:12,
18;  35:12, 17,
25;  36:2, 6, 8;
38:10;  41:20;
42:5,    15;
44:15;   45:5,
16, 20;  46:11,
14;  47:5, 24;
52:17;  56:15;
60:5;   63:21;
81:21;  83:14;
85:19;   87:3;
92:8,    13;
103:6;  106:17;
110:21; 111:10
**timeliness**  [1]
28:4
**tiny** [1]  22:3
**tipped**  [1]  29:7
**today** [6]  32:5;
46:17;   49:6;
56:5;   59:15;
91:5

**today's**    [1]
71:11
**together**   [4]
4:5;    76:10;
107:11; 112:5
**told** [6]   24:7;
26:9,    11;
68:18;  112:7
**tons** [1] 33:17
**took** [5]   8:1;
34:4;    76:19,
20, 22
**topic** [1]  112:7
**Torah**    [1]
49:23
**tort** [1]  78:21
**total** [15]  5:10,
14;  14:17, 20;
15:1, 7;  16:7;
17:2,  3,   24;
21:12;  29:25;
63:13;  75:16;
113:11
**totally**    [2]
72:1, 2
**touch**    [1]
27:22
**touches**   [1]
21:13
**tough**    [1]
84:14
**tracing**   [1]
13:2
**tracks**    [1]
64:20
**trade** [1]  11:9
**traded**    [1]
11:11
**train** [1]  45:2
**transaction**  [2]
26:16;  57:20
**transcription**
[2]       1:25;
113:5
**trap** [1]  45:17
**trial**    [22]
24:21;   51:3;
52:5;   53:23;
55:5;   60:16;
63:11,    24;

72:20,    24;
73:4,    10;
78:14;   79:7;
81:13;  82:23;
83:14;  89:10;
110:12,   24;
111:6
**trials** [3]  5:15;
83:13;  111:11
**tried** [3]  86:1,
2;  89:13
**trier** [1]  7:19
**tries** [3]   9:5;
33:12;  91:6
**triple**    [1]
19:14
**trouble**   [1]
28:1
**truck** [1]  18:7
**True** [1]  67:12
**true** [10]  11:2;
12:1, 2;  23:17;
98:19;  100:17,
21;   106:17;
107:22; 113:4
**truly** [2]  102:8;
113:9
**Trust** [1]  28:6
**truth**    [15]
7:10;   8:6, 13;
11:6;    12:7;
24:3;    28:22,
25;    29:7;
100:12, 14, 16;
104:6, 19
**trying**    [9]
18:6;    21:4,
34:14,    25;
45:11;  54:16;
92:2;   97:22;
100:25
**turn** [2]   14:5;
48:24
**turned**    [1]
37:15
**turning**   [1]
14:2
**twice**    [7]
63:17,    22;
66:18,    23;

67:6;    75:3;
76:2
**two-step**   [3]
86:6, 13, 18
**twofold**   [1]
95:15
**type** [3]  16:22;
68:1, 3
**types** [4]  4:16;
56:21;   68:2;
86:15
**typical**    [1]
16:20

─ U ─

**U.S.** [2]  94:17;
98:25
**Uh-huh**    [1]
96:6
**ultimately**   [3]
67:9;    78:13;
84:18
**umbrage**    [1]
18:11
**unaware**    [1]
8:22
**unclear**    [1]
18:20
**Under**    [1]
19:21
**under** [27]  6:9,
21;   7:6,   24;
8:1;    16:25;
18:25;    19:12,
15;     20:1;
23:15;    28:1;
37:11;    38:2;
41:13;  53:22;
65:24;  66:25;
69:21,    22;
74:20;  81:1, 2;
83:22;  93:23;
99:9;  111:24
**underlies**  [1]
36:9
**underlying**  [2]
33:18;  44:11
**understand**  [7]
4:25;    15:15;

24:23; 27:20; 33:24; 39:25; 93:12
**understanding** [4] 23:24; 28:2; 49:4; 54:6
**understands** [1] 52:7
**Understood** [1] 107:2
**understood** [3] 17:19; 38:23; 77:1
**undertaken** [2] 40:21, 23
**underwriter** [2] 91:9, 25
**underwriters** [2] 26:17, 19
**underwriting** [7] 39:9; 40:13; 46:3; 91:13; 97:11, 19, 21
**underwritten** [1] 97:18
**undue** [2] 99:15; 109:19
**unfair** [1] 98:21
**unfamiliar** [1] 15:14
**unfounded** [1] 99:7
**unique** [1] 57:9
**unitary** [2] 4:22; 5:7
**United** [2] 36:25; 37:6
**universe** [1] 26:1
**University** [2] 50:6, 12
**unjustified** [1] 57:4
**Unless** [2] 73:11, 20

**unless** [6] 7:9; 32:13; 63:25; 64:10; 74:22; 100:17
**unopposed** [1] 51:23
**unproven** [1] 96:7
**unquote** [4] 27:25; 95:2; 97:25; 100:20
**unreasonable** [1] 66:4
**unsophisticate d** [1] 4:17
**untenable** [1] 83:12
**until** [4] 32:13; 52:5; 60:15; 82:1
**untrue** [16] 5:11, 17; 8:23; 9:13; 10:1, 23; 11:3; 12:15, 20; 13:12; 22:21, 22; 23:19; 24:13; 26:24; 27:8
**untruth** [3] 8:21; 10:6; 22:24
**upon** [11] 7:1; 18:3; 27:22; 28:11; 31:18; 32:13, 18; 39:13; 46:12; 58:2; 69:17
**used** [1] 77:23
**useful** [1] 7:25
**using** [7] 35:13, 24; 72:6; 76:18; 77:9; 93:2; 96:1

**- V -**

**valuation** [1] 83:15

**value** [2] 81:20; 109:20
**variables** [1] 42:22
**varied** [1] 5:2
**variety** [1] 38:2
**various** [5] 18:23; 32:6; 40:7; 94:17; 99:21
**vary** [1] 74:14
**vehicle** [1] 26:16
**vehicles** [3] 22:10, 18, 19
**venue** [1] 2:4
**verdict** [6] 53:4; 60:16; 62:10; 72:17, 25; 82:3
**Veronica** [2] 111:2
**version** [1] 54:21
**Versus** [1] 78:11
**versus** [4] 33:22; 34:5, 7; 54:11
**Very** [4] 63:2; 81:5; 110:1; 112:12
**very** [30] 12:15; 16:20; 32:17; 37:4, 22; 39:11, 15, 16; 53:20; 54:2; 60:10, 11; 63:3, 9, 10; 66:11; 68:16; 69:3, 4; 80:15; 82:6; 89:16; 90:7; 93:1; 99:25; 102:14; 105:10; 109:23; 110:12; 112:14

**vice** [2] 2:4, 16
**victimized** [1] 71:9
**view** [9] 5:9; 6:1; 8:23; 14:8; 23:25; 24:5; 38:6; 39:1; 40:24
**viewed** [1] 14:16
**views** [1] 40:21
**violate** [1] 61:18
**violation** [1] 92:24
**violations** [1] 72:3
**Virginia** [2] 87:19, 20
**visit** [1] 111:2
**voce** [2] 79:9; 103:15
**VOLUME** [4] 1:2; 3:1
**volume** [2] 3:12; 113:6

**- W -**

**wait** [1] 52:5
**Wall** [1] 99:4
**want** [25] 24:22; 27:22; 51:6; 53:15; 63:17, 18, 20; 67:4, 19; 72:19, 21; 73:11; 75:10, 14; 76:25; 77:12; 85:5; 88:18; 93:10; 94:1; 102:17; 103:2; 105:16, 25; 106:2
**wanted** [9] 38:2; 51:1; 75:25; 89:2; 106:14, 19;

107:3;   111:18;
112:9

**wants**      [4]
62:15;   68:12;
73:12;  84:24

**W A R D W E L L**  [1]
2:17

**warnings**   [3]
7:20;        8:9;
27:24

**wasn't**     [8]
10:2;    12:12;
24:6;    27:17;
32:23;   34:11;
68:20, 22

**ways**      [6]
30:24;     32:7;
34:24;    42:16,
21;  68:22

**we'd** [2]  54:5;
88:19

**We'll**     [4]
110:1;   112:12,
20, 25

**we'll**      [5]
48:24;   72:23;
110:22,     23;
111:11

**We're** [7]  54:1;
69:20;    78:3;
86:6;    89:22;
93:18;  110:11

**we're**     [19]
18:10;    27:19,
20;       34:17;
38:24;   59:17;
72:6, 19;  78:1;
80:1,   2,   9;
81:7;    84:11,
24;     90:21;
92:2, 3;  103:19

**We've** [1]  31:1

**we've**     [17]
14:22;     15:5;
19:5;    20:16;
27:15;   28:21;
31:2;     43:7;
49:4, 11;  56:3,
17;      66:10;

79:5;       85:1;
87:17;  89:13

**week**     [3]
111:6, 7, 8

**weeks**    [2]
12:5, 20

**Well** [21]   18:9;
24:5;     27:3;
29:9;     37:7;
38:23;    42:8;
50:14;   70:25;
71:21;   82:12;
87:6;    89:24;
90:2;    91:15;
93:12;    99:3;
101:9;    106:2,
23;  107:10

**well** [20]   5:1;
7:20;    10:20;
19:3, 10;  20:4,
6;       25:16;
42:18;    54:9;
59:1;    77:25;
83:6;     93:11,
17;       94:18;
106:22;
107:11;
108:16;  109:23

**went** [4]   12:5;
13:9;    16:14;
104:8

**were** [50]  5:13;
10:23,     24;
12:5;   13:8, 12;
15:16;    16:12,
13,  16;   22:7,
11,  22;    25:1;
26:11,     24;
28:14;  29:1, 4;
32:25;    33:1;
38:7;   40:8, 14;
41:3;   46:4, 14;
48:11,     18;
51:4;    52:16;
56:21;    71:13,
24;      75:24;
78:9;    91:20;
97:3, 7, 12, 17,
18, 20;    98:1,

7;   102:2,  4;
113:7

**weren't**    [1]
109:4

**Westlaw**    [1]
88:23

**what's**     [4]
27:1;    33:24;
90:21;  103:1

**whatever**    [6]
5:4;        38:4;
78:6,       8;
102:17; 110:23

**whenever**   [1]
30:4

**Where**      [3]
17:9; 49:22, 25

**where**     [30]
11:25;    14:21,
24;       19:17;
21:7,  8,  11;
35:4;     38:7;
44:20;    55:8;
58:8,     11;
59:17;    68:4;
76:17;    77:9;
78:22;    83:14,
15, 25;   85:20;
86:18,     25;
92:9,  18,  22;
107:7;  108:8

**Whereas**    [2]
16:19;  40:18

**whereas**    [1]
35:13

**Whether**    [1]
105:11

**whether**    [16]
5:11,      22;
10:22;   26:23;
41:2;   43:1,  7;
46:2;    72:13;
75:6;    77:16;
80:8;    90:11;
106:24, 25

**Which**      [1]
38:12

**which** [67]   6:4,
7,  25;     7:10,
20, 21;  10:17;

13:4,      24;
16:16;    17:12;
21:21;    23:12;
24:7;      25:8;
26:16;  27:5, 6;
30:11;   31:12;
39:6;    46:24;
48:18;   49:15;
52:9,      24;
55:13,     25;
56:12,     23;
60:18,     22;
64:11;    65:18;
67:2,     10;
68:24;   69:13;
70:2, 11,  14;
71:11;    74:10,
16,  19,   22;
75:1;     76:13,
16;   77:2, 23;
78:15;   84:21;
86:20;   87:19;
90:13;   91:22;
92:20;   94:25;
96:1,  20,  24;
101:14;   103:3;
113:7

**whoever**    [1]
80:10

**whole**      [6]
16:18,     21;
62:6;    73:25;
74:3;  80:19

**widespread** [1]
25:12

**will** [30]   6:15;
8:18;     13:14;
18:12;   24:20;
38:18,     19;
39:24;     40:6,
12;       41:10;
46:2;      52:6;
53:25;    54:1;
55:1;   59:5, 11;
72:20;  80:7, 9;
83:23;    87:13,
20;       95:24;
99:7;     101:15;
109:21;  111:2;
113:12

**windfall**    [3]
57:2, 4;  66:12
**withdraw**    [1]
89:13
**within**    [3]
28:8;    33:4;
82:7
**without**    [8]
37:4;    52:15;
57:1;    58:9;
95:10;  102:18,
19;  104:21
**withstand**  [1]
37:23
**WITNESS**    [1]
113:13
**witness**    [1]
10:17
**won't** [3]  49:6;
83:3;  89:17
**WORD**    [1]
114:1
**Word** [1]  3:11
**word**    [5]
10:15;    27:11;
33:24;    34:14;
69:8
**wording**    [1]
68:22
**words**    [7]
10:8;    21:20;
33:23;    65:13;
66:1;    84:18;
86:24
**work** [7]  11:23;
47:20;    75:8;
77:14;    79:2;
105:9;  110:21
**worked**    [1]
49:1
**working**    [1]
66:14
**works**    [6]
59:10;    60:1;
79:24;    91:16;
111:4, 14
**world** [2]  25:7;
71:11
**worse** [2]  6:17;
45:15

**worth**    [1]
84:23
**Would**    [5]
26:7;    43:15,
20;    88:11;
100:11
**would** [94]  4:4,
24;    5:15, 17;
9:16;    11:23,
24;    12:3;
14:15;    17:18;
21:4;    24:24;
25:11,    22;
26:3,  13,  21;
29:7;    30:4;
31:21,    22;
32:4;    33:10;
34:23;  36:5, 7,
21, 23;    37:1,
2;    38:1, 21;
39:5,    20;
41:19;    43:2,
21;    45:6,  12,
21;    46:24;
47:19;    48:5;
49:17;    50:5;
51:21;  53:3, 4,
6,  8;    54:6, 9,
14, 16, 17, 18;
57:19;    58:17,
18;    60:18;
66:17;  67:6, 8,
9;    73:19;
74:18;    75:5;
78:5, 8, 10, 18;
80:16;    84:13,
15,  21;    85:9;
86:1;  87:8, 16;
88:21;    94:3,
10;    98:10;
99:15,    23;
101:6;  102:10;
108:9,    16;
109:7;    110:8;
111:3;  112:23
**wouldn't**    [4]
32:5;    41:17;
98:8;  110:6
**writing**    [2]
12:23;  113:5

**wrong**    [5]
28:17;    40:6;
44:4;    94:11;
98:2
**wrongdoing** [1]
99:9

---

**- Y -**

---

**years**    [5]
12:17;  13:3, 9;
36:25;  70:13
**YETTER**    [43]
2:10;    50:2;
53:17;  59:3, 8,
13,  23;    60:4,
6;  62:1, 6, 14,
18,  21;    63:2;
64:4;    66:24;
67:12,  17,  24;
70:9,    22;
72:18;  73:5, 9;
75:9;    81:8;
83:5, 8, 13, 25;
84:23;    85:23;
86:10;    87:3;
89:12, 22, 25;
110:14;
111:13;
112:18, 20, 25
**Yetter** [7]  2:7;
59:4;    74:3;
75:22;    77:25;
80:17;  85:20
**Yetter's**    [1]
73:25
**yettercoleman.
com** [2]  2:8, 10
**yield** [1]  80:17
**York**  [4]    2:5,
18
**you'd** [1]  75:11
**you'll**    [2]
72:23;  109:24
**You're**    [1]
44:24
**you're**    [23]
17:7,  8,  11;
18:5;    21:6, 7,
11,  20,    22;

23:14;    44:2, 4,
62:22;    64:9;
65:1;    70:2;
71:18;  72:10;
73:20;    93:7;
101:7;  106:15
**You've**    [2]
85:8;  91:4
**you've**    [9]
23:24;    29:20;
50:9;    60:18;
62:13;    83:21;
84:1;    101:18;
107:13
**you-all**    [1]
112:22
**Your** [160]  4:3;
6:2,  24;    7:4,
23;    8:17;
9:11, 20;  10:4,
11;    11:4;
13:1, 7, 14, 23;
16:24;    17:17;
18:9, 18;  19:6;
20:19,    21;
22:15;    23:1,
17,  24:18, 20;
26:10,    18;
27:3, 12;  30:4,
12, 15;  35:15;
36:13,    19;
38:11,    20;
41:8;    42:13;
43:24;    44:8;
45:25;    46:8,
17, 25;  47:14;
48:3,  11,  21;
49:4,  14,  19;
50:5, 21;  52:6;
53:18;    54:4;
59:3,  5,  13;
61:15;    62:6;
63:23;    64:7,
17, 25;  65:11,
21;    66:7;
67:25;  69:24;
71:3;  72:5, 22;
73:12,    24;
75:11,  15,  25;
77:1,  5,  14;

78:17;   79:11;
80:14;   81:4;
82:19;     83:8,
11;     84:24;
85:6,   10,   18,
24;   86:8,  22;
87:1,   2,   17;
88:5,   10,   11;
89:8,  12;  90:2,
23;    91:4,  8;
92:3,     10;
93:25;    94:13,
15;    95:5,  14,
18;      96:9;
97:5,  21;  98:4,
11,   12,   19;
99:17,    22;
100:5,     16;
101:4,     24;
102:7,  15,  24;
103:18;
104:11,
14;   105:1,  9,
18,  23;  106:15;
107:2,   9,   12,
16;   108:3,  10,
11,  22;  109:2;
110:5;   111:16,
17,  19;   112:3,
10,  14,  18
**your** [30]  21:4;
23:25;    29:11;
42:23;    45:22;
46:22;    47:4;
48:24;    54:11,
12,   18;   59:8;
60:19,    20;
62:12;     63:5,
14,   25;   68:5;
73:7;     77:2;
81:9;      94:5;
106:3;    111:4,
24