**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE | § | |
| CORPORATION, as receiver for | § | |
| GUARANTY BANK, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL NO. 1-14-CV-126-XR |
| | § | |
| v. | § | |
| | § | |
| RBS SECURITIES, INC., | § | |
| | § | |
| *Defendant.* | § | |

## ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY

On this date, the Court considered three of the motions to exclude expert testimony pending in this case.[1] Plaintiff Federal Deposit Insurance Company ("FDIC") moves to exclude the testimony of two experts for Defendant RBS Securities, Inc. ("RBS"): John Contino and Stephen Ryan. RBS moves to exclude the testimony of three FDIC experts: John Finnerty, Norman Miller, and Dawn Molitor-Grennich. This order decides the motions on Contino (docket no. 183), Finnerty (docket no. 196), and Ryan (docket no. 185). A further order will decide the remaining motions on Miller and Molitor-Grennich.

## BACKGROUND

This case arises out of transactions in residential mortgage-backed securities ("RMBS"). In 2004 and 2005, Guaranty Bank paid $2.1 billion for twenty RMBS

---

[1] The case is related to another case, *FDIC v. Deutsche Bank Securities, Inc.*, No. 1-14-129-XR. The parties—who share experts with that case—filed identical motions, responses, and replies in the two cases. Indeed, RBS and Deutsche Bank filed their documents jointly. The Court's analysis of these motions in *RBS* will thus be identical to its analysis of the motions in *Deutsche Bank*. The Court, then, in following the practice of Judge Sparks, who formerly handled this case prior to its transfer, will docket an order in *Deutsche Bank* that adopts the reasoning presented below. Any reference to "RBS" below can thus be read as referring to "Deutsche Bank" or "defendants," unless otherwise indicated.

certificates. Among these certificates were the two certificates from RBS at issue in this case ("the Certificates").[2] Guaranty Bank later failed. FDIC, appointed receiver of Guaranty Bank on August 21, 2009, brought this lawsuit in Texas state court on August 17, 2012.

The protracted litigation that followed has narrowed the FDIC's action to a single claim under the Texas Securities Act ("TSA") for violation of Tex. Rev. Civ. Stat. art. 581 § 33(D). At bottom, the FDIC alleges RBS's prospectus supplements for the Certificates it sold Guaranty Bank included material misrepresentations. These supplements, FDIC alleges, misrepresented

> (1) the extent to which the mortgage loans underlying the Certificates complied with the underwriting guidelines of the entities who issued the mortgage loans to borrowers, (2) the extent to which the appraisals of the properties underlying the Certificates complied with the Uniform Standards of Professional Appraisal Practice ("USPAP") and (3) the accuracy of the reported loan-to-value ("LTV") ratios for the loans backing the Certificates.

Docket no. 173 at 2. Each of these alleged misrepresentations were allegedly material to investors of the Certificates.

## 1. Factual Background

As stated above, Guaranty Bank bought RMBS from RBS and then failed. The FDIC became Guaranty Bank's receiver, succeeding to all rights, titles, powers, and privileges. The FDIC, in total, acquired 103 RMBS certificates as receiver for eight failed depository institutions. Gathering together these RMBS, the FDIC implemented a resecuritization in 2010. The FDIC "assigned[ed], transfer[red], and otherwise convey[ed]" the certificates to a trust, FDIC Guaranteed Notes Trust 2010-S1 ("the Trust"), for which Citibank, N.A. was appointed indenture trustee.

---

[2] Also among these certificates were the certificates from Deutsche Bank at issue in 1:14-CV-129.

The Trust then issued notes backed by the RMBS certificates. These Series I Notes and Series II Notes ("the Senior Notes"), to be sold to third-party investors, corresponded to the RMBS certificates. Payment of principal and interest on the Senior Notes was "fully and unconditionally guarantee[d]" by the FDIC. The Trust sold the Senior Notes to Barclays Capital for approximately $1.8 billion. In addition to the Senior Notes, the Trust also gave the FDIC Owner Trust Certificates ("OTCs"), which represented residual interests in the underlying RMBS. These OTCs entitle the FDIC to payments from cash paid to the Trust after the Senior Notes are paid; it is undisputed that the FDIC continues to receive payments from the OTCs, although the parties dispute whether and how these payments should factor into the statutory damages formula, should liability be established at trial. The FDIC allocated portions of the proceeds for both the Senior Notes and the OTCs to the various receiverships of the failed institutions.

## 2. Procedural History

After the FDIC brought this lawsuit in Texas state court on August 17, 2012, it was removed to the Western District of Texas and assigned to Judge Sam Sparks. Judge Sparks then granted the FDIC's remand motion, returning the case to state court. *See FDIC v. J.P. Morgan Sec. LLC et al.,* No. 1:12-CV-878-SS (W.D. Tex. Dec. 5, 2012). In Texas district court, the parties briefed and argued a summary judgment motion. Before the state court decided that motion, the FDIC settled claims brought under the Securities Act of 1933, leaving only the TSA claims now before the Court. The case was again removed to federal court on February 7, 2014. *See* docket no. 1 at 4-5 (explaining this Court's jurisdictional basis after the FDIC severed its federal claims).

Proceeding before Judge Sparks, the parties again filed and briefed cross-motions for summary judgment. On May 9, 2018, Judge Sparks issued an order on these motions. Docket

no. 154. This order concluded that the FDIC was a proper party to assert its claims. *Id.* at 8-10. Judge Sparks also denied summary judgment for RBS on its arguments that no liability could arise since Guaranty Bank agreed to buy the certificates before the prospectus supplements issued and on the LTV claims. *Id.* at 10-12. Further, Judge Sparks granted summary judgment for the FDIC on RBS's affirmative defenses of avoidance and mitigation, but denied summary judgment on RBS's statute of limitations defense. *Id.* at 15. This is because deposition testimony raised triable fact issues over what Guaranty Bank knew and what a reasonable, diligent investor would have discovered. Thus, whether the FDIC's claims are time-barred under the TSA remains a question for the jury at trial. *Id.* Finally, as to damages, Judge Sparks declined to decide as a matter of law whether the FDIC "disposed of"—as the phrase is used in the TSA—the Certificates in March 2010 because a reasonable jury could conclude that the FDIC's resecuritization did not "dispose of" the Certificates. *Id.* at 17.

Along with the summary judgment motions, Judge Sparks also considered the *Daubert* motions now before this Court. In keeping with his traditional practice, Judge Sparks denied all *Daubert* motions subject to re-urging at trial. Docket no. 154 at 5-6. On August 27, 2018, Judge Sparks transferred this case and the above-mentioned related case, 1:14-CV-129. Docket no. 170. To better understand the state of this case after transfer, given its long history, the Court ordered the parties to submit advisories summarizing the remaining claims and defenses and the parties' positions on the previously denied *Daubert* motions. Docket no. 174. The parties did so. Docket nos. 172-73. A review of these advisories and the record indicated to the Court that mediation might be beneficial, so the Court ordered the parties to mediate, docket no. 174, but the mediation did not succeed,

docket no. 175. The Court then scheduled this case for trial on June 3, 2019, with trial in 1:14-CV-129 to follow on August 26, 2019.

Now, the parties have re-filed the *Daubert* motions denied by Judge Sparks. Because this Court does not share Judge Sparks's approach to *Daubert* motions, the Court will address them below and in a further order. After a review of the motions and applicable record, the Court finds that a hearing is not necessary to decide the motions.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides for the admissibility of expert testimony if it will "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Additionally, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods" that the expert has "reliably applied" to the facts of the case at hand. *Id.*

As a preliminary matter, the Court must determine whether the proffered witness qualifies as an expert. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact, rather than for the court. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999).

If the expert is qualified, then the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id.* at 589. This

entails ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("In short, expert testimony is admissible only if it is both relevant and reliable.").

The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Id.* at 592–93. In *Daubert*, the Supreme Court enumerated five nonexclusive factors to consider when assessing whether the methodology upon which an expert rests his opinion is reliable. These factors are: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593–94; *Burleson v. Tex. Dep't of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004).

The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The point of this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

In applying the *Daubert* test, the proponent of expert testimony has the burden to prove by a preponderance of the evidence that evidence is reliable (not that it is correct). *Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998). Expert testimony must be reliable "at each and every step" because "[t]he reliability inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link

between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus, Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "[I]n determining the admissibility of expert testimony, the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## DISCUSSION

The Court first considers the parties' motions regarding each side's damages experts, Finnerty and Contino, before considering the remaining experts in a later order. As a preliminary matter, assessment of the parties' various arguments on damages requires that the Court start with the statute, including the TSA's prescribed damages formula.

Under the provision of the TSA at issue here, "[a] person who . . . sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact . . . is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." TEX. REV. CIV. STAT. ART. 581-33(A)(2). A seller is not liable, however, if it can prove "either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.*

If entitled to rescission, a buyer will receive "(a) the consideration he paid for the security plus interest thereon at the legal rate from the date of payment by him, less (b) the amount of any income he received on the security, upon tender of the security." *Id.* at 581-33(D)(1). If entitled to damages, a buyer's award is

the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security.

*Id.* at 581-33(D)(3).

At summary judgment, the FDIC sought a ruling that it "disposed of" the Certificates in the 2010 resecuritization. RBS argued that the jury should decide, and Judge Sparks agreed, declining to rule as a matter of law that the resecuritization "disposed of" the Certificates. Docket no. 154 at 16. Judge Sparks held that, although the TSA does not define "disposed of," "the term should be given its ordinary meaning: 'transferring to another's care or possession, or relinquishing of property.'" *Id.*

Judge Sparks then noted contrasting facts in the record that precluded summary judgment on this question. On one hand, language in the Trust Agreement indicates the FDIC "disposed of" the certificates. *Id.* at 16-17 (citing the Trust Agreement at § 2.13, which states the FDIC "assign[ed], transfer[red], and otherwise convey[ed]" the Certificates to the Trust, and at § 3.01, which states the FDIC "does hereby contribute, transfer, convey, and assign to the Trust, without recourse, all its right, title and interest in and to the Underlying Securities"). Other language in the Trust Agreement, though, indicates the FDIC did not "dispose[] of" the Certificates. *Id.* at 17 (citing the Trust Agreement at § 3.03, which describes the OTCs the FDIC received as "beneficial ownership interest in the related Underlying Securities," at § 3.05(h), which states "Certificateholder acknowledges and agrees to the terms of the Call/EOD Auction described in the Indenture, and the Guarantor's rights to direct such Call/EOD Action as provided under the Indenture and under the Guaranty," and at § 2.13(b), which states the transaction is not considered a sale for tax

purposes and contemplates terms if the conveyance is deemed to be a pledge of security for a loan). Thus, Judge Sparks concluded that a reasonable jury could determine the resecuritization did not dispose of the Certificates. *Id.*

As this case stands after summary judgment, both provisions—rescission and damages—remain in play. Judge Sparks's summary judgment order also contained the following "guidance" on damages. Judge Sparks, noting that the parties did not brief the issue, stated:

> Regardless of the provision (rescission of damages) used, the Court expects any monies the FDIC has received and continues to receive from the OTCS will be relevant to damages. *See* Tex. Rev. Civ. Stat. art. 581-33(D)(1) (on rescission, accounting for the "amount of any income he received on the security"); *id.* at 581-33(D)(3) (in damages, accounting for the "amount of any income the buyer received on the security"). Payments from the OTCs are income attributable to the RMBS certificates and must be accounted for under the TSA.

Docket no. 154 at 17.

### 1. FDIC Damages Expert John Finnerty and RBS Damages Expert John Contino

The FDIC moves to exclude the testimony of the damages expert retained by RBS, John Contino (docket no. 183). RBS, in turn, moves to exclude the testimony of the FDIC's damages expert, John Finnerty (docket no. 196).

#### a. The Expert Reports

Because each expert references frequently the opinions of the other, the Court first summarizes their reports.

##### i. Finnerty's Report

Dr. John Finnerty, the FDIC's damages expert, is an Academic Affiliate at AlixPartners, LLP, a financial and operational consulting group. Docket no. 197-12 at 1. He is also a Professor of Finance at Fordham University. *Id.* Prior to his current position at

AlixPartners, he was Managing Director of the firm, and before that he was a Managing Principal at Finnerty Economic Consulting, LLC. *Id.* This latter firm provided financial consulting and valuation services. *Id.* He has published many books and papers, and his teaching and research "deal mainly with corporate finance, investment banking, fixed income securities valuation, fixed income portfolio management, and the design and valuation of complex securities." *Id.* at 2. He received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University, and a B.A. in Mathematics from Williams College. *Id.* at 2-3.

Finnerty advances two damages calculations, one based on the market value of the Certificates at issue and another based on the cash proceeds received for the Senior Notes. *Id.* at 4. Later, Finnerty wrote a supplemental report that includes additional damages calculations, as discussed below.

### 1. "Primary" Damages Calculation Based on Market Value

As stated above, if the buyer no longer has the securities, damages are calculated by determining the total consideration paid for the securities and subtracting from that figure either the value of the securities at the date of disposition or the actual consideration received at the date of disposition, whichever is greater.

The total consideration paid for the Certificates and their value at the date of disposition are the same in both of Finnerty's calculations, but his primary and alternative calculations differ on the actual consideration received at the date of disposition.

For both calculations, Finnerty uses the market value at the date of disposition as determined by Interactive Data Corp. ("IDC"). Finnerty opines that the IDC prices provide a reliable basis for assessing the value of the security (here, the Certificates) at the time the buyer disposed of it, as the TSA requires. *Id.* at 17. He argues this is because, when a security

does not have a reliable market price because it is not traded actively or at all, estimates of value from reputable third-party pricing services—like the IDC—are part of the available information for determining a reliable measure of value. *Id.* He notes that the IDC has provided broad coverage of the fixed income market generally and the mortgage-backed securities market specifically since before the events at issue here. *Id.*

In his "primary" market value calculation, however, he uses this IDC estimate of the Certificates' value at the date of disposition twice. He opines that it is appropriate to use this IDC evaluation for both the value at the date of disposition *and* the actual consideration at the date of disposition. Since the TSA calls for the greater of these two figures to be subtracted from the total consideration received, and under this view the two figures would be the same, Finnerty essentially opines that the IDC evaluation is the appropriate (and only) choice.

Finnerty arrives at this conclusion by arguing that Barclays paid $1.8 billion for the Senior Notes, not for the underlying securities. He argues these are "fundamentally different securities," *id.* at 20 n.62, and "[t]he Senior Notes were more valuable than the Underlying Securities because the timely payment of all amounts of principal and interest due on the Senior Notes was guaranteed by the FDIC-C," *id.* at 20. It would not be appropriate, under Finnerty's theory, to use the purchase price as the actual consideration received, since the value of the FDIC's guaranty is incorporated in that price.

### 2. "Alternative" Damages Calculation Based on Cash Proceeds

Alternatively, should the IDC evaluation not be used as the actual consideration received at the date of disposition, Finnerty provides a second calculation that uses the cash proceeds of the sale of the Senior Notes for this figure. In this approach, Finnerty states that

"the aggregate net cash proceeds for the Senior Notes need to be allocated back to the Underlying Securities, and specifically, to each of the At-Issue Certificates, to determine the *pro rata* share of the proceeds FDIC-R received. *Id.* at 24. To do so, Finnerty relies on the market values of the Underlying Securities based on IDC evaluated prices and "allocated the net proceeds on a *pro-rata* basis relative to the contribution of each security to the total market value (as quoted by the IDC) of the aggregate pool of Underlying Securities for each series of Senior Notes." *Id.* at 25. Done this way, Finnerty determined that approximately 3.31 percent of the net cash proceeds for the Series I-A notes can be attributed to the two Certificates at the date of disposition. *Id.*

This method of allocation is attacked by Contino and RBS. As Finnerty notes in a footnote, "I understand that FIDC-R allocated the cash proceeds received for the Senior Notes back to the receiverships on a *pro-rata* basis relative to the contribution of each security to the total Barclays Intrinsic Value of the aggregate pool of Underlying Securities. . . . However, I further understand that allocation the cash proceeds on a *pro-rata* basis using the market values was the approach the FDIC used in subsequent transactions." *Id.* at n.81.

### 3. Value of the OTCs

In both of Finnerty's calculations, he omits the OTCs entirely, a choice which draws scrutiny in Contino's report and RBS's motion to exclude Finnerty's testimony. Finnerty states that he was not asked to value the OTCs as of the date of disposition, nor did Barclays or any other entity perform a valuation of the OTCs contemporaneously with the resecuritization. *Id.* at 26. He states that the "OTCs were subsequently valued for FDIC's accounting purposes on a semi-annual basis using assumptions provided by BlackRock, Inc. . . ., but those valuations did not reflect the fair market value of the OTCs." *Id.* at 26-27. He also notes that while, near the time of the resecuritization, Barclays did "project nominal

(undiscounted) cashflows to each OTC based on a single base-case scenario," these projections cannot be relied upon. *Id.* at 27. This is because, he argues, it is impossible to determine whether any prospective purchaser would have been willing to base a valuation estimate for an OTC on a single cashflow stream. *Id.* Further, he opines that the use of a single-scenario approach to value an OTC can be subject to bias and error when the "projected cash flows are path-dependent and the distribution of cash flows is not symmetrical[.]" He argues this is especially true with "highly risky contingent claims like the OTCs, which are in the form of a residual interest in a pool of RMBS, some of which have experienced large losses that are expected to continue, but with prepayment and default characteristics that are likely to be highly volatile." *Id.* at 27-28.

Ultimately, then, Finnerty opines that

> [d]ue to the extreme volatility and uncertainty surrounding the loans and securities ultimately underlying the OTCs, and the absence of a reliable pricing benchmark for valuing them, it is my opinion that the fair market value of the OTCs cannot be determined at the time of the SSGN 2010-S1 securitization to a reasonable degree of certainty. Consequently, any value that might be attributed to the OTCs retrospectively would be highly speculative. Accordingly, I have excluded the value of the OTCs, if any, from my damages calculation.

*Id.* at 28.

All told, Finnerty's market based approach totals $91,232,613 in damages and his cash proceeds approach totals $72,639,558.

### ii. Contino's Report

John Contino, RBS's damages expert, founded Sperlinga Advisory LLC, an investment advisor that "generally provides its clients with valuation services, specialized analysis, and litigation support in the mortgage-backed and asset-backed securities sectors." Docket no. 197-11 at 1. This work has involved "the analysis of loan portfolios and mortgage

servicing rights, as well as the valuation of [RMBS.]" *Id.* Contino received a Bachelor of Science from Cornell. *Id.* Afterward he worked at PaineWebber, where his responsibilities included structuring securitizations using residential loans and "assisting with analysis of more complex securities that had been created out of the securitizations the firm had structured, including analysis of the associated residual interests." *Id.*

RBS retained Contino to respond to Finnerty's report, value the OTCs, and allocate the value of the OTCs to the individual at-issue securities using the FDIC's methodology. *Id.* at 3.

### 1. Value of the OTCs

First, Contino takes issue with Finnerty's opinion that the OTCs' value cannot be determined. Contino purports to lay out the process commonly used in the industry to do residual valuation using cash flow modeling. *Id.* at 9-10. First, expected payments for each of the underlying securities are determined using assumptions of the future performance of underlying loans and of other potential cash flow sources. Second, these expected payments are put into a cash flow engine, which projects the underlying loan cash flows and applies them to the underlying securities. Finally, the resulting cash flows are discounted to present value.

Contino values the OTCs using these same steps. *Id.* at 10. He used the cash flow projections that Barclays produced contemporaneously with the Senior Notes' pricings. These projections contained assumptions used by Barclays to price the bonds in Intex— Contino contends the bonds are the Senior Notes and Intex is a service that sells structured finance cash flow engines that are commonly used. *Id.* Contino states that the assumptions used "were detailed, specifying future predictions of borrower voluntary prepayments, borrower default rates and associated loss severities, interest rates and certain servicer driven

assumptions (advance rates), on a security-by-security basis for all 103 Underlying Securities." *Id.* at 11. The resulting estimates "employed sophisticated assumptions and methods commonly used in the industry" and the results "were provided to and used by the FDIC." *Id.*

Contino argues that "Barclays structured the Senior Notes so that at their expected assumptions, neither Excess Spread, Excess Interest, the accelerated principal payment feature nor the FDIC-C's guaranty were necessary for full repayment of the Senior Notes." *Id.* at 11-12. Based on its assumptions, Barclays estimated that the Series I OTC would receive $694 million and the Series II OTC would receive $122 million. Contino opines that these assumptions and the resulting cash flows are reasonable, yet he notes that Finnerty disregards them.

Then, in addition to examining the Barclays cash flows, Contino states he independently ran through Intex the "Pricing Case Assumptions" created by Barclays, which generated results nearly identical to the cash flows provided by Barclays. *Id.* Further, Contino benchmarked the Pricing Case Assumptions against recent performance of the underlying mortgage loans, a practice he states is common in the industry. *Id.* at 13. He did so by comparing the total projected losses of the mortgage loans under the Pricing Case Assumptions and the total projected losses of using a set of historical set of determinants obtained from Bloomberg. The result is that the "Pricing Case Assumptions regarding losses can be viewed as generally consistent with historical performance as of the time of the Re-securitization, and perhaps conservative." *Id.* at 14.

Finally, Contino compared the actual performance of the resecuritization to the Barclays projections and found them "prescient" and "in fact slightly pessimistic relative to what actually occurred through October 2017." *Id.* In sum, Contino opines that Barclays'

original projections were reasonable, and perhaps conservative, and using those projected cash flows Contino calculates the value of the OTCs, refuting Finnerty's claim that this cannot be done to a reasonable degree of certainty. *Id.* at 15.

Second, noting Finnerty states he cannot identify a "market" for the OTCs, Contino argues that this fact ignores that the FDIC-R specifically avoided obtaining a market price and chose to use an alternative method to value the securities. *Id.* Two of Finnerty's reasons for stating any OTC valuation would be "highly speculative" were "the lack of any identifiable market for the OTCs, and the absence of a reliable pricing benchmark for valuing them." Contino argues, however, that the FDIC-R could have accessed the markets for at least an indication of a market price for the OTCs (and Barclays offered to do just that), but the FDIC-R decided not to and never sold or intended to sell the OTCs. *Id.* Contino argues that the FDIC-R's actions at the time of the resecuritization show it chose to view the OTCs as part of a "hold" strategy. *Id.* at 16.

In the end, Contino argues the OTCs' present value as of 2010 was $442,278,884 for Series I and $71,243,715 for Series II. *Id.* at 17.

## 2. Finnerty's Value Given to the FDIC Guaranty

Contino also challenges Finnerty's assertion that the FDIC guaranty made the Senior Notes more valuable than the underlying securities. *Id.* at 18. Assuming that the resecuritization never happened and the FDIC-R instead discounted the aggregate cash flows of the underlying securities to determine these securities' value, Contino claims his analysis shows that the value of the underlying securities to the FDIC is "nearly identical, regardless of whether the securities were held or re-securitized." *Id.* at 19.

### 3. Finnerty's Allocation of the Senior Notes' Proceeds

Finally, Contino challenges Finnerty's opinion that it is inappropriate to treat the amount Barclays paid for the Senior Notes as the consideration paid for the Certificates under the TSA damages formula. As stated above, Finnerty's opinion is based on the idea that the underlying securities and the Senior Notes are "fundamentally different securities." Contino contends that this ignores that the FDIC itself allocated the proceeds and the value of the OTCs to each receivership using intrinsic values. *Id.* at 19. Contino states that "[m]y allocation of cash proceeds and OTC values to the At-Issue Securities reflects what I believe to be the allocation methodology that the FDIC-R employed in its apportioning of the Re-securitization's value to the various Receiverships." Finally, he states that "[t]he FDIC-R did not allocate the proceeds or the OTCs using IDC prices as Dr. Finnerty has done, and thus his analysis reflects a hypothetical allocation that did not occur." *Id.*

### iii. Finnerty's Supplemental Report

Finnerty also submitted a supplemental report, which RBS moved to strike as untimely. In the interest of affording as much trial preparation time as possible, the Court opted to decide this motion to strike in an earlier order (docket no. 210). The Court declined to strike Finnerty's supplemental report on timeliness grounds, although it will still consider whether the supplemental report is reliable and whether Finnerty is qualified to opine as to its contents.

Finnerty's supplemental report responds to Contino's valuation of the OTCs, and in light of Judge Sparks's guidance that "[p]ayments from the OTCs are income attributable to the RMBS certificates and must be accounted for under the TSA," Finnerty provides a supplemental alternative damages calculation that incorporates the actual OTC payments received to date and any potential future OTC payments. Docket no. 197-3. Finnerty also

calculates the payment that would be due to the FDIC-R under the assumption that the resecuritization did not amount to a disposition—making rescission the proper remedy— given Judge Sparks's ruling that whether the resecuritization "disposed of" the underlying securities is a jury question. *Id.* Finally, he updates his original damages calculation with statutory interest through June 1, 2018. *Id.*

All told, Finnerty now advances five damages calculations.

### 1. Alternative Damages Calculations Incorporating the OTCs

Finnerty contends that "[i]ncorporating *both* an estimated value of the OTC at the time of the securitization *and* the actual receipt of OTC payments by the FDIC-R post-securitization would impermissibly double-count the OTC." *Id.* at 4 (emphasis in original).

### a. Calculation Based on Actual OTC Payments and Current Market Value of At-Issue Certificates

"In lieu of ascribing an *estimated* value to the OTC at the time of the Senior Notes offering (as Mr. Contino does)," Finnerty "incorporate[s] the *actual* receipt of OTC payments received by FDIC-R post-securitization." *Id.* at 4-5. Looking then at the priority by which funds from the underlying securities are disbursed and the amount of OTC payments that have been received by the Trust, Finnerty allocates the OTC payments attributable to the Certificates. *Id.* at 5-4. Then, he determines the present value of any expected future OTC payments using the IDC values of any outstanding at-issue Certificates in the Trust as a proxy. *Id.* at 7-8.

Taking these two figures and the aggregate cash proceeds of $1.3 billion for the Series I-A notes (Finnerty again reiterates, as in his first report, that this was paid for the Senior Notes, not the underlying securities), Finnerty arrives at a damages figure of $49,790,395. *Id.* at 8.

### b. Calculation based on Estimated OTC Value At Disposition

Alternatively to the above approach, which uses the actual amounts received, Finnerty proposes a calculation that mirrors Contino's in fixing an estimated value of the OTCs at the time of disposition—but Finnerty uses much higher discount rates to do so.

First, Finnerty responds to Contino's report, arguing that the discount rate of 3 percent per year Contino applies to the series of projected nominal cash flows is artificially low. *Id.* at 9. This rate represented the FDIC's estimated cost of funds at the time of the securitization, Finnerty argues, which is not an appropriate market-based discount rate. Finnerty states that a valuation that uses a discount rate that does not appropriately compensate the investor for the investment's risk is unreliable, and the 3 percent rate would imply that the cash flows are "even *safer* than the risk-free interest payments on treasury instruments of similar maturities." *Id.* at 10-11. Finnerty notes that Contino took a different approach in a report for a different matter, applying discount rates of 18 percent as of 2006 and 25 percent as of 2005 to value residual interests.

Then, Finnerty applies what he considers to be more appropriate discount rates of 15 percent and 25 percent, arriving at damages calculations of $71,190,381 and $73,258,528, respectively. *Id.* at 15.

### 2. Alternative Damages Calculation Assuming the Resecuritization is Not a Disposition

Since, after summary judgment, whether the 2010 resecuritization "disposed of" the Certificates remains a jury question, Finnerty's second report adds a calculation to account for the possibility that the jury decides they were not "disposed of." *Id.* at 15-17. Under that assumption, this calculation considers what payment would be due to the FDIC-R upon rescission. Finnerty arrives at a figure of $64,698,089. *Id.* at 17.

### 3. Updated Damages Calculations From First Report

Finally, Finnerty updates the primary and alternative calculations from his first report to add statutory interest through June 1, 2018. *Id.* at 17-18. These figures are now $93,388,313 and $74,318,513, respectively. *Id.*

### b. RBS's Motion to Exclude Finnerty's Testimony

As stated above, the Court denied RBS's motion to strike the Finnerty supplemental report on timeliness grounds. The Court now, however, applies the *Daubert* standard to both Finnerty reports.

### i. Qualifications

First, this Court must determine if Finnerty is qualified to testify on the matters at hand. *Cooks*, 589 F.3d at 179. A party who moves to exclude expert testimony on qualification grounds must show that the expert does not possess a higher degree of knowledge, skill, experience, or education than an ordinary person. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995). RBS does not appear to argue that Finnerty is not a qualified expert, only that his opinions should be excluded as unreliable. Even if it did, the Court is satisfied that, given his extensive experience discussed above, Finnerty is qualified to testify as to any of his damages theories.

### ii. Reliability of the Opinions

RBS does, however, contest the reliability of Finnerty's opinions. As to Finnerty's original report, RBS argues that Finnerty's choice to exclude the OTCs from his damages calculations does not comply with the TSA, given Judge Sparks's guidance that payments from the OTCs "must be accounted for under the TSA." Docket no. 196 at 15. RBS contends that the OTCs could be accounted for several ways—using the kind of analysis Barclays used at the time of resecuritization or that Contino used in this litigation, or using the cash

proceeds actually received to date—and Finnerty's failure to do so renders his calculations unreliable. *Id.* at 16-17.

The FDIC argues, regarding the OTCs' value in 2010, that Barclays was clear it was not valuing the OTCs (and that more work would be required before it could do so) and that Contino's use of Barclays work is itself grounds for Contino's exclusion, as the FDIC argues in its motion regarding Contino. Docket no. 206 at 20. As to the actual cash payments, the FDIC argues that payments made years later "ha[ve] no bearing on the fair market value of the OTC in March 2010 except in hindsight." *Id.* at 21. Further, the FDIC argues the TSA refers to "actual consideration received *at the time the buyer disposed of it*." *Id.* (emphasis in original). In the FDIC's view, this means it was reasonable, "absent guidance on how such payments should be treated under the TSA, to consider payments on the OTC received more than six years after the FDIC-R disposed of the RMBS not to be 'income' on the RMBS." *Id.* at 21-22.

At this stage, however, the parties do have such guidance. The Court agrees with Judge Sparks's guidance—the OTCs must factor in to the statutory damages formula. This precludes the parties from submitting to the jury testimony to the contrary. The only reasonable conclusion, then, is that Finnerty's "primary" and "alternative" calculations from his original report (and as updated with additional statutory interest in his supplemental report) must be excluded. Any calculation that ignores the OTCs would not be reliable, nor would it help the jury understand the proper measure of damages under the TSA.

The Court also has misgivings about Finnerty's attempt, in his "primary" calculation in his original report, to conflate the "value" and "actual consideration received" prongs of the TSA, instead using the IDC market value estimates for both figures. The TSA is structured to make the plaintiff whole, not provide a windfall. *See Aegis Ins. Holding Co.,*

*L.P. v. Gaiser*, No. 04-05-00938-CV, 2007 WL 906328, at *4 (Tex. App.—San Antonio Mar. 28, 2007, no pet.). The Court agrees with RBS's assessment of the balance struck by the TSA's damages formula: if a plaintiff "sells a security in a 'fire sale' below its actual value, damages will be based on the security's value and not the lower consideration actually received," but if a plaintiff "sells a security for more than its value, the plaintiff cannot recover damages based on the lower value of the security and keep the 'actual consideration received' in excess of the value of the security." Docket no. 196 at 19. On this additional ground, the Court would exclude Finnerty's "primary" calculation, which appears to be the only one of Finnerty's calculations to use IDC values for both the value and actual consideration received prongs.

The Court will not exclude the three calculations advanced in Finnerty's supplemental report, none of which substitute an IDC value for the "actual consideration received" and all of which account for the OTCs. The first of these calculations is based on the actual OTC payments and the current market value of the at-issue certificates, the second is based on an estimated OTC value at the time of disposition, and the third applies only if the jury determines the resecuritization did not "dispose of" the Certificates (thus implicating the TSA's rescission provision).

RBS's primary argument applicable to these calculations regards how Finnerty allocates to each underlying RMBS the proceeds paid by Barclays for the Senior Notes. RBS argues he ignores "how the total proceeds were *actually* allocated by the FDIC to the individual Certificates at the time of the resecuritization, and instead arbitrarily allocates the cash proceeds based on a '*pro-rata* basis relative to the contribution of each security to the total market value (as quoted by IDC).'" Docket no. 196 at 24 (quoting Finnerty Rep., docket no. 197-12 at 28). Finnerty concedes that the FDIC, in the transactions at issue, "allocated

22

the cash proceeds received for the Senior Notes back to the receiverships on a *pro-rata* basis relative to the contribution of each security to the total Barclays Intrinsic Value," but he notes that "allocating the cash proceeds on a *pro-rata* basis using the market values was the approach the FDIC used in subsequent transaction." Docket no. 197-12 at 28.

RBS argues that this choice to use an "irrelevant" allocation method renders the calculations excludable. But Finnerty's manner of allocation goes to weight, not admissibility, and cross-examination is the proper vehicle for curing any problems on this point. As *Daubert* explains, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Pipitone*, 288 F.3d at 250.

This is true also of RBS's other arguments regarding the supplemental calculations. RBS argues, in the calculation based on actual OTC payments, Finnerty does not deduct "the $500+ million cash flow projected at the time of the resecuritization," and in the calculation based on estimated OTC value, his chosen discount rates conflict with the rate used by the FDIC and Barclays. Docket no. 196 at 33-34. But as the FDIC counters, these arguments amount to differences of opinion about the proper way to incorporate Judge Sparks's guidance, not reasons to exclude Dr. Finnerty's opinions. Docket no. 206 at 28.

Finally, the Court does not share RBS's view that the FDIC's description of the alternative calculations as "illustrative" means the FDIC does not intend to present them to the jury. If the Court is mistaken, the FDIC should correct it at time of trial.

RBS requests that, if the Court intends to deny RBS's motion to exclude the alternative calculations in the supplemental report, it reserve ruling on their admissibility until Finnerty is again deposed. The Court will not do so, but as stated in the order on RBS's motion to strike the supplemental report, RBS may move the Court to file a late *Daubert*

challenge based on new information obtained at this deposition. Depending on the proximity to trial of any potential challenge, the Court may decide it on the papers or orally at the pretrial conference or at trial.

Thus, RBS's motion to exclude Finnerty's testimony is GRANTED IN PART and DENIED IN PART. The Court will allow the alternative calculations set out in Finnerty's supplemental report (sections IV, V, and VI), but not those set out in his original report, including as updated for additional statutory interest in the supplemental report (sections VII and VIII).

### c. The FDIC's Motion to Exclude Contino's Testimony

#### i. Qualifications

As with Finnerty above, Contino's qualifications are not challenged, and even if they were the Court is satisfied that Contino is qualified to testify as to the matters at hand, to the extent his opinions are reliable and relevant.

#### ii. Reliability of the Opinions

The opinion at issue here is Contino's valuation of the OTCs as of March 2010, a summary of which is set out above. The FDIC raises two arguments challenging the reliability of this valuation: first, that Contino did not do a "what if?" analysis to know what would happen if the variables did not turn out exactly as assumed, and, second, that Contino should have used a different discount rate that reflect the riskiness of the OTCs as seen by the market. Docket no. 183 at 8.

##### 1. "What if?" Analysis

The FDIC's financial advisor, Barclays Capital, structured the 2010 resecuritization. *Id.* at 3. In structuring this transaction, Barclays created a proprietary model that predicted the future performance of RMBS based on assumptions entered in the model. *Id.* at 5. This

model, the FDIC argues, was improperly relied on by Contino in forming his expert opinion, which renders his valuation of the OTCs unreliable.

The FDIC argues that the complexity of RMBS necessitates using hundreds of scenarios when projecting future payments, and the standard technique for doing so is a Monte Carlo simulation. *Id.* at 9. A Monte Carlo simulation is a statistical technique that "measures the probability of various outcomes," but "[i]nstead of simply averaging the input values, Monte Carlo analysis uses randomly-generated data points to increase accuracy, and then looks to the results that those data points generate." *Id.* (quoting *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 293 (5th Cir. 2010)). Because Contino relied on a model that assumed just one value per variable per month—the Barclays model, which made no volatility assumption and therefore considered only one interest-rate path—the FDIC contends Contino's opinion is unreliable. *Id.* at 11.

In response, RBS notes the FDIC cites no precedent indicating that the *only* reliable method is a Monte Carlo simulation. Docket no. 197-1 at 12. RBS argues that "the FDIC's own financial advisory used projected cash flows based on a 'single' scenario," and that single scenario "accurately predicted the actual cash flows the FDIC ultimately received," which rebuts the idea that this type of method is unreliable. *Id.* Instead, RBS contends that Contino "used an alternative to a Monte Carlo simulation because he, like other valuation experts, uses single scenario DCF analyses to value securities such as the OTCs in real-world applications." *Id.* at 14. RBS argues the numerous tests Contino performed corroborated his opinions, and any criticisms of the "single value" assumptions used should go to weight, not admissibility. The Court finds that Contino's use of a single scenario is not a basis for excluding his testimony as unreliable.

## 2. Discount Rate

Further, the FDIC argues Contino's use of a 3 percent discount rate is a basis for excluding his testimony. The FDIC contends Contino "chose three percent because the FDIC determined that that was the rate at which it, an agency of the United States Government, could borrow money in 2010," but "to *value* an investment on the market, the correct discount rate must reflect the riskiness of the investment, not the creditworthiness of the investor." *Id.* at 11-12 (emphasis in original). The FDIC thus argues Contino's choice of discount rate departs from industry practice and Contino's own past practices, as the FDIC notes he opined in another case that buyers of a residual interest in an RMBS would have used higher discount rates. *Id.* at 12.

RBS argues that the FDIC did not intend to sell the OTCs in the market, which makes the 3 percent rate reasonable, as it reflects the value of the OTCs to the FDIC, consistent with the TSA's purpose of making the plaintiff whole and no more. Docket no. 197-1 at 15-16. Further, RBS notes Barclays used the same rate and the FDIC continued to use a similar discount rate for years to value the OTCs in semi-annual reports. *Id.* at 16.

Regardless, the appropriate discount rate is a question better reserved for the jury, and as with Finnerty's calculations employing a higher discount rate discussed above, the Court will allow Contino's calculations using a lower discount rate. The Court finds that Contino's opinions have a sufficiently reliable basis, and any arguments as to their deficiencies may be explored on cross-examination.

### iii. Relevance of the Opinions

Finally, the FDIC argues Contino's valuation of the OTC is irrelevant, given Judge Sparks's guidance on damages. Docket no. 182-1 at 13. Since Judge Sparks said the OTC payments received are "income," and the FDIC argues "deducting *both* the ostensible value

of the OTC in March 2010 when the securities were sold *and* the payments the FDIC has actually received on the OTC since October 2016 would impermissibly double-count that asset and undercompensate the FDIC-R," the FDIC contends Contino's valuation is irrelevant. *Id.*

RBS argues the FDIC misconstrues Judge Sparks's guidance. In RBS's view, Judge Sparks did not require that the parties "deduct the OTCs *only* as 'income the buyer received on the security' under the TSA." Docket no. 197-1 at 19. Instead, RBS views the guidance only as rejecting the FDIC's attempts to exclude the OTCs from damages entirely.

The Court agrees. The TSA requires that one of two figures—either the value of the security or the actual consideration received for the security, as determined at the time of disposition—must be deducted. But both figures also require that "the amount of any income the buyer received on the security" be added. Judge Sparks's limited guidance on the role of the OTCs in calculating damages did two things: first, it foreclosed any argument that the OTCs can be excluded from damages altogether, and second, it indicated that the actual payments received on the OTCs are part of the "income the buyer received on the security." But as RBS correctly notes, "the Court did not rule on the method for determining how to account for the OTCs 'at the time the buyer disposed of' the security under *either*" the value or actual consideration prongs. Docket no. 197-1 at 20. The FDIC argues that accounting for the OTCs' value under either prong would double-count the asset, while RBS argues it would not. For now, the Court will reserve this question for the jury and will take up the issue at trial if necessary.

Accordingly, the FDIC's motion to exclude Contino's damages calculations is DENIED.

## 2. RBS Accounting Expert Stephen Ryan

Next, the Court considers the FDIC's motion to exclude the testimony of Stephen Ryan, an accounting expert for RBS (docket no. 185).

### a. Qualifications

First, this Court must determine if Ryan is qualified to testify on the matters at hand. *Cooks*, 589 F.3d at 179. A party who moves to exclude expert testimony on qualification grounds must show that the expert does not possess a higher degree of knowledge, skill, experience, or education than an ordinary person. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995). The FDIC challenges Ryan's qualifications as an argument in the alternative, should the Court opt not to exclude Ryan's opinions on reliability or relevance grounds. Still, the Court, in its gatekeeping function, must assess Ryan's qualifications and experience.

Ryan is an accounting professor at the Stern School of Business at New York University. Docket no. 198-5 at 5. Before teaching at NYU, he taught at the Yale School of Organization and Management. *Id.* He has a BA in economics and philosophy from Dartmouth College and a Ph.D. in business, concentrating in accounting, from the Stanford Graduate School of Business. *Id.* In his teaching and research, he has focused on "financial accounting and financial analysis based on financial report information, with the primary focus being financial reporting by financial institutions for their financial instruments and transactions, including trading positions." *Id.* at 6. He has served in various capacities with the Financial Accounting Standards Board ("FASB"): on the Financial Accounting Standards Advisory Council, the Liabilities and Equity Resource Group, and the Financial Institutions Advisory Group; and as chair of the Financial Reporting Issues Conference Committee. *Id.* Further, he has served on the Federal Reserve Bank of New York's Financial Advisory Roundtable since 2012. *Id.*

The FDIC argues Ryan is an accounting professor, not an investor, and he has no experience in structuring, selling, rating, or investing in RMBS. Docket no. 185-9 at 9. Further, the FDIC notes all of Ryan's expert work has been as an "accounting expert," but he has no experience "as a market participant nor any expertise on their views[.]" *Id.*

RBS argues Ryan "specializes not only in applying accounting rules to properly reflect economic realities in the preparation of financial statements, but also in analyzing financial information to understand the proper treatment of financial transactions." Docket no. 198-1 at 8. Noting Ryan has published peer-reviewed articles on how market participants view transactional structures, RBS argues Ryan is qualified based on his research and scholarship, "which provide him with specialized knowledge not possessed by the average juror[.]" *Id.*

Having reviewed Ryan's report, the Court is satisfied that Ryan has the necessary expertise to testify on its contents, to the extent they are reliable and relevant.

### b. Reliability and Relevance of the Opinions

Next, the Court considers the reliability and relevance of Ryan's opinions. As stated above Judge Sparks declined to rule as a matter of law that the resecuritization "disposed of" the Certificates. Docket no. 154 at 16. Judge Sparks held that, although the TSA does not define "disposed of," "the term should be given its ordinary meaning: 'transferring to another's care or possession, or relinquishing of property.'" *Id.* Citing several provisions in the Trust Agreement, Judge Sparks concluded that a reasonable jury could determine the resecuritization did not dispose of the Certificates. *Id.*

### i. Ryan's Report

Ryan's testimony concerns whether the resecuritization was a sale. John Finnerty opines in his expert report that the 2010 resecuritization was a sale of the underlying

securities, and Ryan states he was retained to respond to this opinion. Docket no. 198-5 at 4. In Finnerty's report, he opines that, from an economic perspective, "the sale and transfer of the Underlying Securities to the Trust followed immediately by the sale of the Senior Notes issued by the Trust to third parties, would have been understood by investors in the capital market as a sale of the Underlying Securities." Docket no. 197-12 at 16. Finnerty states that, after the resecuritization transactions, "FDIC-Receiver no longer bears the downside economic risk on the Underlying Securities," as "FDIC-C, as Guarantor, has assumed the credit and default risk on the Underlying Securities," which changes the FDIC-R's risk/return profile. *Id.* at 17-18. Risk of default was assumed by the FDIC-C, as guarantor, not the FDIC-R, and the "fact that the FDIC-R no longer bears this economic downside risk is significant, from an economic perspective, in concluding that a sale occurred." *Id.* at 18.

RBS did not challenge this portion of Finnerty's report, and the Court thus did not address it in its discussion of Finnerty's proposed testimony above. In the FDIC's motion challenging Ryan, the FDIC, noting Ryan's testimony is styled as rebuttal to Finnerty, argues that "[i]n light of the Court's ruling that whether the RMBS have been disposed of must be determined using the ordinary meaning of the term, the FDIC-R submits that no expert testimony from either party about the views of market participants is necessary or appropriate." Docket no. 185-9 at 9.

Ryan, in rebuttal, advances two primary opinions. First, he opines that Financial Accounting Standard ("FAS") 140, applied to the resecuritization, shows that generally accepted accounting principles ("GAAP") would require the receiverships to account for their transfers of the underlying securities to the Trust as secured borrowings, not sales. Docket no. 198-5 at 7. His first basis for this opinion is that "reasonable assurance of isolation of the Underlying Securities from the Receiverships did not exist," and his second

basis is that "the FDIC-C retained effective control over the Underlying Securities through the combination of its option to call any class of Senior Notes once losses" reach a certain threshold and "its ability to direct the Indenture Trustee to 'conduct an auction of all the Underlying Securities related to such class of Senior Notes.'" *Id.* at 7-8.

Second, he opines that market participants would view the resecuritization as a secured borrowing. *Id.* at 21. His primary reason for this opinion is that the "FDIC-C collectively retained all of the credit risk of the Underlying Securities." Ryan contends his opinion is supported by credit rating agency rating manuals, which "indicate that these agencies treat securitizations in which the sellers provide recourse as secured borrowings," and by investors' views that "securitizations in which transferors retain the risks and rewards of the transferred assets as secured borrowings." *Id.* at 21-22. Ryan identifies further support in "empirical evidence that equity and debt investors and credit rating agencies view securitizations in which sellers retain sufficiently large first-loss interests as secured borrowings." *Id.* at 22.

### ii.  The *NCUA* Order

Much of the briefing on this motion centers on a 2017 order on similar facts in the District of Kansas. *See Nat'l Credit Union Admin. Bd. v. UBS Secs., LLC*, No. 12-2591-JWL, 2017 WL 513970 (D. Kan. Feb. 8, 2017). In that case, the National Credit Union Administration Board ("NCUA") brought federal and state claims against sellers, underwriters, and issuers of RMBS certificates for alleged misstatements related to the certificates. *Id.* at *1. The order debated by the parties in this case decided several motions to exclude expert testimony. In relevant part, the order excluded portions of a law professor's expert testimony. That professor, Adam Levitin, opined whether transactions were "dispositions in the market" as relevant for damages under the statute, which is similar to

31

the statutory language at issue here. *Id.* at *5. As in this case, a prior summary judgment

order had ruled that whether transactions were "dispositions" was a fact issue. In that prior

order, the court construed the statutory phrase using its ordinary meaning, similar to the way

Judge Sparks confined "disposed of" to its ordinary meaning here.

    The expert in question, Levitin,

> opined that there is no definitive test for whether a transaction is a "sale" and
> that a range of factors may be considered on the issue, which factors
> ultimately boil down to a consideration of whether risk and control have been
> transferred. Professor Levitin chose to apply a "true sale" analysis used in
> bankruptcy law, which he considered to be the best method for determining
> a sale in light of the economic realities of a situation. In the course of that
> analysis, he applied certain factors under a particular GAAP accounting rule.
> As his ultimate standard, he opined that only the NGN transactions constitute
> dispositions because only for those transactions would an independent law
> firm have issued a true sale opinion letter.

*Id.* at *6.

Because the court had already discussed the meaning of the statutory language, the

court did not permit Levitin to discuss the meaning of "sale" or "disposition" under the

statute. *Id.* The court also forbade Levitin's weighing the evidence and opining whether the

court's standard was met with respect to the transactions, "as such an opinion would invade

the province of the jury." *Id.*

The court also excluded Levitin's testimony on whether a law firm would have

considered the transactions to be a sale. Levitin "testified that the true sale opinion would be

relevant to market participants such as investors, credit ratings agencies, and financial

auditors." *Id.* But the court was not persuaded that Levitin had the expertise to know what

market participants would find relevant. And since the market participants Levitin

considered important were the independent law firms asked to provide true sale opinion

letters, the court viewed Levitin's opinions from the viewpoint of market participants as

"improper legal opinion" that was "couch[ed] . . . as an expert consideration from the viewpoint of the independent law firm acting as market participant." *Id.* At bottom, "[e]ither way, an opinion is being offered that a legal expert would or would not consider the transactions to be sales," which the court found improper. Further, the court questioned the relevance: "the question is whether these transactions constitute dispositions, not whether investors or anyone else considered them to be dispositions." *Id.*

The court, however, did not exclude all of Levitin's testimony, permitting him to testify on the "extent to which these transactions included transfers of risk or control (the key factors considered by him)" and, as a witness with specialized knowledge, on "information concerning securitizations generally and these securitizations in particular that would be helpful to the jury." *Id.* at *7.

### iii. Discussion

Perhaps as a means of evading the reasoning in this *NCUA* order, Finnerty's report disclaims that his opinion is limited to an economics perspective. Docket no. 197-12 at 19. He states he is not "opining as to whether the resecuritization transaction would qualify as a 'true sale' under generally accepted accounting principles nor as to whether a law firm experienced in securitization transactions would have been willing to furnish a 'true sale' opinion letter . . . ." *Id.* Ryan, likewise, states he offers "only accounting and economic, not legal, opinions in this report." Docket no. 198-5 at 5 n.8.

The FDIC asks this Court to adopt the *NCUA* order's reasoning. Docket no. 185-9 at 8. Based on this order, the FDIC argues Ryan should not be able to substitute a GAAP standard for the "ordinary meaning" interpretation Judge Sparks already adopted. *Id.* Further, it argues Ryan should not be able to opine about market participants because this testimony is irrelevant and improperly relies on accounting rules, and because Ryan does

not have the necessary experience of a market participant. *Id.* at 8-9. As stated above, given Ryan's teaching and research experience the Court rejects the argument that Ryan is not qualified.

RBS distinguishes the *NCUA* order, arguing that, unlike Leviten, Ryan does not offer a legal opinion that the resecuritization was a "sale," and thus he does not impose on the jury's role. Docket no. 198-1 at 9. Further, RBS argues Ryan's market participant testimony relates to "how true market participants—credit rating agencies and investors—would have viewed the resecuritization," unlike Levitin's use of a law firm, which is difficult to view as a market participant. *Id.* at 10.

Here, the Court will adopt the *NCUA* order's reasoning in part. First, Ryan will not be able to substitute the standard under any financial accounting rule for the standard Judge Sparks adopted. At no point will the Court permit the parties and their witnesses—Finnerty, Ryan, or others—to supplant the ordinary meaning of "disposed of": "transferring to another's care or possession, or relinquishing of property." To that end, the Court will limit Ryan's testimony on the requirements of FAS 140, which stipulates "three conditions [that] must be met for a transferor to account for a transfer of financial assets as a sale under GAAP." Docket no. 198-5 at 5.

The Court has already interpreted the "disposed of" language, establishing the standard that will decide this question. The Court also found that applying the record to the statutory language does not lend a result as a matter of law. The question thus goes to the jury, and in deciding this question the jury will have the benefit of hearing experts like Ryan, but that is not an invitation for Ryan to substitute a new standard.

The *NCUA* court allowed Leviten to testify regarding the "extent to which these transactions included transfers of risk or control (the key factors considered by him)." Here,

similarly, the Court will allow Ryan and Finnerty to testify as to factors they deem important to the question of whether the resecuritization was a sale, including the extent to which the resecuritization included transfers of risk or control. Given Ryan's accounting background and the content of his report, it stands to reason that the factors Ryan is qualified to employ in assisting the jury and rebutting Finnerty will involve accounting principles. Ryan can thus opine that the resecuritization was a secured borrowing—not a sale—because, for example, the receiverships kept the OTCs, which bear substantial first risk of loss, or because the FDIC-C retained effective control over the underlying securities. Much of Ryan's report concerns risk, control, and similar factors describing the makeup of the resecuritization. What Ryan can not do is, for example, apply these arguments as a set of requirements laid out in a financial accounting rule, tie the fulfillment of these requirements to the statutory standard, or indicate that GAAP or FAS are in any way binding in this case.

The Court will not exclude Ryan's market participant testimony, however. Having reviewed Ryan's and Finnerty's reports, the Court does not share the concern of the *NCUA* court, which was considering a law professor's testimony based on the likely behavior of a law firm, that Ryan or Finnerty are attempting to couch legal opinions in their market participant testimony. The parties are warned, though, that their experts will not be permitted to weigh the evidence and supply legal conclusions to the jury. As the *NCUA* court noted, "the fact that the present cases involve the esoteric subject of securitizations does not alter th[e] principle" that experts cannot "tell the jury how they should find on the ultimate question of fact." *NCUA*, 2017 Wl 513970, at *6. At this stage, however, the Court will stop short of imposing strict bounds on the proposed market participant testimony, but it will limit trial testimony where the experts encroach on the jury's role. Finally, Ryan and Finnerty will also be able to testify, as witnesses with specialized knowledge, on

securitizations generally and the 2010 resecuritizations in particular, to the extent helpful to the jury.

As an additional ground for excluding Ryan's testimony, the FDIC argues the probative value of Ryan's opinions is substantially outweighed by the risk that they will confuse the jury and waste time. Docket no. 185-9 at 10. Under Federal Rule of Evidence 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, [or] wasting time . . . ." FED. R. EVID. 403. The Court will not exclude Ryan's testimony under Rule 403, as its instructions here are intended to minimize these risks, particularly the risk that a juror could "easily believe that [GAAP] standards should dictate the determination of whether a sale occurred, when the Court has held otherwise." *Id.*

Thus, the FDIC's motion to exclude Ryan's testimony is GRANTED IN PART as detailed above.

## CONCLUSION

For the foregoing reasons, Plaintiff FDIC's motion to exclude the testimony of John Contino (docket no. 183) is DENIED and Defendant RBS's motion to exclude the testimony of John Finnerty (docket no. 196) is GRANTED IN PART and DENIED IN PART, as indicated in this order.

Further, Plaintiff FDIC's motion to exclude the testimony of Stephen Ryan (docket no. 185) is GRANTED IN PART and DENIED IN PART, as indicated in this order.

It is so ORDERED.

SIGNED this 22nd day of March, 2019.

                      _____
                      XAVIER RODRIGUEZ
                      UNITED STATES DISTRICT JUDGE