**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE | § | |
| CORPORATION, as receiver for | § | |
| GUARANTY BANK, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL NO. 1-14-CV-126-XR |
| | § | |
| v. | § | |
| | § | |
| RBS SECURITIES, INC., | § | |
| | § | |
| *Defendant*. | § | |

## ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY

On this date, the Court considered the remaining motions to exclude expert testimony pending in this case.[1] A previous order decided the motion of Plaintiff Federal Deposit Insurance Company ("FDIC") to exclude John Contino and the motions of Defendant RBS Securities, Inc. ("RBS") to exclude John Finnerty and Stephen Ryan. That order set out the relevant factual and procedural background in this case, which the Court does not restate here. Now, the Court will decide the remaining motions concerning Norman Miller (docket no. 192) and Dawn Molitor-Gennrich (docket no. 194).

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides for the admissibility of expert testimony if it will "help the trier of fact to understand the evidence or to determine a fact in

---

[1] The case is related to *FDIC v. Deutsche Bank Securities, Inc.*, No. 1-14-129-XR. The parties—who share experts with that case—filed identical motions, responses, and replies in the two cases. Indeed, RBS and Deutsche Bank filed their documents jointly. The Court's analysis of these motions in *RBS* will thus be identical to its analysis of the motions in *Deutsche Bank*. The Court, then, in following the practice of Judge Sparks, who formerly handled this case prior to its transfer, will docket an order in *Deutsche Bank* that adopts the reasoning presented below. Any reference to "RBS" below can thus be read as referring to "Deutsche Bank" or "defendants," unless otherwise indicated.

issue." FED. R. EVID. 702. Additionally, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods" that the expert has "reliably applied" to the facts of the case at hand. *Id.*

As a preliminary matter, the Court must determine whether the proffered witness qualifies as an expert. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact, rather than for the court. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999).

If the expert is qualified, then the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id.* at 589. This entails ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("In short, expert testimony is admissible only if it is both relevant and reliable.").

The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Id.* at 592–93. In *Daubert*, the Supreme Court enumerated five nonexclusive factors to consider when assessing whether the methodology upon which an expert rests his opinion is reliable. These factors are: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication,

(3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593–94; *Burleson v. Tex. Dep't of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004).

The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The point of this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

In applying the *Daubert* test, the proponent of expert testimony has the burden to prove by a preponderance of the evidence that evidence is reliable (not that it is correct). *Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998). Expert testimony must be reliable "at each and every step" because "[t]he reliability inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus, Inc*., 167 F.3d 146, 155 (3d Cir. 1999)). "[I]n determining the admissibility of expert testimony, the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

**DISCUSSION**

Under the provision of the Texas Securities Act at issue here, "[a] person who . . . sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact . . . is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." TEX. REV. CIV. STAT. ART. 581-33(A)(2). A seller is not liable, however, if it can prove "either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.*

### 1. RBS's Motion to Exclude Norman Miller's Testimony

RBS moves to exclude the testimony of Norman Miller (docket no. 192).

#### a. Qualifications

First, this Court must determine if Miller is qualified to testify on the matters at hand. *Cooks*, 589 F.3d at 179. A party who moves to exclude expert testimony on qualification grounds must show that the expert does not possess a higher degree of knowledge, skill, experience, or education than an ordinary person. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995). RBS does not challenge Miller's qualifications, but the Court, in its gatekeeping function, will assess his qualifications and experience.

Miller is a Professor of Real Estate at the University of San Diego, and before that he taught at the University of Cincinnati. Docket no. 192-2 at 6. He earned a Ph.D. from Ohio State University in 1977. *Id.* He is a past president of the American Real Estate Society and is on the editorial boards of several journals. *Id.* He has consulted on mortgage risk analysis and automated valuation models ("AVMs") in the private sector, and housing market analysis has been the focus of many of his academic publications. *Id.* at 6-7. His

research expertise in pricing models has led firms to use his methods in the private sector, and as advisor to these firms Miller has "applied various property valuation methods and modeling techniques, including hedonic modeling and appraisal emulation, to develop automated valuation tools for use by the firms' clients." *Id.* at 7. His "work on AVMs focuses on methodologies to improve the accuracy of the models by identifying specific influences on value, and developing and testing modules that improve accuracy." *Id.* He has been an expert witness in RMBS cases, and on valuation disputes that predate these cases. *Id.*

Having reviewed Miller's report, the Court is satisfied that Miller has the necessary expertise to testify on its contents, to the extent they are reliable and relevant.

### b. Reliability and Relevance of the Opinions

Next, the Court considers the reliability and relevance of Miller's opinions.

### i. Miller's Report

The FDIC retained Miller to "provide an expert opinion relating to the selection and use of a retrospective automated valuation model (AVM) to calculate the weighted average loan-to-value ratios (LTVs) of the pools of loans that provide cash flows to the certificates Guaranty Bank purchased[.]" *Id.* at 5. This testimony pertains to the FDIC's contention that RBS's prospectus supplements materially misstated the LTVs of the loans underlying the Certificates sold to Guaranty Bank.

First, Miller opines that a retrospective AVM is an appropriate, reliable way to estimate the values of properties as of 2004 and 2005 in calculating the weighted average LTVs of the pools. *Id.* at 5. He explains that AVMs estimate the value of a given property as of a given date. *Id.* at 9. When valuing a property, an appraisal emulation model of AVM, the type Miller used here, identifies comparable properties (ranked by similarity to the subject property), then accounts for differences in features and size and historical price

5

trends in the area. *Id.* An AVM's value estimate includes a confidence score that indicates its accuracy. *Id.* at 11. Miller states that "[b]ecause of their efficiency and reliability, AVMs were frequently used by lenders and investment banks during the time relevant to this litigation, and continue to be used in the real estate industry widely today." *Id.*

Miller states that "manual appraisals traditionally have done a better job than AVMs of accounting for unique features or adjusting for the condition of a subject property," but "so long as the AVM is run over a reasonable number of loans, the positive and negative errors tend to cancel out." *Id.* at 17. Miller argues AVMs compare well to manual appraisals because AVMs use precise statistical methods to adjust sales prices of comparable properties when accounting for differences in size and features, AVMs are not prone to bias, AVMs' confidence metrics allow users to quantify the risk of error in an estimate, and AVMs have become more accurate over the years with better data filtering, especially among "leading venders like DataQuick." *Id.*

Second, Miller opines that the retro appraisal emulation AVM developed by DataQuick Information Systems, Inc. ("DataQuick") is a reliable AVM for this case. *Id.* at 5. He selected it based on his knowledge of DataQuick's reputation in the AVM industry, his "detailed discussions with DataQuick about its specific model," and his knowledge of appraisal emulation models generally. Miller opines that this AVM "is the best available tool because it follows the same methodology as a human appraiser: it selects the best available comparables, makes adjustments for features and time, and weights the comparables to come up with an estimate of market value." *Id.* at 12. Miller also states he reviewed a DataQuick white paper that describes the AVM's methodology. *Id.* at 12-13. He states he "interviewed the AVM developers at DataQuick and was satisfied from my discussions with [lead AVM developer Dr. Gordon] Crawford and his colleagues that the DataQuick Appraisal Emulation

AVM follows a reliable methodology and would produce accurate results when run on pools of loans." *Id.* at 13. He confirmed the reliability of the values produced by the DataQuick AVM with an analysis of the default rates of loans relative to their LTVs based on AVM values.

Third, Miller opines that the appraisal values on which the original weighted average LTVs were based are biased in favor of overvaluation. *Id.* at 5. He bases this opinion on his review of LTVs based on appraisal values, LTVs based on AVM values, and the corresponding default rates of the loans. Applied here, the AVM returned values for 9,063 of 10,567 properties, with an average confidence score of 83. *Id.* at 16. Miller removed 7 properties for which the entries in the origination date field in the loan tapes may have been incorrect, and the FDIC's statistical expert removed 184 loans as outliers. *Id.* The report uses the remaining 8,879 loans. Comparing the weighted average LTVs as recalculated by the AVM to the original weighted average LTVs included in the prospectus supplements, Miller concludes that the supplements understated the LTVs. *Id.* at 19. He argues this shows "investors in each of these securitizations were looking at significantly less real equity to protect against losses in foreclosure than the LTVs in the loan tapes suggest." *Id.* at 20. Thus, "[t]he risks of losses in foreclosure, based on such differences in value estimation, were significantly higher than those disclosed on the basis of original appraisals." *Id.* He also argues his opinion is supported by empirical analysis of large samples of mortgage loans in recent academic literature. *Id.*

Thus, fourth, Miller opines that the weighted average LTVs based on AVM values are more accurate estimates of the borrowers' equity in the properties that back the loans at issue. Miller examined whether the rate of default was higher for the loans at issue in this case with original LTVs below 80 percent but AVM-based LTVs above 80 percent. *Id.* at

21. He chose this threshold because, he contends, lendors and investors consider loans with LTVs above 80 percent to be the riskiest because lenders are unlikely to recover any equity in the event of foreclosure. *Id.* He found a 32.71 percent default rate on the loans with an original LTV below 80 percent and an AVM-based LTV above 80 percent, as compared to a 19.57 percent default rate on the loans with both original and AVM-based LTVs below 80 percent. *Id.* at 22.

### ii. Discussion

RBS seeks to exclude Miller's testimony as unreliable for several reasons. Docket no. 192.

### 1. Challenge to Retrospective Use of DataQuick AVM

First, RBS argues Miller used the DataQuick AVM as his "sole basis for his opinion that the value opinions provided by the professional appraisers, who conducted on-site appraisals for the properties associates with the loans underlying the Certificates, were overvalued." *Id.* at 10. RBS contends this reliance renders his testimony unreliable.

RBS's principal support for this contention is a 2016 deposition of Stanley Wu, Vice President of Data Science and Architecture for CoreLogic, the company that owns the DataQuick AVM. *Id.* at 9. Wu testified that "[p]rofessionals in the real estate field should not—and I believe, do not—rely solely on CoreLogic or other AVMs to make reliable determinations of the reasonableness of value opinions offered by licensed certified appraisers, whether individually or collectively." *Id.* Wu further testified that CoreLogic's "AVMs are not used to determine whether an appraiser actually inflated or deflated an opinion of value . . . . because there's no way to discern from AVMs the cause of any difference between an AVM's point estimate and the opinion of value" in a licensed appraisal. *Id.* Wu stated that "even where a difference is identified between AVM value

ranges and appraisals' opinions of value, no professional would purport to draw conclusions on opinions of value contained in professional performed appraisals." *Id.*

In response, the FDIC deflects Wu's testimony, pointing to contradictory statements made in marketing materials that stated, for example, "[a] comparison between our retroactive AVM appraisals of properties and the originally appraised values can detect disparities that call into question the earlier appraisals and indicate possible loan-to-value misrepresentations." Docket no. 207 at 16.

In addition to its purported conflict with CoreLogic's recommended use, RBS argues Miller's use of a single AVM conflicts with industry standards (citing a report from RBS expert Lee Kennedy) and regulatory standards (citing the Interagency Appraisal and Evaluations Guidelines, which state an AVM user "should not rely solely on validation representations provided by an AVM vendor"). *Id.* at 12. Further, RBS cites an RMBS case that rejected use of an AVM because it could not account for "important considerations in valuing a residential property" like whether a home has a view of the ocean or a parking lot. *See U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 434 (S.D.N.Y. 2016).

The FDIC distinguishes this *UBS* case, which considered the reliability of the AVM "with respect to an individual property, as distinguished from a 'mass basis,'" and in which the plaintiff had to prove that the values of specific, individual properties were inflated. Docket no. 207 at 17-18. The FDIC argues that here, by contrast, Miller used the AVM to estimate average LTVs of pools of loans, not second-guess an appraiser on any individual property. *Id.* at 18. Further, Miller explains that the use of multiple AVMs—called a "cascade"—"may be appropriate when the user wishes to value individual properties in

several specific markets," but "the high accuracy of the results when the AVM is used to determine the average LTV of a pool of loans obviates the need for a cascade." *Id.*

RBS also points to Wu's testimony in arguing that, even if the DataQuick AVM could reliably draw conclusions about appraisal values, it cannot do so retrospectively, at least not to the extent Miller attempts. Wu testified that he was not aware of any tests of the DataQuick AVM looking five or ten years in the past, and an article by CoreLogic's Vice President of Collateral Solutions states the retrospective testing of the AVM "only went back two years, so further testing would be needed to determine how far back is too far back for retrospective AVMs to be useful." Docket no. 192 at 10-11.

The FDIC counters this argument by citing several cases that have accepted testimony based on retrospective AVMs. Docket no. 207 at 8. Further, it argues Miller and other academics rely on retrospective AVMs in their research to "determine values of properties many years in the past, including to evaluate the presence of appraisal fraud and appraisal inflation during the build-up to the financial crisis." *Id.* (citing docket no. 201-2 at 6 (listing academic articles that rely on output of retrospective AVMs)).

Finally, RBS argues the DataQuick AVM systematically underestimates the value of the properties as compared to actual sale prices. RBS expert Jerry Hausman performed a bias test on the DataQuick AVM, comparing the AVM values for the relevant purchase transactions to the actual purchase prices for those properties. Docket no. 192 at 14. Hausman concluded the average AVM values is below the average purchase price for all loan groups. *Id.* at 15. RBS contends this is to be expected, given Miller's concession that "AVMs tend to produce less accurate values in rapidly fluctuating, highly-dispersed, highly-priced dispersed markets." *Id.* As to these arguments, while Miller refutes them in his declaration, the FDIC contends they go only to weight and should be resolved at trial.

Here, the Court finds unavailing RBS's above arguments as to the reliability of AVMs generally, Miller's chosen DataQuick model specifically, or this model's retrospective use in the context of this case. As have other courts, this Court will allow the retrospective use of a commercial AVM in assessing LTVs of large groups of mortgage loans. The FDIC lists several cases that have allowed testimony based on AVMs.[2]

The Court finds one case particularly persuasive. *See* docket no. 207-4, Order Denying Defendants' Motion to Exclude the Testimony of Dr. Norm G. Miller, *Fed. Home Loan Bank of Seattle v. Banc of Am. Secs. LLC*, Nos. 09-2-46319-1 et al. (Sup. Ct. King Cty., Wash., Mar. 16, 2016) ("*FHLB Seattle*").[3] Applying a rule modeled on Rule 702, the *FHLB Seattle* court rejected similar challenges to similar testimony by the same expert considered here, Norman Miller. The court stated that

> [t]he purpose for which the DataQuick AVM is being offered, to value large pools of properties, has been generally accepted by the courts, the real estate industry, [and] academics . . . for years. It is not, as argued by Defendants, being offered for the purpose of 'overturning the value opinions of appraiser.' This evidence is generally accepted in the relevant community.

*Id.* at 5-6.

RBS raises grounds for distinguishing the FDIC's cited cases, including by noting that the experts in some of those cases used a different commercial AVM or developed their

---

[2] Docket no. 207 at 8 (citing *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.,* No. 11-30039-MGM, 2015 WL 2130060, at *9 (D. Mass. May 7, 2015); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,* No. 11-CV-6201, 2015 WL 353929, at *4 (S.D.N.Y. Jan. 28, 2015); *Fed. Home Loan Bank of Seattle v. Banc of Am. Secs. LLC*, Nos. 09-2-46319-1 et al. (Sup. Ct. King Cty., Wash., Mar. 16, 2016); *FDIC as Receiver for Franklin Bank v. Morgan Stanley & Co. LLC*, No. 201167305 (Dist. Ct. Harris Cty., Tex., Feb. 25, 2015); *CMFG Life Ins. Co. v. RBS Secs. Inc.*, No. 12-CV-037-WMC, 2014 WL 3696233 (W.D. Wis. July 23, 2014), *rev'd in part on other grounds*, No. 14-2904, 2015 WL 4978996 (7th Cir. Aug. 21, 2015); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 505 (S.D.N.Y. 2013)).

[3] The Court also takes note of a Texas state court that denied a challenge to AVM testimony offered by Miller. *See* docket no. 207-5, Order on Defendants' Motion to Exclude Experts, *FDIC as Receiver for Franklin Bank v. Morgan Stanley & Co. LLC*, No. 201167305 (Dist. Ct. Harris Cty., Tex., Feb. 25, 2015). This order contains no analysis, however, so it is useful here only to the extent it indicates other courts have found Miller's testimony acceptable.

own. Docket no. 216-1 at 9. The cases that use the same AVM Miller uses here, RBS argues, did not have the benefit of Wu's testimony casting doubt on testimony like Miller's. Still, the FDIC points out that Wu adopted verbatim the statements of an earlier affidavit by a CoreLogic vice president, Jacqueline Doty, and Doty's statements were available to and rejected by the *FHLB Seattle* court. *Id.* at 16-17 (citing *FHLB Seattle*, docket no. 207-4 ("To the extent [the issues raised in Ms. Doty's affidavit relate to Dr. Miller's use,] the court finds the position of Dr. Miller more persuasive.")). Given the conflicting statements from CoreLogic in the record, the Court does not find Wu's testimony warrants excluding Miller's testimony. More broadly, RBS's distinctions of the FDIC's cited cases do not affect the Court's conclusion, supported by the weight of case law, that AVM testimony like Miller's clears the threshold of reliability for *Daubert* purposes.

Thus, RBS's view that Miller should have used more AVMs (or that it should not have used this one retrospectively) and its arguments regarding Wu's testimony will go to weight, not admissibility. Having decided these more general attacks on the reliability of AVMs used as Miller does here, the Court will turn to RBS's arguments that Miller's understanding of the AVM is inadequate.

### 2. Challenges to Miller's Testing and Knowledge of the AVM

RBS advances several arguments as to Miller's evaluation, testing, and knowledge of the AVM and its methodology. First, RBS argues Miller's results cannot be replicated. RBS expert Lee Kennedy placed an order with DataQuick using the properties, customized settings, and retrospective dates used by Miller. Docket no. 192 at 13. RBS contends Kennedy's results deviated from Miller's significantly—for example, Kennedy was provided 9,041 hits on the 10,567 properties, while Miller was provided 9,065. *Id.* The FDIC contends Kennedy received almost identical results because "[t]he average AVM value—

the relevant metric here—is $526,738 from Dr. Miller's run and $526,814 from Mr. Kennedy's run, a difference of $77, or 0.01%." Docket no. 207 at 20-21.

Next, RBS argues Miller has "only a superficial understanding" of the DataQuick AVM, as his knowledge of it comes from "a generic marketing document and his vague recollection, unsupported by contemporaneous notes, of a few brief conversations with former DataQuick personnel several years ago." *Id.* at 6. RBS argues Miller's conversations with DataQuick developers were only three phone calls conducted years ago. *Id.* at 16. RBS contends he "simply relied on a 'screen shot' of purported internal and external testing results from several years ago provided by Dr. Crawford," and "he did not even look at the external testing results for the DataQuick AVM he decided to use here[.]" *Id.*

The FDIC argues Miller applies his expertise and used due diligence in selecting the AVM. The FDIC points to the acceptance of Miller by the *FHLB Seattle* court, which found

> [Miller's] declaration and reports demonstrate he has substantial expertise in AVMs and methodologies that underlie them, including the appraisal emulation process, and inputs and data on which the DataQuick AVM relies. This comes from his own work, in addition to interviews with DataQuick personnel and investigation into its methodologies.

Docket no. 207 at 10. Contesting RBS's portrayal of Miller's due diligence, the FDIC states he interviewed the AVM's head developer for several hours, which is a "substantial length of time for experts to discuss a subject they already know well." *Id.*

Finally, RBS argues Miller does not have the "information needed to competently evaluate the DataQuick AVM, including essential information about its inputs, outputs and methodology." *Id.* at 6. He "did not review *any* of the code or algorithms used to program the DataQuick AVM . . . and thus cannot speak with any certainty about the specific process used by DataQuick to generate the AVM's opinions of value." *Id.* at 17. Because of this, RBS argues the DataQuick AVM is an "impermissible black box," and Miller's lack of

knowledge concerning its inputs makes it impossible for RBS to effectively cross-examine him. *Id.*

The FDIC, in response, argues courts regularly admit opinions based on proprietary software without requiring the testifying expert to review the underlying code, so long as the program was commonly used in the expert's field, and the FDIC argues AVMs from commercial vendors are widely used in the real estate industry and academia. Docket no. 207 at 12-13. Further, several of the cases FDIC cites allowed commercial AVMs. *See FHLB Seattle*, docket no. 207-4 at 7-8; *Franklin*, docket no. 207-5 at 1; *CMFG*, 2014 WL 3696233, at *14; *Assured Guar.*, 920 F. Supp. 2d at 505.

Having reviewed Miller's report and his declaration in support of the FDIC's response, the Court is satisfied that Miller adequately vetted the DataQuick AVM, and any perceived inadequacies in his evaluation can be explored on cross-examination. This is true also of RBS's concerns as to replicability. Finally, given Miller's experience with AVMs, his expertise in their methodologies, and the routine acceptance of commercial AVMs by other courts, the Court does not deem it necessary that Miller access the underlying source code of the AVM used. As the *FHLB Seattle* court stated,

> Miller is able to determine if there is a code error based upon output of the AVMs. Nor is it necessary, or even possible to review 'an algorithm,' as there is no single mathematical code to support the model. There are potentially millions of mathematical combinations for making adjustments in the appraisal emulation model. What is necessary to test the model was in fact performed, as extensively described in the report[] and declaration[] of Miller . . . .

*FHLB Seattle*, docket no. 207-4 at 6.

Thus, RBS's motion to exclude Norman Miller's testimony is DENIED.

## 2. RBS's Motion to Exclude Dawn Molitor-Gennrich's Testimony

Next, the Court turns to RBS's motion to exclude Dawn Molitor-Gennrich (docket no. 194).

### a. Qualifications

First, this Court must determine if Molitor-Gennrich is qualified to testify on the matters at hand. *Cooks*, F589 F.3d at 179. A party who moves to exclude expert testimony on qualification grounds must show that the expert does not possess a higher degree of knowledge, skill, experience, or education than an ordinary person. *See McCullock*, 61 F.3d at 1043. RBS does not appear to challenge Molitor-Gennrich's qualifications as an expert, but the Court will assess Molitor-Gennrich's qualifications and experience.

Molitor-Gennrich is a private consultant on matters of real property appraisals and appraisal services. She is a member of the Appraisal Institute (and was on its Board of Directors) and holds designations as a member who can provide reviews of residential appraisals and opinions of value, evaluations, reviews, consulting, and advice regarding investment decisions. Docket no. 187-3 at 7. She has, since 2009, "provided my expertise in the *Uniform Standards of Professional Appraisal Practice* (USPAP or the Uniform Standards) and the Appraisal Institute's *Code of Professional Ethics* as a peer review screener for the Appraisal Institute's Professional Practice area." *Id.*

Between 2002 and 2007, she served on the Appraisal Foundation's Appraisal Standards Board, which develops, interprets, and amends the USPAP. She is an Appraiser Qualifications Board-certified USPAP instructor. She previously worked for Union Bank and for the Bank of California in different appraisal-related capacities. *Id.* at 8. After a previous firm she co-founded ceased operations, she founded Dawn Molitor-Gennrich Consulting, LLC, which "provides consulting and litigation support services in the areas of

real property appraisal and appraisal review, including real estate valuations standards and guidelines, such as USPAP[.]" *Id.*

Having reviewed Molitor-Gennrich's report, the Court is satisfied that she has the necessary expertise to testify on its contents, to the extent they are reliable and relevant.

### b. Molitor-Gennrich's Report

Molitor-Gennrich was asked to evaluate the credibility, under USPAP, of Appraisal Reports relating to 666 of the underlying residential mortgage loans selected by another expert, Charles Cowan. Docket no. 187-3 at 22. This testimony pertains to the FDIC's claim that RBS's prospectus supplements materially misstated that the appraisals related to the loans underlying the RMBS at issue complied with USPAP.

Molitor-Gennrich states USPAP divides the appraisal process into development (the minimum practice requirements, which are set out in USPAP Standard 1) and reporting (Standard 2). *Id.* at 12. Standard 3 states the requirements for conducting an appraisal review. *Id.* Also relevant are the Ethics Rule (which requires that the appraiser act with the right intention) and the Competency Rule (which requires both that an appraiser have the knowledge to appraise a property and apply appropriate analytical methods in doing so). *Id.* at 13-15.

For each of the 666 loans, Molitor-Gennrich reviewed, if available, the Appraisal Report and other supplemental documents from the loan file, including the agreements of sale for the subject properties, contemporaneous reviews of the Appraisal Reports, and any workfiles that may have been included with the Appraisal Reports. *Id.* at 22-23. She developed a checklist form (the "Form") to collect information for each Appraisal Report, the intent of which was to see whether the Appraisal Report differed from various data sources available at the time the report was created, including Multiple Listing Services,

online local public records data, and aggregate public data sources (collectively, "Appraisal Materials"). *Id.* at 23. She hired a firm to complete the Form, trained the firm's appraisers to use the Form, and trained a separate team of appraisers to compare the results of the Form to the Appraisal Materials. *Id.* This latter team then screened the Forms and passed on to Molitor-Gennrich a subset that excluded those Forms with factual data discrepancies with the Appraisal Report. *Id.*

For this subset (375 of the 666 loans), she conducted a Standard 3 compliance review. *Id.* at 24. This involved a review of the Appraisal Report, Appraisal Materials, the Form, and any Supplemental Data. *Id.* This review included "viewing maps and aerial imagery of each subject property and the surrounding area from around the time period when the associated appraisal was conducted." *Id.* She recorded her opinions as to the credibility of the Appraisal Reports and compliance with the Competency Rule in another form she created, the USPAP Questionnaire. *Id.*

She states that, while minimal discrepancies did not trigger non-compliance in her review,

> an appraisal report is not credible if the factual data presented is determined to be inaccurate or cannot be confirmed to be accurate from reliable data sources; the analysis of the data is not clear; the valuation approaches are not appropriate or applied appropriately for the assignment; or the analysis required throughout the appraisal report and the reconciliation of conclusions does not tie the appraisal report together in a way that intended users can understand the rationale for the opinions and conclusions for the intended use.

*Id.* After review, she found that 365 of the 375 Appraisal Reports she reviewed were not credible. *Id.* She deemed a report not credible if it failed to comply with two of more of the benchmark rules in Standard 1: "[b]e aware of, understand, and correctly employ recognized methods/techniques necessary to produce a credible appraisal" (1-1(a)); "[d]o not commit a

substantial error of omission or commission that significantly affects an appraisal" (1-1(b));

"[d]o not render appraisal services in a careless or negligent manner, such as making a series of errors that, in aggregate, affect appraisal credibility" (1-1(c)). *Id.* at 26. The bulk of Molitor-Gennrich's report is comprised of illustrative examples of the ways specific appraisals fall short.

### c. Reliability

RBS argues Molitor-Gennrich's opinions are unreliable because she improperly relied on Appraisal Reports (without reviewing the appraisers' workfiles or interviewing appraisers) and on third-party data.

First, RBS argues Molitor-Gennrich's reliance on the Appraisal Reports, prepared to report appraisal findings to clients, is improper because they are "merely summaries and did not purport to contain all information used in producing the report." Docket no. 194 at 12. Because USPAP requires appraisers to prepare "workfiles" with information "necessary to support the appraiser's opinions and conclusions and to show compliance with . . . applicable Standards," RBS contends Molitor-Gennrich should have requested and reviewed these workfiles. *Id.* Alternatively, RBS argues she should have interviewed the appraisers to determine whether information that is not otherwise required in an Appraisal Report was actually missing from the appraisers' analysis. *Id.* In RBS's view, to conclude that the appraisals fell short of USPAP, "[t]he fact that details were not addressed in Summary Appraisal Reports is woefully insufficient given that, by definition, such summary reports were not intended to contain the detailed analyses Ms. Molitor-Gennrich claims to be missing." *Id.* at 13.

In response, the FDIC argues appraisal reviews do not require review of workfiles or appraiser interviews because USPAP states "[t]he subject of an appraisal review assignment

may be all or part of a report, workfile, or a combination of these." Docket no. 208 at 11. The FDIC notes that, according to USPAP, "a summary Appraisal Report must include sufficient information to indicate that the appraiser complied with the requirements of STANDARD 1" and must "summarize the information analyzed, the appraisal procedures followed, and the reasoning that supports the analyses, opinions, and conclusions." *Id.* at 12. The FDIC states no court has considered whether appraiser interviews are necessary, but the only court that has considered whether workfiles are necessary rejected that argument. *Id.* at 13 (citing *Mass. Mutual Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 2130060, at *11 (D. Mass. May 7, 2015)).

RBS distinguishes that case by arguing the expert in question, John Kilpatrick, applied "a wholly different methodology" than does Molitor-Gennrich and the court does not analyze the role of workfiles in that methodology. Docket no. 218-1 at 9. RBS is correct that Kilpatrick used a different method, but that methodology did not include a review of the workfiles (which the defendant in that case pointed to in attempting to exclude the testimony) and yet the court allowed Kilpatrick to testify as to the appraisals' credibility. Thus, based on this and other arguments raised by the FDIC, the Court is persuaded that it is not necessary, in clearing the *Daubert* reliability threshold, that Molitor-Gennrich have reviewed appraisal workfiles or conducted appraiser interviews. These choices can be explored on cross-examination.

Next, RBS argues Molitor-Gennrich's opinions are unreliable because she relied on unverified third-party data, including data from Google Earth, Multiple Listing Services, and a housing price index. Docket no. 187-1 at 14-16. These arguments, however, go to weight, not admissibility. *See United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("As a general rule, questions relating

to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). Thus, the Court finds Molitor-Gennrich's testimony sufficiently reliable.

### d. Relevance

Next, RBS argues Molitor-Gennrich's testimony is not relevant. First, RBS argues Molitor-Gennrich's opinions are irrelevant because she admits she "did not make a judgment as to whether the original appraisers honestly held the opinions of value that are stated in their reports[.]" Docket no. 187-1 at 16. But it would have been improper for her to testify as to the original appraisers' state of mind, as multiple courts have concluded. *See Massachusetts Mut. Life Ins. Co.,* 2015 WL 2130060, at *13 (D. Mass. May 7, 2015) ("Dr. Kilpatrick may not directly testify as to the original appraisers' state of mind, but he may testify as to the appraisals' 'credibility.'"); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201-DLC, 2015 WL 353929, at *6 (S.D.N.Y. Jan. 28, 2015) ("Evidence of the extent to which the Nomura Appraisals conformed to industry standards is a distinct inquiry from the issue of an individual appraiser's belief and whether it was honestly held. While the former may provide circumstantial evidence regarding the latter, it is not inadmissible on that score.").

The Court adopts the following reasoning of the *Nomura* court:

> The term "credibility" is a defined term in USPAP. It reflects an objective assessment of an appraisal. It imposes on appraisers the obligation to support an appraisal by evidence and logic. Thus, credible appraisals are those that have complied with USPAP standards. Whether a particular appraisal does so comply is a classic subject for expert testimony.
>
> The defendants contend that Kilpatrick's testimony about the credibility of appraisals is nothing more than an improper attempt to opine on the honesty of appraisers. They are wrong. Evidence of the extent to which the Nomura Appraisals conformed to industry standards is a distinct inquiry from the issue of an individual appraiser's belief and whether it was honestly

> held. While the former may provide circumstantial evidence regarding the
> latter, it is not inadmissible on that score.

*Nomura Holding Am., Inc.*, No. 11-CV-6201-DLC, 2015 WL 353929, at *6.[4] In addition to

arguing that Molitor-Gennrich's opinions that many appraisals were not credible represents

circumstantial evidence that the appraisers did not believe the values in their appraisals, the

FDIC also argues the opinions are relevant to the FDIC's allegation that RBS's statements

about LTV values were misleading. Docket no. 208 at 19. At summary judgment, Judge

Sparks noted this "could prove actionable even without evidence of subjective falsity."

Docket no. 154 at 12. On either basis, the Court finds Molitor-Gennrich's testimony relevant.

## CONCLUSION

For the foregoing reasons, Defendant RBS's motion to exclude the testimony of

Norman Miller (docket no. 192) is DENIED.

Further, Defendant RBS's motion to exclude the testimony of Dawn Mollitor-

Gennrich (docket no. 194) is DENIED.

It is so ORDERED.

---

[4] RBS argues the *Nomura* court's reasoning should not apply because the expert there, Kilpatrick, used a different methodology and the *Nomura* court based its holding on "other evidence" in the case. Docket no. 218-1 at 11-12 (citing *Nomura*, 104 F. Supp. 3d 441, 508 (S.D.N.Y. 2015)). But the *Nomura* order RBS cites sets out fact findings and legal conclusions following a bench trial. That order weighed whether, coupled with other evidence, Kilpatrick's opinions on the appraisals' credibility was "sufficient circumstantial evidence of bias to permit a determination that the appraisers produced appraisals that they knew did not accurately describe the value of these properties." The order the Court cites is an earlier ruling on the admissibility of Kilpatrick's testimony. Here, the Court does not decide whether Molitor-Gennrich's testimony is sufficient circumstantial evidence, only that the Court is satisfied, for relevance purposes, that it could constitute such evidence, particularly when coupled with other evidence (as in *Nomura*).

SIGNED this 26th day of March, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE